SIERRA CLUB, Natural Resources Defense Council and National Parks Conservation Association, Plaintiffs,

v.

Lt. Gen. Carl A. STROCK, Chief of Engineers, United States Army Corps of Engineers, and H. Dale Hall, Director, United States Fish and Wildlife Service Defendants,

and Miami–Dade Limestone Products Association, Inc., Vecellio & Grogan, Inc., Tarmac America LLC, Florida Rock Industries, Inc., Sawgrass Rock Quarry, Inc., Apac–Florida, Inc., Rinker Materials of Florida, Inc., Kendall Properties and Investments, Defendant–Intervenors.

No. 03 23427 CV.

United States District Court, S.D. Florida.

July 13, 2007.

Bradford H. Sewell, Lawrence M. Levine, S. Ansley Samson, Natural Resources Defense Council Inc., Stanley N. Alpert, Alpert Firm, New York, NY, Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, DC, Paul Joseph Schwiep, Coffey Burlington, Miami, FL, for Plaintiffs.

Mark A. Brown, Michael Semler, United States Department of Justice, Wildlife & Marine Resources Section, Norman L. Rave, Jr., Barry Alan Weiner, United States Department of Justice, Environment & Natural Resources, Washington, DC, for Defendants.

Douglas Martin Halsey, Thomas Neal McAliley, White & Case, Elizabeth Brooks Honkonen, Michael Nachwalter, Kenny Nachwalter Seymour Arnold Critchlow & Spector, Edward George Guedes, Elliot H. Scherker, Greenberg Traurig, Franklin G. Burt, Richard J. Ovelmen, Jorden Burt LLP, Miami, FL, Lawrence R. Liebesman, Rafe Petersen, Holland & Knight, Washington, DC, Martin John Alexander, Holland & Knight, West Palm Beach, FL, John A. Devault, III, Bedell Dittmar Devault Pillans & Coxe, Jacksonville, FL, Kenneth B. Hayman, Department of Envi-

ronmental Protection, Tallahassee, FL, for Defendant–Intervenors.

Charles H. Baumberger, Rossman Baumberger Reboso & Spier, Miami, FL.

## ORDER SUPPLEMENTING COURT'S ORDER OF MARCH 22, 2006

HOEVELER, Senior District Judge.

THE COURT has before it the question of what further relief, if any, should be granted to Plaintiffs in light of the Court's conclusions that the Defendants had committed multiple violations of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.; the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq.; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.[1] These violations occurred in relation to the issuance of CWA § 404(b) permits in April 2002 to nine private corporations[2] for the destruction of approximately 5,400 acres of wetlands in order to remove the underlying limestone for processing into cement, concrete blocks, and other products. The Court's Order granting summary judgment for Plaintiffs found that Defendants, the United States Army Corps of Engineers ("Corps") and United States Fish and Wildlife Service ("FWS"), had made numerous decisions lacking a rational basis and had failed to consider all relevant factors in their permitting decision; further, the Court found that the record in this case prior to issuance of the permits compelled the conclusion "that the permits should not have been issued." *Sierra Club v. Flowers,* 423 F.Supp.2d 1273, 1379 (S.D.Fla.2006). The Defendants were directed to prepare a legally sufficient Environmental Impact Statement ("EIS"), i.e., a supplemental EIS ("SEIS"), and to engage in formal consultation regarding the impact on protected species, at a minimum. As will be further detailed below, the Court now has concluded—based upon the additional information presented by the parties—that not only should the permits not have been issued in April 2002, but also that these permits must be set aside today. The following findings therefore supplement and affirm those in the Court's Order entered March 22, 2006, reported at *Sierra Club v. Flowers,* 423 F.Supp.2d 1273 (S.D.Fla.2006).

## I. INTRODUCTION

The Court's Order granting summary judgment for Plaintiffs requested briefing from the parties to assist the Court in determining an appropriate remedy in light of current developments in the case.[3]

---

1. Summary Judgment was granted on March 22, 2006, on behalf of Plaintiffs as to each of the following claims (i.e., as to all claims which had not already been dismissed voluntarily by Plaintiffs): Count I (Corps' issuance of the permits/Record of Decision ("ROD") in compliance with CWA and APA), Count III (Corps' compliance with ESA), Count IV (FWS' compliance with APA), and Count V (Corps' preparation of Environmental Impact Statement ("EIS"), and failure to issue SEIS pre-ROD, in compliance with NEPA and APA). *See* Docket No. 26, April 6, 2004 (Amended Complaint); *Sierra Club v. Flowers,* 423 F.Supp.2d 1273, 1380 (S.D.Fla.2006).

2. Eight of the nine corporations have intervened in this action (only Sunshine Rock has not). A tenth corporation, the Lowell Dunn

Company, did not obtain its permit until October 2004, i.e., more than two years after the date of the ROD and the issuance of the other nine permits, and thus its permit has not been considered during these proceedings. Presumably, if the Corps based their decision to issue that permit on the same process and data which has been found by this Court to compel an opposite conclusion, i.e. denial of the permit application, then that permit would suffer similar deficiencies if re-evaluated by the Corps.

3. The administrative record upon which the Court relied in granting summary judgment was limited to information before the agencies prior to issuance of the permits in April 2002. Because the Court presumed that pertinent developments had occurred between

Because the Intervenors (members of the limestone mining industry) alleged that they faced a significant disruption in their mining businesses if the Court were to determine that a prohibition against further mining was appropriate, the Court granted their request for an evidentiary hearing. The Court also participated in a view of the area by helicopter, and visited representative sites on the ground to more thoroughly evaluate the scope and context of the mining activities and their impacts.[4] The Court witnessed mining activities proceeding at that time (and already had learned that the Corps had taken no action to limit any of the mining activities during the period of supplemental environmental analysis ordered by this Court).[5]

During a six-month period spanning from mid-June through December 2006,[6] the Court heard extensive argument from the parties and received a total of 32 days of testimony[7] and approximately 440 exhibits. During the hearing, the Court frequently announced its intention to learn as much as possible about the facts of this case and to hear all of the evidence.[8] In addition, the Court permitted the parties

April 2002 and the Court's Order in March 2006 (a four year period), and because the Supplemental Administrative Record ("SAR") which had been submitted prior to the summary judgment briefs extended only through April 2004, the Court requested briefing from the parties so that the Court's decision on remedies would be based on current information as to the status of the mining, the alleged impacts to the environment, and other issues related to the permits.

4. While the Court first raised the suggestion of a site visit, Plaintiffs had previously requested permission from Intervenors to access their mining sites and subsequently filed a motion asking this Court to schedule a Court-attended aerial inspection. All parties cooperated in scheduling that site visit, and the Intervenors provided the helicopter transportation, which was appreciated by the Court.

5. Despite the Court's ruling in March 2006 detailing the environmental risks of this permitted activity, the Corps elected to proceed without any disruption of the mining process during the approximately eighteen months anticipated, at a minimum, for completion of Defendants' supplemental review. "[T]he Federal Defendants believe that the public interest is best served by leaving the permits in place and allowing mining to continue in accordance with the existing permits during the remand period." Docket No. 119, filed May 5, 2006, p. 2. The Defendants' eighteen-month estimate of time may be less than what will be required. Intervenors' counsel noted in his opening statements that the remand period would be from 18 to 36 months, Tr. 53, 54, thus it would approach the scheduled end of the entire permitted period. In any event, wetlands continue to be destroyed today, fifteen months after this Court's Order invalidating these permits was entered, despite this Court's extensive comments regarding the insufficiency of the environmental analysis upon which the Corps had relied in issuing these permits.

6. Efforts to schedule the hearing dates more promptly were frustrated by the conflicting schedules of the numerous attorneys participating in the hearing, and occasionally by the Court's other scheduled hearings and trials. Plaintiffs were represented by a total of six attorneys, Defendants by four attorneys, and Intervenors by twelve attorneys. See Docket (listing counsel of record). The number of attorneys actively participating in the hearing averaged at least eight each day, including a minimum of four attorneys for Intervenors. In this Order, the Court occasionally has referenced statements made by counsel for the respective parties. It is this Court's custom not to identify counsel by name; thus, "Intervenors' counsel" may refer to any of the twelve attorneys representing the Intervenors.

7. Thirty-two witnesses appeared in court, and the parties relied on the deposition testimony of another eleven witnesses.

8. The Court also granted the Intervenors' extraordinary request to present surrebuttal testimony and, on several occasions, permitted Intervenors' witnesses to answer questions as to which sustainable objections were raised— in order to provide them with as great an opportunity as possible to represent their substantial financial interests. The Court has considered all of the testimony in this case

to file post-hearing briefs, which total nearly 300 pages. The Court has carefully studied all of these materials. While the Defendants and Intervenors have urged this Court to accept that the Defendants' ongoing supplemental environmental review is proceeding properly, the Court has significant doubts in light of the evidence regarding continuing violations of governing regulations.

Shockingly, the Court learned for the first time during the evidentiary hearing, in June 2006, that benzene, a carcinogen,[9] had been detected as early as January 2005 in the water being pumped from the Biscayne Aquifer ("Aquifer"), "the primary source of drinking water for the Miami–Dade County area." AR1028,[10] p. 4. The contamination was found in the area where limestone mining, which uses explosives [11] to remove the limestone from the Aquifer, is proceeding pursuant to the challenged permits. The contamination was so significant [12] that Miami–Dade County's Water and Sewer Department ("WASD") (the agency responsible for the delivery of drinking water for the County) shut down seven of the fifteen production wells which draw water from the Aquifer in that area, known as the Northwest Wellfield ("Wellfield"), and pump it to water treatment plants several miles away.[13] More than two years after the initial contamination incident,[14] Miami–Dade County's Department of Environmental Resources Management ("DERM"), the agency responsible for protecting the Wellfield, announced that it could not eliminate the mining-related blasting as a source of the benzene.[15] DERM's report concluded that the

and given appropriately less weight to that testimony which was beyond an expert's area of expertise or arguably was hearsay.

9. "Benzene is a chemical that is known to cause cancer." Tr. 455 (Dr. Susan Markley)

10. Document number 1028 of the Administrative Record ("AR").

11. The explosives being used by the permittees at the time the benzene was discovered included fuel oil which contained benzene.

12. Benzene had never previously been detected in the vicinity of this wellfield at anywhere near the levels observed, one of the monitoring wells had levels of 14.9 to 50.9 parts per billion ("ppb"), which were "several times higher than had been previously detected anywhere in the vicinity of the [Wellfield]." Docket No. 366, filed March 16, 2007 (Intervenors' Notice of Filing, Attachment 1, WASD Corrective Action Plan/Reactivation Plan, last revision date February 5, 2007 ("CAP"), p. 2). According to state drinking water standards the maximum allowable concentration of benzene is 1.0 ppb. *Id.* (citing Primary Drinking Water Standard, F.A.C. Chapter 62–550).

13. "The Northwest Wellfield is Miami–Dade's largest single source of water supply, [authorized by state water regulators] to provide 155 million gallons per day to the northern half of

Miami–Dade County, [it] is the water supply for approximately one million people. The water from the Wellfield is pumped to the Hialeah–Preston Water Treatment Plant where it is treated and distributed." Intervenors' Exh. 17 (Memo from William Brant, Director, WASD, to George Burgess, County Manager, June 14, 2004).

14. DERM's report was published after the conclusion of the evidentiary hearing before this Court, but has been submitted by the Intervenors for consideration by the Court. Docket No. 366, filed March 16, 2007. The Court hereby GRANTS Intervenors' Motion to Admit Into Evidence Certain Recently Released Public Records (including DERM's report), Docket No. 374.

15. WASD already had initiated a comprehensive investigation into the benzene contamination, installing monitoring wells, participating in multiple sampling events, and incurring costs of more than one million dollars, before being redirected from the investigation by County management who determined that DERM was the proper agency to conduct the investigation. Tr. 2377–79 (Ana Caveda), Plaintiffs' Exh. 144. The personal opinions of senior WASD professional staff who conducted the investigation were that the mining-related blasting activities were the likely

two reported contamination periods (January 2005 to February 2006, and a second episode beginning in August 2006) were *not* caused by several other potential sources.[16]

Despite protestations to the contrary, it appears likely that the Corps-permitted mining activities, specifically the blasting used to dislodge the limestone [17] from the Aquifer, are a source of the benzene. A significant portion of the mining occurs in this same Wellfield where the contamination was discovered—some of the active mining operations are less than 3000 feet from the production wells. The Court need not determine conclusively [18] whether

source of benzene. "In my [personal] opinion, [benzene] was probably caused by the blasting," Tr. 1300 (Pitt); "[Blasting] was the most likely of the sources that we identified," Tr. 2366 (Caveda). The Court found these two witness' testimony credible, and notes that the Deputy Director of WASD, Dr. Douglas Yoder, acknowledged Pitt's opinion, but asserted that WASD was relying on DERM's investigation and conclusion that there was "insufficient evidence" to know where the benzene was coming from. Tr. 4281–83 (Dr. Douglas Yoder). Recently, DERM reported to the County that "[b]ased on the frequency of blasting operations in the vicinity of [production well 1] as well as the volumes of diesel fuel utilized, the rock mining operations represent a potential source for the benzene contamination documented." Docket No. 366 (Executive Summary of Northwest Wellfield Benzene Investigation, prepared by DERM, February 2007 ("Executive Summary of Investigation")), p. 6. Despite WASD's investigation, and DERM's own hypotheses, Wilbur Mayorga, the Chief of DERM's Pollution Control Division and the person assigned to be the "liaison" to the mining companies during the benzene investigation, Tr. 4690 (Mayorga)), maintains that "to date the source of the contamination has not been found." *Id.*

16. WASD already had initiated a comprehensive investigation into the benzene contamination—installing monitoring wells, participating in multiple sampling events, and incurring costs of more than one million dollars—before being redirected from the investigation by County management who determined that DERM was the proper agency to conduct the investigation. Tr. 2377–79 (Ana Caveda), Plaintiffs' Exh. 144. The personal opinions of senior WASD professional staff who conducted the investigation were that the mining-related blasting activities were the likely source of benzene. "In my [personal] opinion, [benzene] was probably caused by the blasting," Tr. 1300 (Pitt);

"[blasting] was the most likely of the sources that we identified," Tr. 2366 (Caveda). The Court found these two witnesses to be very credible, and notes that the Deputy Director of WASD, Dr. Douglas Yoder, acknowledged Mr. Pitt's opinion, but asserted that WASD was relying on DERM's investigation and conclusion that there was "insufficient evidence" to know where the benzene was coming from. Tr. 4281–83 (Dr. Douglas Yoder). Despite WASD's investigation, and DERM's own hypotheses, Wilbur Mayorga, the Chief of DERM's Pollution Control Division and the person assigned to be the "liaison" to the mining companies during the benzene investigation, Tr. 4690 (Mayorga), testified that "to date the source of the contamination has not been found." *Id.* Recently, DERM reported to the County that "[b]ased on the frequency of blasting operations in the vicinity of [the contamination] as well as the volumes of diesel fuel utilized, the rock mining operations represent a potential source for the benzene." Executive Summary of Investigation, p. 6.

17. It is "necessary to blast to fracture the stones so they can be mined." Tr. 4969 (Albert Townsend, testifying on behalf of permittee/Intervenor Tarmac America LLC ("Tarmac")).

18. Making a conclusive determination that blasting is *the* source of the benzene contamination may have ramifications as to liability for remediation costs, etc.—therefore it is not surprising that the County pursues the investigation carefully. However, a failure by the Corps to take certain minimal steps, e.g., inspecting the blasting locations and materials used by the active mining operations, which might reduce the risk of further contamination from this potential source is surprising in light of conditions in the permits themselves relating to protection of the Wellfield from contamination, including the prohibition of

the benzene originated from mining-related blasting as the contamination itself (and the Corps' failure to treat it as significant) is sufficient to expose the Corps' ongoing violations and dereliction of their duties under the CWA, NEPA, and APA.[19] When the Court questioned the Defendants' primary witness as to why the benzene contamination had not been included in the report of the Corps' "Three Year" review required by the permits,[20] his response was: "[W]e don't have any clear indication from the County that it's a problem." Tr. 2776 (John F. Studt).[21]

The Corps' shifting of responsibility to the County,[22] combined with a complete failure to advise not just this Court (during the pendency of these proceedings) but

mining within a certain distance from the production wells.

19. "Congress has charged [the Corps and FWS] with acting in the public interest." Tr. 7189–90. The Corps' apparently unyielding determination to approve mining, regardless of the demonstrated risks of adverse impacts, demonstrates that they did not act in the public interest prior to issuance of these permits, nor during the time when they should have been monitoring and enforcing the terms and conditions of the permits.

20. The report of the Corps' "Three Year" review was filed in April 2006, a full year after it was due. It also failed to provide the public—to the extent that this document presumably was available to the public—with adequate information about this Court's Order on Summary Judgment and the Court's finding of significant violations by the Defendants. "An Order on Motions for Summary Judgment dated March 22, 2006, was received ... and is under review by the Corps for required actions." Docket No. 103 (Memorandum for Record, dated April 19, 2006, p. 14 of Exh. B to Declaration of John F. Studt, Chief, South Permits Branch, Regulatory Division, Jacksonville District, dated April 24, 2006 (" 'Three Year' review report")). Indeed, despite the Court's findings regarding the inadequacy of the Defendants' analysis of potential impacts on the wood stork, the "Three Year" review report repeats the prior assessment (of consultants hired by the permittees) that "the Lake Belt 10–Year Mine Plan is not likely to adversely affect the wood stork." This is a conclusion which the FWS now has admitted was incorrect; the Biological Opinion, issued August 31, 2006, announces that there will be a "take" of wood storks under the current mining plan. Docket No. 241, filed September 1, 2006 (Defendants' Notice of Filing Biological Opinion ("BO")).

21. Although the Corps' witness, John Studt, testified that the Corps didn't "have any clear indication from the County that [the benzene was] a problem," Tr. 2776, Studt himself was in written contact with the acting Director of DERM in late January 2006 and received a copy of a January 2006 County memorandum on potential contamination of the Wellfield in general. The memorandum noted that studies conducted by the United States Geological Survey ("USGS") indicated that the County's wellfield protection zones (on which the Corps' mining prohibition was based) "might not be sufficient to minimize the risk to the public" and that a necessary protective buffer around the production wells would be "substantially greater" than the current zones. Plaintiffs' Exh. 149. The County's statements are clearly relevant to the Corps' determination of adverse environmental impacts from the mining in this Wellfield and should have triggered, at a minimum, further investigation by the Corps—including, perhaps, consultation with the EPA about the water quality issues. ("I did not consult separately [with the EPA about benzene], no .... I know we did not coordinate [our 'Three Year' report with EPA] in writing." Tr. 2684, 2699 (Studt).) Moreover, Corps staff also received messages from DERM as early as February 2005 describing the benzene contamination as an "emergency" and an "immediate public health hazard." Plaintiffs' Exh. 150. Regardless of the quantity of communication received by the Corps, it is undisputed that the Corps knew about the benzene incident almost immediately after it occurred, knew that it might be related to the mining, and still did nothing to limit the mining. Defendants' counsel correctly noted that "just because the County has been silent [about the need to stop the mining because of the contamination risks] ... that alone is not dispositive." Tr. 7170.

22. *See* n. 21, *supra*.

also the public as to the contamination of the Wellfield by benzene and the potential connection to the mining activities,[23] eliminated the possibility of meaningful public participation required by NEPA and the CWA.[24] In summary, the Corps' lack of concern about the benzene contamination represents a failure to fulfill its legal obligations to conduct the agency's permitting activities with transparency.[25] This is just one example of the many errors made by the Corps in failing to provide accurate information for public assessment and review throughout the permitting process.[26]

**23.** It bears observation that if the Corps had filed the "Three Year" review by December 31, 2005, as promised (*see* Docket No. 56, filed May 2, 2005, Notice to Court), and if the Corps had been candid about the benzene contamination which had already occurred, then this Court's Order in March 2006 should have vacated the permits. The Court presumes that counsel for the Defendants did not have access to information concerning the benzene contamination at the time of filing their "Notice to Court" on May 2, 2005, nor when they filed their "Notice of Filing" on September 27, 2005, as they asserted in those submissions that the Corps' ongoing (and delayed) review of the permits at issue "[did] not materially affect any of the argument presented in the summary judgment briefs." The "Three Year" review reports that the status update from the mining industry, dated March 15, 2005, indicates "excellent water quality in both the active and inactive mining lakes" and that neither cryptosporidium nor giardia, "the principal potential contaminants of concern regarding the Northwest Wellfield, have been found in any of the lake, ... monitoring well, or production well samples through the end of 2004." Docket No. 103. The foregoing statement is not incorrect, but may be viewed as somewhat misleading in light of the fact that the miners' report was written, and then adopted by the Corps, at a time when the County had shut down almost half the production wells in the Wellfield due to the highest level of benzene contamination ever seen in that Wellfield and which County regulators believed had been caused by blasting related to mining. In light of the record as now developed, i.e., that the Corps knew of the benzene contamination as early as February 2005, and was present at a meeting in May 2005 at which the benzene issue was discussed, Plaintiffs' Exh. 108, Intervenors' Exh. 15, it would have been a serious mistake for counsel to have failed to advise the Court of this information if it was in counsel's possession. Clearly, the Corps should have informed this Court, through counsel, that the benzene contamination had been discovered, that it was significant, and that blasting related to activities authorized by the permits under review by the Court was considered to be one of the sources.

**24.** The Defendants' approach also leads to a corruption of the applicable federal environmental regulatory tests for approving activities in wetlands. Instead of conducting an analysis which assesses risks and balances harms, the Defendants imply that if Plaintiffs cannot specify "what levels of organisms may be present" in the mining pits, Docket No. 350, p. 15, then the Corps is free to blithely rely on the County management's assertions that the safety of the drinking water supply is adequately protected—despite evidence to the contrary, such as the fact that the necessary upgrades to the water treatment plants (to treat the contaminated water from the Wellfield) will not be completed until at least four to five years from now. Tr. 4291 (Dr. Yoder).

**25.** The regulations specifically state that "public scrutiny" is essential to implementing NEPA. 40 C.F.R. § 1500.1(b), *see also Sierra Club v. Marsh*, 976 F.2d 763, 770 (1st Cir. 1992) ("public disclosure is a central purpose of NEPA"). As previously stated by the Court, "the deferential judicial review of an agency's actions should oblige that agency to disclose fully the reasoning behind its decisions in order to demonstrate clearly that such decisions were issued in compliance with governing laws—such candor would ensure that our nation's environmental laws are respected." *Sierra Club*, 423 F.Supp.2d at 1285.

**26.** The Court addresses in further detail below the Corps' continuing errors, e.g., a failure to protect the Aquifer, the loss of endangered wood stork foraging habitat, the destruction of archaeological sites by the mining operations, and a failure to establish and enforce adequate mitigation requirements.

Defendants' lack of transparency and clarity in the permitting process also have made the "public interest" issues [27] difficult to grasp in this case. It is impossible to discern precisely what is at issue under these permits with respect to the number of acres to be mined, the precise locations and types of mining impacts at any given point in time, and the total length of time during which the mining activities may proceed.[28] Defendants rely on the permittees to report the number of acres mined and wetlands impacted, but the permittees use different descriptive terms than those used by the Defendants—raising a question as to whether there is or could be any meaningful monitoring to ensure the accuracy of the reporting of impacts.[29] The Defendants offered very little [30] to support their untenable position that the alleged benefits to the economy outweigh risks of environmental harm from the continued mining.[31] Nor is it an easy task to test the Intervenors' arguments that there are in-

27. The Corps' public interest review of all permits is described in 33 C.F.R. § 320.4(a).

28. Despite the fact that the ROD references a total of 5,409 acres of impacts, AR1028, p. 5, and the Biological Opinion ("BO") states that the mining footprints now total 5,712.2 acres (of which reportedly only 4,521 acres are wetlands), BO, p. 2, the BO claims that "[n]o increase in the total area permitted for mining has resulted from [the permit modifications since 2002]." BO, p. 4.

29. For example, the ROD itself references three sources of estimates of the "acres of impact" of the proposed mining—each of which yields a different amount e.g., the estimated impacts for Sunshine Rock range from 38.04 acres to 70.1 acres, AR1028, p. 5, 7. The permit issued to Sunshine Rock states that it relates to "the placement of fill material in waters of the United States, covering approximately 68.7 acres." AR1055. The recently issued BO references "acres of fill/excavation" or "actual mined acreage" and "wetland impacts," e.g., for Sunshine Rock, a total of 45 acres of fill/excavation are permitted including 9 acres already mined as of early 2005, and an additional 42 acres, all of which have been cleared of vegetation (note that the sum of these two numbers exceeds the total amount permitted), BO, p. 13. The *Lake Belt 2005 Annual Report* (the most recent Annual Report submitted to the Court) describes "lake" acreage, "disturbed" acreage, "mining," and "wetland impacts" as of February 2005; the reported acres of "lakes" and "disturbed" areas apparently include activities already completed before these permits were issued, e.g. Sunshine Rock is described as having a total of 113 acres of "lake" acreage, another 34 acres of "disturbed" acreage, and the company reportedly generated only 5 acres of "mining" and no "wetland impacts" between April 2004 and February 2005. Plaintiffs' Exh. 16, Table 2. The figures for other permittees are similarly discrepant.

30. The Defendants presented only three witnesses (all of whom are employed by Defendants and none of whom are responsible directly for the regular monitoring of the activities pursuant to these permits nor were they able to testify specifically as to the numbers of acres impacted to date or planned to be impacted in the future), and less than thirty exhibits. Indeed, the Defendants presented their own employees as "experts"—which is emblematic of the often-observed problem presented when testimony is offered by individuals who have been hired to give a specific "expert" opinion, rather than an opinion that is unquestionably free of bias. To be clear, the Court is not suggesting that the employees who testified on behalf of their employer, nor the other experts who testified in this case, were anything less than credible; the entire record in this case, however, evinces a significantly flawed decision making process—one that relied on a number of assumptions rather than on independent verification and analysis of relevant claims—and which produced unlawful outcomes by those federal agencies entrusted with protecting our national natural resources. In short, the pertinent public officials have failed to "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

31. Defendants' argument that this mining results in benefits for Everglades restoration is based on financial concerns. The alleged benefits are that the mitigation fee paid for

sufficient alternative sources of limestone to replace the rock being harvested under these permits, and that any reduction in mining will be devastating to the mining companies,[32] their employees, and the population in general.[33] Without an accurate baseline against which to measure the planned future mining impacts, and in light of the widely varying mining production levels of the different permittees, it is difficult to assess whether there might be alternative sources for some of the mining activities for at least some period of time.[34]

As noted in this Court's earlier Order, the Court's duty is to "immerse" itself in the evidence and determine whether the agency decision was rational and based on consideration of the appropriate factors. The Court has endeavored to understand the full extent of the scientific evidence regarding the conditions of the Aquifer and its vulnerability to contamination.[35] From a review of the evidence, the Court has understood the primary message to be essentially undisputed:[36] the deep, vast quarry pits left behind from the mining

each ton of rock provides funds to acquire wetlands for conservation and that the mined limestone products provide a ready supply of materials for purchase and use by the Corps in its construction projects related to Everglades restoration. This argument is of little persuasive effect in the context of the extensive adverse environmental impact of this permitted mining. Moreover, the Corps has not demonstrated that it will be unable to meet the alleged additional costs if mining is discontinued in these wetlands.

32. Moreover, the multi-national nature of most of the corporations who are mining under these challenged permits, and the recent purchase of permittees Florida Rock and Rinker by competitors (and non-permittees) Vulcan and CEMEX, respectively, see discussion, *infra,* render it rather difficult to measure the impacts of this Court's ruling on the specific permittees themselves.

33. Throughout the hearing the parties' acrimony was generally subdued; in their briefs, however, Intervenors accuse the Plaintiffs of being "callous" regarding the "devastating economic impacts that will flow from vacation of the permits or an enjoining of mining," Docket No. 352, p. 2, and Plaintiffs point to the "huge annual profits" accumulated by the intervenors for several years' worth of business activity, i.e., the sale of mining products, despite the fact that "they have yet to, and may never, satisfy the stringent standards for destroying the wetlands at issue," Docket No. 356, p. 12. While the Intervenors' predictions that *any* halt in mining by the Court would lead to "[m]assive unemployment" and a "recession throughout South Florida," Docket No. 352, p. 112, appear to be at least mildly inflated, it is also true that

Plaintiffs must not fault corporations for proceeding to operate profitably when the Corps has improvidently authorized permits for these privately profitable activities.

34. Because these permitted actions involved an industry which claims to be so vital to the regional and statewide economy, this Court granted the evidentiary hearing and has considered all of the evidence offered post-ROD. If such a vital industry was not involved, this Court would have ruled originally that the Corps and FWS had not done their job and that all permitted actions must cease immediately.

35. Hydrology and the other relevant sciences are obviously not the area of this Court's academic expertise. Many of the witnesses who testified have decades of experience in the pertinent fields and rely on data and analysis which, while commensurate with such experience, is somewhat impenetrable to those without formal training in the field.

36. Intervenors' counsel made the following candid admission during his closing argument. "Obviously, the fact is that water is moving faster [in the Aquifer]. No one's disputing that the data that was used 20 years ago to develop the [setback distances] around the Wellfields, well, it's been superseded by more recent data." Tr. 7234. Unfortunately, counsel proceeded to (presumably inadvertently) misstate the facts regarding the history of benzene contamination in the Wellfield. "So if it had been an issue, as [Plaintiffs] suggest, that the actual detonation of [blasting] emulsion was creating benzene, it would have come up somewhere. It would have come up somehow over the last 50 years. . . . It came up nowhere until January

activity expose the Aquifer (and the drinking water drawn therefrom by the pumps in the Wellfield) to a greater risk of contamination than if the pits were not present.[37] Regardless of whether the existing or planned municipal water treatment facilities will be able to treat those incidents of benzene contamination which already have occurred, or any potential future contamination by benzene or pathogens such as cryptosporidium or giardia, it nevertheless remains an exceedingly significant occurrence that a previously pristine Aquifer has suffered these grave problems. The Court finds that the evidence clearly establishes that the CWA and ESA compel denial of these mining permits, and also that the Corps' governing regulations, as well as the intent and letter of NEPA and the APA have been violated by the Corps' issuance of these permits.[38] The principles governing judicial review of agency actions direct that the Court approve an agency decision even if the Court disagrees with the agency,[39] as long as the agency's conduct is compliant with the law, i.e., is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law." 5 U.S.C. § 706(2)(A).[40]

---

2005, when they've been doing this [mining] out there for 50 years. So it's plainly something that is of concern, but there's just no logical connection why suddenly, suddenly, this particular activity could be the explanation."
Tr. 7240. William Brant, former Director of WASD, testified persuasively that, looking back at sampling over the years, "there were occasional hits of benzene.... [Y]ou would see it one time and then it would not be there for another year or so." Tr. 1494. "In the early years of [sampling], when you have very few samples [sampling occurred only once per year, generally] low levels of benzene were detected, not very high." Tr. 6552 (Dr. Hennet). The infrequency of the County's sampling in this area in the past ("the data is pretty sparse for 40 years of blasting," Tr. 6552 (Dr. Hennet)) has been suggested as an explanation for the sporadic nature of indications of benzene, Tr. 6551–52 (Dr. Hennet), as well as the relative lack of indications of pathogens such as cryptosporidium and giardia, Tr. 291–94 (Dr. Huffman).

**37.** Although the Intervenors argue that there is an inherent risk of contamination of the Aquifer from the wetlands themselves and existing canals near the Wellfield (i.e., from water bodies that are not mining pits), they have not provided evidence to disprove the overwhelming evidence that the existence of the mining pits on top of the Aquifer renders it more vulnerable to contamination, by facilitating more direct interaction with the Aquifer, than if the pits were not present.

**38.** NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "The President, the federal agencies, and the courts share responsibility for enforcing [NEPA] so as to achieve the substantive requirements of section 101 [of NEPA]." 40 C.F.R. § 1500.1(a). Section 101 of NEPA declares that

[I]t is the continuing responsibility of the Federal Government to use all practicable means ... [so] that the Nation may fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences; ... enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b).

**39.** As noted in this Court's March Order, *Sierra Club*, 423 F.Supp.2d at 1310 n. 110, "[w]hether the Court would have reached the same conclusion is irrelevant, 'the agency must merely have reached a conclusion that rests on a rational basis.'" *City of Oxford v. F.A. A.*, 428 F.3d 1346, 1352 (11th Cir.2005).

**40.** This Court must not "substitute its judgment for that of the agency." *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246

However, "[t]he failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986),[41] and subjects the agency action to reversal according to the APA. 5 U.S.C. § 706(2)(a).

It appears that the primary issue in this case from the Defendants' perspective may be the question of whether there were other available sources of readily accessible limestone outside the permitted area,[42] rather than a focus on the impacts on wetlands and the Aquifer.[43] This conflict

(11th Cir.1996), *citing Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This Court also must not engage in "undue judicial interference." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (court can only compel agency to act when the agency had an enforceable duty to do so). The unique facts and procedural posture of this case suggest that—far from this Court's Orders being perceived as "undue judicial interference"—it appears that the Court's rulings may fall on deaf ears.

**41.** The Department of the Army has acknowledged on a national level that the Corps has been deficient in ensuring compliance with mitigation required in permits pursuant to 33 C.F.R. § 325.4(a)(3). Plaintiffs' Exh. 174, Government Accountability Office Report to the House Committee on Transportation and Infrastructure, "Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure that Compensatory Mitigation is Occurring," September 2005. The Corps' record of admitted failures with respect to enforcing mitigation requirements may suggest that the Corps is an agency to which deference should be given only after a full investigation by the Court—specifically as to those actions regarding mitigation.

**42.** The Corps has argued that the future of Everglades restoration depends on the Court's approval of this mining, reporting that there will be "likely harm to Everglades restoration projects that would result if the Court orders *any* relief that disrupts ongoing mining activities" and that "vacatur of the existing mining permits would … jeopardize the Corps' ability to complete "a dam restoration project that is designed to protect local communities from potentially disastrous flooding." " Docket No. 350, pp. 11 (emphasis added), 28; Tr. 2944–47, 2954–58 (Scott Burch). The Corps suggests that any limit on mining imposed by this Court to protect the wetlands and Wellfield being destroyed by this mining might

actually lead to a disaster of the scale of Hurricane Katrina in August 2005. "[W]e could, under a high water event, experience a failure [of the Hoover dike at Lake Okeechobee] similar to what happened in New Orleans." Tr. 2956 (Burch). This testimony is disturbing not only because it raises the terrible specter of the Hurricane Katrina tragedy but, most importantly, because it leaves the mistaken impression that limestone from the Lake Belt area is critical to the project to rehabilitate the Hoover Dike. In fact, the same witness making such damaging predictions (the Corps' own Chief of its Cost Engineering Branch) admitted that he did not know if the Hoover Dike project actually was using any material from the Lake Belt, Tr. 2986–88 (Burch); indeed, he admitted that the Hoover Dike project is using "gravel from all around the state … [and] material coming from quarries other than the Lake Belt." Tr. 2986–87 (Burch).

**43.** Although a senior staff member for the Corps testified that one of the Corps' goals is to "provide strong protection of the nation's aquatic environment, including wetlands, as a primary goal of the [regulatory] program," Tr. 2467–68 (Studt), and Defendants reference Congress' intent to protect the aquatic environment at the time it passed the CWA and established the Corps' regulatory program, Docket No. 350, p. 2, the Corps' actions suggest otherwise. For example, the mandatory regulatory presumption, which the Corps failed to apply, is that there are other environmentally preferable alternatives which must be considered, 40 C.F.R. § 230.10(a)(3), prior to permitting the destruction of wetlands. In issuing these permits, however, the Corps chose to focus instead on "economic hardship on the mining industry" and the "legal issues" that would arise if the permits were not issued, Docket No. 42, filed July 15, 2004, p. 4, and therefore failed to test carefully the permit applicants' claims that this Wellfield was the only location available for this limestone mining.

in the Corps' approach exemplifies the concern expressed by Senator Muskie thirty-five years ago that the Corps, "a mission-oriented agency, is not equipped to evaluate the environmental impact of dredging activities [and, indeed] would do a disservice to their mission if they would try to act as environmental protectors." [44] *Sierra Club,* 423 F.Supp.2d at 1351 n. 219 (*citing* 117 Cong. Rec. 38854 (1971) (statement of Senator Muskie, during Senate Consideration and Passage of S. 2770, debating whether the Corps or EPA should have regulatory authority under the CWA)).

The Court's impression, gleaned from the record prior to issuance of these permits, and subsequently confirmed by review of the supplemental administrative record and evidence before the Court, is that the Corps was driven by a sense of predetermination [45] and an urgency [46] which compromised the environmental analysis Defendants are required to perform. It has been evident throughout this process that the Corps has every intention of continuing to approve mining in this area, and that the Intervenors (permittees) are eager for such approval.[47] The Corps'

---

**44.** For example, Congress and members of the public clearly expect the Corps to perform its duties, such as constructing a new dike or improving bridges, in the most cost-effective manner; the Corps, therefore, may properly consider any cost increases in materials, e.g., limestone and its related products, to be of serious concern. Since the Corps relies on the limestone mined from the Lake Belt area to provide a convenient source of construction materials for its own purchase and use, the Corps faces an inherent conflict when attempting to regulate mining in these wetlands, since any reduction in this mining may increase the costs of these materials.

**45.** The Corps refused to limit the mining despite receiving significant objections after the ROD was issued. Then–Congressman Peter Deutsch reported his personal "great concern," and a widespread public "concern that these mining activities grossly conflict with our efforts to restore America's Everglades." SAR 1198 (letter from Congressman Deutsch to Corps, dated October 18, 2002). As the Court noted previously,

> [T]here is an underlying theme of pre-determination evident in the frequent reference by the Corps' staff to the historical presence of mining in the area, the Corps' swift rejection of suggestions that mining be stopped or limited, and the omnipresence of mining representatives and their reminders that the Florida legislature's creation of a Lake Belt Committee indicated the state's support for mining .... [A] sense of inevitability permeated the agencies' decision-making processes [such that there was] a high likelihood that procedural safeguards, such as those enshrined in NEPA and the CWA,

were overlooked or viewed as unimportant in light of the expected approval of the mining.

*Sierra Club,* 423 F.Supp.2d at 1287. Nothing presented to the Court since the entry of that Order suggests that this Court's conclusion was wrong; instead, additional evidence supports that conclusion.

**46.** The Corps was in such a hurry to issue these permits that it did so before establishing an accurate baseline of prior impacts on wetlands (from mining pursuant to previously-issued permits) against which to measure the impacts of these permits. Nor were the annual impacts of this permitted mining monitored in the first two years. In early 2004, the Corps still had no accurate information as to the permitted mining's annual impacts on hundreds of acres of wetlands. (The permits required annual reports from the permittees regarding the number of acres impacted, but the Lake Belt 2003 Annual Report, published in early 2004, reported that it had no information about the acres impacted because the County's aerial photos of the mining area had not yet been released from the previous spring (2003)). SAR1321 (letter from permittees' consultant to Corps, dated March 11, 2004, explaining that they were relying on aerial photos to assess impacts).

**47.** The permits themselves suggest that they will be extended. "[T]he intent of the Permittee and [the Corps] is that the currently authorized unmined areas [from prior permits] will be permitted through future extensions of this permit [subject to studies provided by the permittee, applicable law, monitoring reports,

persistence provides further support for this Court's prior findings that the Corps violated NEPA by failing to consider fully the "no mining" or "curtail future mining" alternatives [48] when it approved this mining plan. The Corps also violated the CWA when it failed to presume that practicable, *environmentally preferable* alternatives exist, as required by the CWA,[49] and instead readily approved the comprehensive mining plan.

The theme of predetermination also is evident in recent submissions from the Defendants; in their post-hearing brief, the Defendants state that any "adverse impact to the public interest [caused by vacating these permits] is *unnecessary,* since the Corps needs only a limited time (nine months) to complete its supplemental NEPA analysis." Docket No. 350, p. 32 (emphasis added).[50] This implies that the Corps has no intention of stopping these environmentally damaging activities, despite this Court's sweeping condemnation of the basis for these permits and the mounting evidence that the Aquifer has been irreversibly contaminated.[51]

In three decades of federal judicial service, this Court has never seen a federal agency respond so indifferently to clear evidence of significant environmental risks related to the agency's proposed action.[52] It may be that the power of "economics"

etc.]." *See, e.g.,* AR1055, p. 3 (permit issued to Sunshine Rock, Inc.). "Prior to the expiration date [of the permit], the Corps will decide if the permit will be renewed and extended to cover the projected '50 year' life of mining activities, or some lesser period, as may be appropriate." *Id.* This raises, again, the question of whether these permits are for ten years, as claimed by Defendants, or whether they are "bridging permits" designed to allow mining to continue without interruption while the Corps plans for the full fifty years of mining envisioned in the EIS (and criticized by other federal agencies, local agencies, organizations, and individuals). *Sierra Club,* 423 F.Supp.2d at 1279.

48. 40 C.F.R. § 6.203(b)(1), (c); 40 C.F.R. § 1502.14(d).

49. 40 C.F.R. § 230.10(a)(3).

50. The Defendants also state that "[i]t is in the public interest that the Court should remand the permits to the Corps without vacatur." Docket No. 350, p. 5. The Court already did remand the permits without setting them aside in March 2006, but it appears that may have been a mistake since in the intervening period Defendants continued to ignore their duty to protect the municipal water supply and the wood stork.

51. The Defendants announced to this Court that "the Corps ... [already has] concluded that continued mining over the short term (i.e., the 18–month remand period) will result in only minor environmental impacts." Docket No. 92, filed April 26, 2006, p. 9. In light of the Corps' earlier conclusions that there would be no "significant impact" on the quality of the human environment when they issued the permits in 2002, only to later discover that benzene contamination and destruction of wood stork foraging habitat were occurring, this Court has little confidence in the Corps' present assertions that there will be "only minor environmental impacts." Moreover, nothing in the permits prohibits the mining companies from mining the area more rapidly than in the past (and completing all of the mining projected to have continued until 2012 and beyond), Tr. 2620–21 (Studt); this lack of control over the rate of mining effectively renders meaningless the Defendants' assumptions, based on the estimates of annual rates of mining, as to the magnitude of potential impacts in the "relatively short period of time of 18 months." Tr. 2581–82 (Studt). The permits themselves are based upon an anticipated 331.5 acres of wetlands impacts per year; an eighteen-month period reasonably could be predicted to result in the destruction of five hundred acres of wetlands (331.5 acres per year times 1.5 years). Tr. 2537 (Studt). This is in addition to the acres of wetlands already destroyed pursuant to these permits. "[E]stimated wetland impacts to date [August 2006, nearly one year ago] should be approximately 1,500 acres." Plaintiffs' Exh. 159; Docket. No. 240, filed August 28, 2006 (Defendants' Notice of Filing Biological Assessment ("BA")).

52. In thirty years of trying cases nor have I ever felt the weight of a decision so heavily on me; this burden is the result of Intervenors' claims that any limits imposed on this mining

(i.e. financial profit to be gained from further production of building materials) unduly influenced the Corps. The events preceding the issuance of the EIS and the Record of Decision ("ROD"), specifically when the Corps seemed to wilt in the presence of pressure for approval of the permits, suggest such a conclusion. 423 F.Supp.2d at 1287–88.[53] It now appears that even the local governmental agencies have yielded, perhaps as a result of increasing pressure from the mining companies or others.[54] Recently, the County restarted some of the production wells which had been shut down more than two years ago due to benzene-related contamination issues.[55] CAP, p. 5. Under the presumption that benzene will continue to be found, the County appears to have conceded that upgrades to the water treatment plant which handles the majority of the County's drinking water are necessary[56] in order to prepare for the perhaps inevitable reclassification of the Wellfield

---

by the Court will lead swiftly to a catastrophic effect in the lives of so many mining company employees and others. Yet, as I reflect on that burden I am faced with more compelling evidence that the source of drinking water for the current population of Miami–Dade County, as well as future generations, i.e. millions of people, is at risk because of this mining. Also, the evidence regarding the profits enjoyed by these private companies—most of which are very large or multinational enterprises (Rinker/CEMEX, Florida Rock/VULCAN, Tarmac–TITAN, White Rock/Continental)—throughout the multiple years of mining under these invalid permits suggests to the Court that today's ruling, when viewed in context, imposes a remedy which is less punitive on the Intervenors than what it might at first seem and, also what might otherwise have been imposed.

53. The Corps even ignored the County's request for a public hearing and instead issued these permits despite widespread concerns that the mining and remnant pits would contaminate the Aquifer. AR654 (letter from Merritt Stierheim, County Manager, to Corps, dated July 19, 2000).

54. Despite the County's prior clearly stated objections to these mining permits specifically noting the risk of Wellfield contamination, AR485, AR608, AR646, AR655, AR656, AR791B, AR813, it appears that DERM may now have abandoned attempts to establish a more accurate mining setback line, instead opting to proceed with expensive upgrades or the replacement of water treatment plants.

55. It is troubling to the Court that William Brant, who had worked for the County for 27 years, may have been forced to resign as Director of WASD soon after he had advocated, in candid memoranda, for a full investigation of the source of the benzene—an investigation which might have exposed mining activities as the source. Tr. 1479–81, 1552–53. The County Manager (George Burgess) asked for Brant's resignation, Tr. 1552 (Brant), soon after a meeting at which Brant was instructed by Assistant County Manager Joe Ruiz "not to write any more memos" relating to rock mining as a potential source of the benzene contamination, and to allow DERM to take control over the investigation. Tr. 1479. According to Brant's testimony, he had urged the County management to contact the mining industry to ask "if there were any alternative explosives that they could be using to see if it had any impact on the benzene concentrations." Tr. 1478. Whatever the County's reasons for removing Brant as Director of WASD may be, the evidence does not suggest that the new leadership will result in any greater protection of the Wellfield or better communication with the Corps. The Court notes that while John Renfrow (the new Director of WASD) was Director of DERM, he rejected Brant's suggestion in May 2005 that the Corps be notified of the benzene contamination as "inappropriate and premature," Plaintiffs' Exh. 106 (Memorandum from John Renfrow to William Brant, May 18, 2005); Tr. 1484 (Brant). At least some of the DERM staff did not agree with Renfrow—DERM staff had notified the Corps promptly, in February 2005, regarding the benzene contamination.

56. William Brant, former head of WASD, testified that these upgrades to the water treatment plants would not be necessary but for the mining lakes in the vicinity of the Wellfield. Tr. 1575. The Court found Mr. Brant to be a very credible witness.

from "groundwater" to "groundwater under the direct influence of surface water" ("GWUDI")[57] by federal and state authorities. Even if the water treatment plants are able to treat the raw water for the anticipated amounts of benzene, it is nevertheless of grave concern that benzene will now regularly affect a previously pristine Aquifer.[58] The ability to cure a problem does not justify its creation. It is improper for these risks to be imposed solely on the public, including the risk that the public will have to pay a substantial sum to upgrade the water treatment facilities, particularly when the private sector earns enviable profits on the harvesting of these non-renewable natural resources.

Having fully considered all of the evidence, as well as the administrative record before the Court—including the Supplemental Administrative Record ("SAR"),[59] the Court concludes that there is no reason to disturb the Court's earlier findings regarding the failure of the Defendants to comply with their duties to the public. It also appears that the basis for each of the Court's previously expressed concerns has been validated[60] and these permits must be set aside until completion of the SEIS. In sum, the Court concludes that the Corps failed to give appropriate weight to the public's need for reliable freshwater as compared to the private need to continue mining this specific limestone and any larger public need for this limestone (instead of limestone from other sources). The Court's decision to set aside these permits is compelled by Defendants' failure to fulfill their legal duties to protect our natural aquatic resources and habitats.

## II. DETERMINATION OF AN APPROPRIATE REMEDY

For more than sixty years the APA has directed the courts regarding the pre-

**57.** "The surface water treatment rule promulgated by the EPA in 1989 requires that public water supplies derived from 'groundwater under the direct influence of surface water' (GWUDI) receive the same treatment as water supplies derived directly from surface water." AR1175 (Northwest Wellfield Watershed Protection Plan, prepared for the SFWMD by DERM, dated August 16, 2000). Treating surface water to reach acceptable drinking water standards is much more costly than treating groundwater.

**58.** Note that the benzene concentration detected at production well 1 ("PW–1"), the southernmost of the fifteen pumping wells in the Wellfield, reached as high as 15 ppb in February 2005 and 9 ppb in November 2006. Even though the water treatment plant can reportedly process and clean this quantity of benzene from the finished water, it is unclear what might happen to anyone operating a private well near a mining lake. The testimony and evidence suggests that are no private wells functioning in the Wellfield itself, but this evidence does not include data on private wells near other mining locations which continue to mine under these permits. For example, the northernmost and southernmost locations where mining is taking place pursuant to these challenged permits "are not in the region of the Northwest Wellfield protection areas." ROD, AR1028, at 75–76. While the Corps previously, and perhaps erroneously, concluded that those projects "would be of no risk to the drinking water resource," it is unclear what the level of risks are to the neighboring residential communities which may use private wells to tap into the Aquifer for drinking water or other purposes. The ROD states that there are 1,800 private landowners in the Lake Belt area and that their corresponding land uses include, *inter alia*, "rural residences," AR1028, p. 5, i.e., which may be the type of residence which relies on a private well.

**59.** Since the facts in this matter which were in the administrative record prior to issuance of the challenged permits in April 2002 were already addressed in this Court's March 2006 Order (which is incorporated herein) they will not be restated here.

**60.** The implications of the current evidence as to two of the Court's primary concerns announced in the March 2006 Order, e.g., the contamination of the municipal water supply and the threats to the endangered wood stork, are discouragingly bleak.

sumed remedy for unlawful conduct by federal agencies: "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).[61] This standard of review also has been specifically applied to each of the environmental statutes at issue herein, *Sierra Club*, 423 F.Supp.2d at 1284, including both of the substantive environmental statutes, the CWA and ESA, along with NEPA.[62]

Agency decisions are guided by statutes as well as by regulations. Agency regulations may be viewed:

> as an attempt to solve various problems of "market failure" identified by economists .... [R]egulation is frequently justified by the need to compensate for the fact that the price of a product does not reflect costs that its production and use impose on society. For example, in an unregulated market the price of steel

will not reflect the "externalities" (sometimes referred to as "spillover costs") that its manufacture imposes in the form of air pollution. Neither the manufacturer nor the consumer of its products bears these costs. As a result, the demand for steel will be greater than it should be, because it is higher than it would be if buyers had to pay for the cost of its adverse side effects.

Stephen G. Breyer, Richard B. Stewart, Cass R. Sunstein, Matthew L. Spitzer, Administrative Law and Regulatory Policy: Problems, Text, and Cases, Fifth Ed. (2002) ("Administrative Law"), pp. 5—8.[63]

A prime goal of the APA was to strengthen judicial review of agency decisions—to ensure that agencies were considering all the relevant facts, listening to diverse viewpoints from affected interests, consistently obeying their own regulations, and explaining their decisions as a "reasoned exercise of [the agency's] discretion in a given case." *Administrative Law*, p. 416.[64] These concerns are the foundation of the "hard look" doctrine, discussed in

---

**61.** The clear language of the APA provides that "courts [shall] ... set aside federal agency action that is 'not in accordance with law.'" *FCC v. NextWave Personal Communications*, 537 U.S. 293, 300, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003). If a party prevails on its APA claim, "it is entitled to relief under that statute, which normally will be vacatur." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C.Cir.2001) (citations omitted). "[A]gency actions should be reversed if they are found to be 'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law'." *Sierra Club v. Martin*, 168 F.3d 1, 3 (11th Cir.1999).

**62.** It is undisputed that vacating, or "vacatur" of (the term derives from the APA's command that a Court "shall set aside" an agency's illegal action), improper agency actions was the presumptive remedy until the early 1990s, see discussion, *supra*, and remains so today.

**63.** Environmental harms present a particularly vivid example of "externalities," also de-

scribed as "transactions costs," *Administrative Law*, p. 420, because people who produce those harms, e.g., contamination of the Aquifer, cannot easily bargain with those who suffer from those harms, e.g., consumers of municipal drinking water who face higher costs for clean water. Several factors render it difficult for courts to remedy through private litigation those market failures which manifest as environmental harms, e.g., the possibility of a remedy may be unavailable until after a significant harm already has occurred, and direct proof of causation is difficult to establish. Testimony suggests in this case, for example, that the Miami–Dade County Attorney's office reportedly concluded that there was not a legally sufficient basis for DERM to file a claim against the miners to recover the costs of the benzene investigation. Tr. 2379–80 (Caveda).

**64.** This Court must exercise its "narrowly defined duty of holding agencies to certain minimal standards of rationality," *Ethyl Corp. v. E.P.A.*, 541 F.2d 1, 36 (D.C.Cir.1976).

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), and applied in this Court's March 2006 Order.[65]

The growth of the regulatory role of the national government has provided a multitude of reported decisions addressing the conduct of federal agencies in rulemaking and other contexts. Despite this body of precedent, the Court has not found specific guidance addressing the precise question in this case. The most favorable reading of the precedent presented by the Defendants and Intervenors to support their arguments against setting aside these permits is that this Court has discretion to decline to do so. Defendants and Intervenors do not cite any precedent compelling this Court to authorize the continuation of activities under permits the Court believes should never have been issued due to a failure to properly consider adverse environmental impacts.

In its March 2006 Order, this Court remanded these permits without immediately vacating them.[66] Defendants and Intervenors urge this Court to maintain that status—despite evidence that Defendants' violations, and consequent environmental harms from the improperly permitted mining activities, are continuing. Intervenors specifically promote the relatively new concept labeled "remand without vacatur" ("RWV"),[67] and suggest that courts should

---

**65.** *Sierra Club,* 423 F.Supp.2d at 1346 n. 199, 1378.

**66.** The Court decided not to set the permits aside at that time because it was unknown whether the record of Defendants' activities in the four years between issuance of the permits and the Court's Order would require that remedy. For example, the Court was uninformed at that time (March 2006) as to the results of the Corps' "Three Year" review, etc.

**67.** The concept of "remand without vacatur" ("RWV") is founded upon the Supreme Court's reasoning in *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("'[A] statutory grant of legislative rulemaking authority [to an agency] will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.'"). Proponents of this concept advocate RWV to fill the gap often created when a court vacates an important rule. *See* Ronald M. Levin, "Vacation at Sea: Judicial Remedies and Equitable Discretion in Administrative Law," 53 Duke L.J. 291 (2003). Professor Levin argues that RWV in such circumstances would permit the agency's rule to remain in effect while the legislature or regulatory agency corrects the deficiencies; however, he concedes that "at least some Justices [of the Supreme Court] might have ... doubts about the highly discretionary device of remand without vaca-

tion," due to their preference for formalism and bright-line rules. Levin, *supra,* at 346. Defendants and Intervenors nevertheless petition this Court to follow the United States Court of Appeals for the D.C. Circuit D.C. Circuit Court of Appeals in adopting RWV. Docket No. 352. While the D.C. Circuit has embraced the use of RVW, see *Checkosky v. S.E.C.,* 23 F.3d 452 (D.C.Cir.1994), certain judges in that Circuit disfavor its use. *See Milk Train, Inc. v. Veneman,* 310 F.3d 747, 758 (D.C.Cir.2002) (Sentelle, J., dissenting) ("Therefore, when we hold that the conclusion heretofore improperly reached should remain in effect, we are substituting our decision of an appropriate resolution for that of the agency to whom the proposition was legislatively entrusted. I therefore cannot concur."); *Checkosky,* 23 F.3d at 490 (Randolph, J., dissenting) ("The remand-only disposition ... is contrary to law. It rests on thin air."). Judge Wald, a former judge of the D.C. Circuit, "believes that there are inherent powers in a reviewing court to postpone vacation until the agency has a chance to make things right," Patricia M. Wald, "Judicial Review in Midpassage: The Uneasy Partnership Between Courts and Agencies Plays On," 32 Tulsa L.J. 221, 236 (1996); however, even she expressed doubt over the legitimacy of RWV, in *American Medical Ass'n v. Reno,* 57 F.3d 1129, 1136 n. 4 (D.C.Cir.1995), Judge Wald remarked, "we do not reach the question raised and left undecided in *Checkosky* as to the validity of this precedent [authorizing RWV] as an appropriate remedy." *Id.* (citations omitted).

apply RWV whenever possible.[68] Several reported decisions of the United States Court of Appeals for the D.C. Circuit employ RWV—none of which involve an environmental permitting issue.[69] More importantly, the Eleventh Circuit has not adopted RWV. Intervenors rely upon, and extensively cite, a law review article advocating the adoption of the following recommendations issued by the American Bar Association ten years ago:

> The Administrative Procedure Act should be construed, or if necessary amended, to permit [the courts to exercise discretion and order RWV] ... In exercising this discretion, a reviewing court should normally strike the balance *in favor of vacating the agency's action,* unless special circumstances exist ... [such as] where, in the context of the proceeding as a whole: (a) the agency's error *did not preclude fair public consideration of a central issue* in a rulemaking *or a fair hearing on the necessary findings* in an adjudication or other agency proceeding; (b) the court finds a substantial likelihood that the agency, after further consideration, *will be able to remedy its error and reach a similar overall result on a valid basis;* and (c) the [Plaintiffs'] interest in obtaining relief from the agency's decision *is clearly outweighed* by the substantial and adverse impact that vacation of the agency's action would have on [Intervenors]

who over time have reasonably relied on the agency action being remanded ... *[a]nd such impact cannot be remedied after such interim period.*

Levin, *supra* n. 67, at 387 (citing American Bar Association Recommendation No. 107B (August 1997)) (emphasis added). The ABA's recommendation, therefore, supports, in principle, the Court's decision to set aside these permits. The ABA's recommendations reveal a presumption of vacation ("a reviewing court should normally strike the balance *in favor of vacating the agency's action* "), and none of the special exceptions to this presumption apply—the Corps' actions precluded the public's "fair consideration" of the permitting decision; the Court does not believe the Corps can remedy its error; and the Plaintiffs' (and the public's) interest in obtaining relief from the effect of these permits is not "clearly outweighed" by the impact on Intervenors (or the public) of setting aside these permits. It appears that this Court's consideration of irreparable harm under the ABA's recommended guidelines should weigh heavily against the continuation of activities currently resulting in substantial environmental damages that "cannot be remedied after such interim period" (e.g., contamination of the Aquifer, the death of wood stork due to the destruction of their foraging habitat, and the continued devastation of wetlands).[70]

---

**68.** Professor Levin suggests that § 706 of the APA "should not be read too literally, where such a reading would confine the court's equitable remedial authority." Levin, *supra* n. 67, at 322.

**69.** Most of the decisions applying RWV involve *rulemaking* or other similar agency functions. "The D.C. Circuit started applying RWV in the 1970s ... [m]ost cases involved defects in the agency's substantive explanation for its policy choice ... the court focused on cases where costs of vacating the rules were high, while the benefits were likely to be

minor or nonexistent." Kristina Daugirdas, Note: "Evaluating Remand without Vacatur: A New Judicial Remedy for Defective Agency Rulemaking," 80 N.Y.U. L.Rev. 278, 290—91 (2005).

**70.** *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.,* 280 F.3d 1364 (11th Cir.2002) (vacating injunction prohibiting operation of a pump station without a permit, since without the pumping there would be flooding; the court noted that the plaintiffs only wanted the state agency defendant to obtain the appropriate federal permits—not to stop the pumping).

In essence, Defendants and Intervenors urge this Court to engage in an "equitable" balancing and to take the extraordinary step of not setting aside, or vacating, the very permits which this Court long ago concluded should not have been issued. *Sierra Club*, 423 F.Supp.2d at 1380.[71] The balancing test proffered by Defendants and Intervenors requires the Court to evaluate both the seriousness of the agency's deficiencies and the disruptive consequences of an interim change (by the Court) that may later be changed (by the agency). *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890, 908 (D.C.Cir.2006). Since this Court's prior Order already found serious deficiencies in the Defendants' actions,[72] the first part of the test cannot be satisfied and, because the test includes two parts (note the use of the conjunction "and"), the Defendants' and Intervenors' arguments must fail.[73] In summary, the Court finds the Intervenors' arguments unpersuasive and the cases they cite inapposite. This Court is not inclined to suggest a new standard for administrative agency review in this Circuit, particularly when the theory rests on such a slender reed, and when application to the facts of this case would merely result in the expansion of benefits already enjoyed by the private actors, including years of profits to which they might not otherwise have been entitled.[74]

As noted above, there is little guidance specifically addressing these issues; the parties have not cited any, and it is likely that no factually similar cases exist. The Court's cursory review could not identify another community in the United States in which the Corps permits rock mining and blasting activities on top of a major municipal water source, and the parties have not presented such an example. Further, this Court's search reveals a lack of reported cases sharing a similar posture to this case: where the Court's ruling on remedies is occurring after five years of mining (i.e., half of the "10 year" term of these permits) and more than a year after summary judgment was awarded to Plaintiffs—with a delay due to extensive evidentiary hearings on potential remedies.

---

71. Defendants and Intervenors repeatedly argued against an "injunction" and focused a large proportion of their presentation on the impact that would be caused by a permanent injunction against limestone mining in the Lake Belt area. The Court is not issuing an injunction; indeed, Plaintiffs have not pressed for a permanent injunction against all mining in this area. Rather, the Court makes this decision based upon the evidence presented to the Court to date: not only should these permits never have been issued in the first place, but they lack sufficient support for their issuance today.

72. The Court's interpretation of the agency's deficiencies is that they were serious.

73. Even if the Court had not found serious deficiencies, it bears mention that judicial review would be meaningless if the mere claim of disruptive consequences to an industry or private actor was sufficient to avoid the setting aside of improper agency conduct. "Potential disruption, alone, however is insufficient to justify the application of RWV .... The possibility of long delays could create incentives for parties to act strategically by prolonging the final disposition of the case." Daugirdas, *supra* n. 69, at 298, 310. The focus of disruption must be on a significant public interest—in particular, a federal objective. While "Everglades restoration" is a public interest and, arguably, a federal objective, it is not so directly connected to this mining that it could provide the sole justification for the otherwise improperly permitted activity.

74. To be clear, the Court passes no judgment on the Intervenors nor their representatives for the aggressive pursuit of maximal profits, but it is this Court's duty to follow this nation's environmental laws and to insist that federal agencies do the same—regardless of pressures which may temporarily have led them astray.

Therefore, the Court will briefly review the fundamental principles of judicial review, specifically focusing on how they apply to the regulatory violations at issue.

To answer the question of what relief is appropriate to award Plaintiffs today, July 2007, in light of their success on summary judgment last year, the Court first must consider the question in light of the earlier determination that these permits should never have been issued in April 2002. The Court must consider, within limits,[75] current information in making a decision about remedies. In essence, this consideration requires the Court to determine whether a re-issuance or after-the-fact validation of those permits is supported by the record today. Rather than merely looking back to April 2002, when the permits were originally issued, the arguments offered by the parties instead take into account the intervening five years' worth of developments—including modifications to the permits.[76] All parties have asked this Court to rule based upon that updated information. During the hearing, counsel for Defendants stated that "the Corps is waiting for any guidance from the Court. If the Court ruled right now that mining should not continue, then the Corps would not persist in allowing the mining to continue." Tr. 2648.[77] The Court is mindful not to be tempted by the Defendant's invi-

**75.** Judicial review is guided by the principle of deference to a legitimate, i.e., regulations-abiding, exercise of agency discretion. In light of that principle, this Court is extremely reluctant to make its own determinations based upon the current scientific evidence which the Corps itself is reviewing; not only because the Court is not trained in hydrology or any of the fields of science at issue, but primarily because of the "final action" threshold question for a court's review of an agency's action. Here, the only "final action" clearly established as of this date is the issuance of the ROD and the permits which followed; therefore, this Court has focused on that "final action"—albeit with the benefit of new information—in determining what remedy should be imposed. Perhaps the Corps' questionable decision in April 2006 to allow the mining to occur despite the substantial problems in the permits which had been identified by this Court (and the known incidence of benzene contamination) could be construed as a final action—this may be an alternative theory to support this Court's current review. In any event, Defendants agreed with Intervenors' request for the evidentiary hearing, Docket No. 78, and did not object to the majority of the evidence offered by Plaintiffs and Intervenors.

**76.** For example, a 2005 amendment to the Tarmac permit allowed mining to proceed in an area that was not authorized in the 2002 permits, but rather was within the "50 year" planned area of mining initially evaluated in the EIS issued in June 2000 (the subject of overwhelming criticism, *see Sierra Club*, 423 F.Supp.2d at 1305). This permit amendment, or modification, was done without public notice or consultation with FWS.

**77.** The Corps' position before my colleague, Judge Middlebrooks, as a result of his opinion in *Florida Wildlife Fed'n v. United States Army Corps of Eng'rs*, 404 F.Supp.2d 1352 (S.D.Fla. 2005) (rejecting permits issued for construction of a biotech research complex), was that the permitted activity should stop immediately after the Court announced its ruling. The difference between the Corps' position in this case and their position in *Florida Wildlife Federation* may exemplify the inherent conflict of interest in the Corps' enforcement of environmental laws which conflict with the agency's own construction projects. The permits at issue in *Florida Wildlife Federation* related to the construction of a facility largely intended for private enterprises only indirectly connected to the Corps' mission. In the present case, the Corps is a direct consumer of the limestone produced pursuant to these invalidated mining permits—purchasing aggregates, concrete, and other materials for public construction projects. Notably, if the Corps simply had taken the same position before this Court that it had taken before Judge Middlebrooks (to stay any further action under the invalidated permits), an extraordinary amount of judicial resources, as well as those of the parties, would have been conserved.

tation, for this Court's role is not to force a specific substantive result from an agency. This Court does, however, strongly recommend that the Corps take note of what this Court has described, in many pages, as an inevitable conclusion of the evidence presented: these permits must be set aside, at least until the SEIS is completed.

A court's blind adherence to the principles of agency deference, particularly when faced with the agency's own acknowledgment of serious deficiencies,[78] is contrary to the doctrine of separation of powers.[79] To be clear, this Court is not dictating what the agency's future decision should be; rather this Court has determined that the agency has failed to perform its important duties.[80] The principles

**78.** The Corps' tacit admissions that it failed to recognize the impact of mining on wood storks, failed to hold a public hearing, and repeatedly violated governing regulations are enough to raise concern about the results of any future deference in this case. Reviewing the Corps' errors in this case alongside its previously admitted failures to mitigate potential impacts in other CWA projects, *see* Plaintiffs' Exh. 174, Government Accountability Office Report to the House Committee on Transportation and Infrastructure, "Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure that Compensatory Mitigation is Occurring," September 2005, suggests that the Corps is an agency with serious performance deficiencies. Another example comes from the Corps' own admission, in testimony before a House Subcommittee, that flooding damage from Hurricane Katrina would have been worse if the Corps' original protection plan had been adopted (the plan was rejected by a Federal Court (*see SOWL, Inc. v. Rush*, No. 76 Civ. 3998 (E.D.La. Dec. 30, 1977)). *See* U.S. Gen. Accounting Office, GAO–05–1050T, Testimony Before the Subcommittee on Energy and Water Development, Committee on Appropriations, House of Representatives, "Army Corps of Engineers: Lake Pontchartrain and Vicinity Hurricane Protection Project," (2005)). In sum, it may be determined one day that the Corps' past failings should result in their sacrifice of the cloak provided by judicial deference as to their actions impacting environmental protection. This Court does not issue such a broad ruling at this time, but is compelled to note that the agency's conduct has been somewhat below an appropriate standard.

**79.** Obviously, Article III of the United States Constitution must not be read in isolation; our constitutional system is structured to provide certain checks and balances on the authority of each of the three branches of government. For example, the courts and the Executive review the constitutionality of challenged legislation, and Congress has the power to impeach the President or a judge under appropriate circumstances.

**80.** The Court's prior Order found that Defendants violated statutory and regulatory guidance, and subsequent evidence suggests that some of those violations persist today. The CWA specifically notes that "an unacceptable adverse effect on municipal water supplies" may be grounds for denial of a 404 permit, and that permits should only issue if they are consistent with the 404(b) guidelines, found at 40 C.F.R. § 230; 33 U.S.C. § 1344. Those guidelines, and other governing regulations, unambiguously prohibit the approval of permits which cause municipal water supply contamination unless it was "clearly demonstrated" that the presumed practicable alternatives were not available or would have "other significant adverse environmental consequences." 40 C.F.R. § 230.10(a), (a)(3); *see also Id.* § 230.10(4)(c) ("[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to 'significant degradation' of the waters of the United States.")

The evaluation of whether an activity will lead to "significant degradation" requires an assessment of the persistence and permanence of the effects, the first example of the type of effects to be considered is "effects on municipal water supplies." 40 C.F.R. § 230.10(5)(c)(1). The Corps is required to make a factual determination regarding "the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants." 40 C.F.R. § 230.11(d). While the predicted source of the benzene is not the "material proposed for discharge," i.e., presumably the muck and other remnants of the limestone mining process, the 404(b) Guidelines clearly require the Corps to consider secondary effects of the proposed activity, 40 C.F.R. § 230.11(h), and the effects of the blasting process used to extract the rock

of agency deference, as stated in *Chevron U.S.A., Inc. v. NRDC.*, 467 U.S. 837, 862, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), require courts to accord substantial deference to the federal agencies in interpreting their regulations. However,

> courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions.

*NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)[81]. "[C]ourts must overturn agency actions which do not scrupulously follow the regu-

lations and procedures promulgated by the agency itself." *Sierra Club v. Martin,* 168 F.3d 1, 8 (11th Cir.1999)[82] (quoting *Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986)). When the terms of a regulation are unambiguous, no deference is given to agency action which contradicts the regulation's plain language. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) ("[W]e must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language ....'") (citations omitted). Clearly, deference is not absolute but rather admits of exceptions for those rare occasions when agencies fail to abide by their own regulations or statutory directives, as they do here.[83] This is not to suggest that agencies must execute their duties flawlessly—although it is a worthy aspiration, nor that agencies

from the Aquifer must be considered as some of these secondary effects.

**81.** "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (citing *NLRB v. Brown,* and others).

**82.** The opinion in *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999), held that the Forest Service did not follow its own directive, therefore, its decisions regarding several forest management plans were not entitled to deference. The court found that the agency's decision not to maintain population data on certain sensitive species when it had previously said that it would do so, was "contrary to the clear language of [its own forest plans] and the [National Forest Management Act]" and therefore not entitled to deference. *Id.* at 11–12. The court made this decision despite the fact that none of the agency's governing regulations specifically imposed such a population data requirement. In response to the court's decision, the Forest Service adopted amendments to the plans which attempted to give the Forest Service its own discretion to do what the appellate court previously had criticized it for doing, i.e., rely upon habitat infor-

mation instead of maintaining actual population inventories on proposed, endangered, threatened, or sensitive species. The Eleventh Circuit rejected this attempt to limit its earlier ruling, and directed that the agency must follow NEPA and the governing directives of its prior plans which required it to keep actual population data on such species, not simply habitat information. *Ouachita Watch League v. Jacobs,* 463 F.3d 1163 (11th Cir.2006). Thus, the appellate court confirmed its willingness to enforce an agency's own directives even if they are not specifically included in the agency's governing statutes or implementing regulations.

**83.** For the Court to ignore the failures of an agency (governed by the executive branch) in implementing federal laws (passed by Congress) would result in an "abdicat[ion]" of the Court's responsibility, *NLRB v. Brown,* 380 U.S. at 290–91, 85 S.Ct. 980, and a deviation from the principles of our government. Thus, while this court's review must be performed with "conscientious awareness of its limited nature." *Ethyl Corp. v. E.P.A.,* 541 F.2d 1, 36 (D.C.Cir.1976) (affirming EPA decision regulating emissions from gasoline additives), it is not done without some authority to take action—regulatory violations are evidence that deference does not apply.

should be discouraged from acknowledging past errors in judgment, i.e., such admissions need not subject the agency to a total lack of trust; but it must be that our system of government permits the courts, on those rare occasions when judges are faced with evidence that an agency's orientation or conduct is contrary to its Congressional mandate, to peek carefully behind the curtain of deference and set aside certain agency actions. Courts are justifiably reluctant to approve environmental permitting decisions when the record demonstrates that those decisions were based upon assumptions rather than upon an independent study of the issues. When the Corps planned to renew shell dredging permits in Louisiana's Lake Pontchartrain which would have "affect[ed] over two million acres of ecologically fragile water and wetland ... [and might have] also interfere[d] with the process of delta-building ... and with the health of living reefs and the formation of new reefs," a federal appellate court criticized the Corps for arguing that "damage to the [bottom dwelling life in Lake Pontchartrain already] was completed in the 1950's and so the effects of further [shell] dredging cannot be considered significant." *Louisiana v. Lee,* 758 F.2d 1081, 1085–86 (5th Cir.1985) (vacating dismissal of action challenging failure to file EIS and noting that while agency can rely on mitigating effects of permit conditions when deciding whether EIS is required, significant environmental effects were at issue).[84] Twenty years later the Corps' arguments are strikingly similar. Noting that the wetlands to be mined in

the next year and a half had "largely been impacted already by some part of that sequence of mining or have a significant amount of Melaleuca," Tr. 3073 (Paul Souza), Souza testified that there would not be any adverse effects from the mining in the near future.[85] Defendants fail to recognize that their own actions—the permitting of additional clearing of vegetation and continued destruction of wetlands—are the basis for the argument that the area is suitable only for mining, an argument which this Court already has rejected. *Sierra Club,* 423 F.Supp.2d at 1295 n. 49, 1330, 1373 n. 275 (rejecting "already degraded wetlands" arguments). Such self-generating justification for further destruction is simply improper in the context of the facts of this case, and in light of the Defendant's neglect to administer their important regulatory duties. The Corps' failure to perform an adequate environmental analysis before it issued these permits caused the present situation; acres of wetlands—perhaps what would have been suitable foraging habitat—are now denied protection by the Corps because they have "been impacted already." Tr. 3073 (Souza).

The Court previously found that the Corps violated multiple provisions of NEPA—e.g., failing to adequately evaluate the adverse impacts of the proposed mining on Wellfield contamination, on wood stork habitat, and on seepage—largely due to a reliance on insufficient data and outdated analyses. The Corps also failed to properly consider mitigation,

---

84. "The renewal of [the permits] will not maintain a status quo, but rather will continue a course of environmental disruption begun years ago," *Lee,* 758 F.2d at 1085–86. The court remanded the case back to the district court to "compare the projected ecological status of the affected areas if the [project] is continued for another five years with their projected condition if the dredging is halted now." *Id.* at 1086.

85. The Corps also apparently has relied on the existence of mitigation in rendering its decision not to disturb mining during the current period of supplemental environmental analysis. "The principal factors [for our decision not to stop the mining at this point] are that there would be a small amount of additional [mining] and, second, that the mitigation was, in fact, ahead of schedule." Tr. 2651 (Studt).

and was deficient in planning for littoral shelf construction. They failed to ensure that the targeted area for mitigation and restoration would be acquired, and they improperly balanced the applicant mining companies' needs against the long term productivity of the environment. *Sierra Club*, 423 F.Supp.2d 1273. Similarly, the Court identified numerous violations of the CWA by the Corps, including a failure to properly define the project purpose—a deficiency which resulted in their failure to apply the proper presumption against locating activities in wetlands.[86] That improper definition rendered the Corps' analysis of practicable alternatives incomplete. This compounding of errors, in part due to the Corps' favorable view toward proposals from the permit applicants,[87] consistently permeated the permitting process.

To date, Defendants have done little to demonstrate their consideration of the public's viewpoint, in violation of the CWA, 33 U.S.C. § 1344(a), and the Corps' regulations implementing the CWA, see 33 C.F.R. § 327.4. "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).[88]

"NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

**86.** As discussed in the Court's prior Order, the CWA 404(b)(1) Guidelines prohibit the destruction of wetlands "if there is a practicable alternative to the proposed [action] which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). This provision should guide the mining industry to "first seek project sites that will have the least damaging effects on wetlands and their ecosystems." *Sierra Club*, 423 F.Supp.2d at 1351. The test of alternatives requires measurement of alternatives at the time when the specific property was acquired by the applicant, not at the time when the permit application is submitted.

**87.** If the Corps accepts a permit applicants' claims as true, without conducting sufficient independent study, there is a significant risk that permitting decisions will be based upon a set of assumptions which lack a proper foundation.

**88.** Interestingly, when the Court last visited the Corps' website and searched for the terms "lake belt" nothing current was found. At the hearing, the Court was advised that a special website, *www.lakebeltseis.com*, had been established by the Corps to advise the public regarding the SEIS process. While the information on that website is more current, it does not indicate why the draft SEIS is not available yet (July 2007), despite the claim that it would be available as of May 2007. On the Evergladesplan.org website (the "official site of the Comprehensive Everglades Restoration Plan (CERP)") there are "Q & As" which appear to be out of date. For example, Q & A number 12, regarding the wood stork, reports that "[FWS] ... notified the Corps in December 2001 that it would not seek higher-level review of the project. The wood stork issues have been adequately resolved." So you Want to Know More About ... USACE Lake Belt Permits, *http://www.evergladesplan.org/facts info/sywtkma lakebelt.aspx* (last visited July 10, 2007). It therefore appears that Q & A number 12 has not been updated, or the Corps is ignoring both the Court's Order and the FWS' Biological Opinion. It also appears that one of the permittees' consultants may not be aware of the mandatory public disclosure required by NEPA. "The Lake Belt looks pretty lonely on the Jacksonville Corps 'Hot Topics' web page. We were hoping that it was 'old news' by now." SAR1188 (message sent July 8, 2002, to Corps staff member). The comment reveals a desire to have the mining plan proceed without further public scrutiny.

Prior to the passage of [NEPA], environmental considerations were systematically underrepresented in the federal agency decision making process. Consistent with traditional notions of natural resource allocation, the benefits of development were overstressed and less environmentally damaging alternatives for meeting program objectives were often given limited consideration. NEPA declares a broad national commitment to protecting and promoting environmental quality. This commitment is implemented by focusing government and public attention on the environmental effects of proposed agency action; the Act ensures that important environmental consequences will not be 'overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.' In short, NEPA requires that the evaluation of a project's environmental consequences take place early in the project's planning process.

*North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1539–40 (11th Cir.1990) (footnotes omitted).[89] The contamination

of the Aquifer, the death of wood storks, and the destruction of hundreds of acres of wetlands by devegetation and demucking appear to be the regrettable outcomes of the Corps' failure to gather complete information before issuing these mining permits in 2002; these permits must be set aside before further harm is done.

Having previously found "substantial procedural or substantive reasons," *Skinner,* 903 F.2d at 1539, to grant summary judgment for Plaintiffs, and failing to find anything but support for that conclusion in the record amassed since that Order, including evidence of ongoing violations, this Court is compelled to set aside these permits until completion of the SEIS. However, this Court is very mindful of the Intervenors' arguments regarding the potentially catastrophic effects of limiting their ability to retrieve limestone, a non-renewable natural resource, from below the surface of their private property. Indeed, this Court extensively weighed the Intervenors' claim, particularly with respect to the employees of permittees' companies who may be facing unemployment and who have not enjoyed the past profits to the same extent as the corporations[90]

**89.** As described by then Judge, now Justice, Breyer writing for the Court of Appeals for the First Circuit twenty years ago:

[T]he harm at stake [in a NEPA violation] is a harm to the *environment,* but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project .... [T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation.

*Sierra v. Marsh,* 872 F.2d 497, 500–501, 504 (1st Cir.1989) (vacating denial of preliminary

injunction while noting that additional development as result of marine terminal and connecting causeway must be considered when weighing injunctive relief claims and that the economic need for the project was exaggerated) (emphasis in original).

**90.** It is interesting to note that three of the corporations mining under these permits have been sold in the past three years. Permittee CSR Rinker Materials Corp. (now known as (Intervenor) Rinker Materials of Florida, Inc.) is in the process of being acquired by a Mexican corporation, Cemex S.A.B. de C.V. (In addition, permittee/Intervenor Kendall Properties & Investments' property currently is mined by Rinker.) Permittee/Intervenor Florida Rock Industries, Inc., was recently sold for $4.6 billion to Vulcan Materials Co. Permittee Pan American Construction (now known as (Intervenor) APAC–Florida, Inc.) bought permittee Continental Florida Materi-

themselves.[91] For that sole reason, and with the explicit statement that this decision should not carry precedential value because it is driven by unique circumstances,[92] the Court has crafted a partial stay of this Order, described in more detail below, which will allow all of the permittees to continue to mine under these permits until the SEIS is completed, with certain restrictions on three of the mining operations.[93] The Defendants also claim that the impact of vacatur during the remand period will have a "severe" effect on the Florida economy, causing a "major economic disruption" and "disruption to critical Everglades restoration projects." Docket No. 350, pp. 5, 27. It appears that at least some of the Defendants' broad predictions rest on debatable grounds.[94]

als, Inc., for $5 million in Dec. 2004. See discussion, *infra*.

91. The Court is primarily relying upon the arguments of Intervenors' counsel as to the question of devastating economic harm specifically to the corporations themselves—as the limited corporate information provided as evidence is somewhat impenetrable. In any event, it is not clear that corporate financial health necessarily is a factor under any of the governing statutes or corresponding regulations at issue here. Plaintiffs' expert economist, whom this Court found credible, testified that market conditions are likely to adjust and respond to shortfalls by strategic positioning and substitution. Tr. 1832–33 (Dr. Richard Weisskoff). (Indeed, perhaps Florida Rock's recent sale to Vulcan demonstrates these principles. *See* discussion, *infra*.) Intervenors' own economist testified that a gradual decrease in the supply obviously of limestone would result in lesser impacts on the economy (and Intervenors) in the interim. Tr. 5990 (Dr. Jesse David).

92. The Court's concern for both the permittees' and the greater public's need for access to the limestone, in light of the Defendants' conduct in improperly approving these activities, have compelled this court to adopt an unusual partial stay of this Order.

93. Only three of the corporations mining under these permits, *Tarmac* (owned by Titan, a Greek multinational corporation), *Florida Rock* (recently purchased by Vulcan Materials), and *APAC* (whose property is mined by *White Rock*, which also bought fellow-permittee Continental), will be limited from mining in certain areas of their existing operations, as described in further detail below, until the SEIS is completed.

94. The Defendants' witness was unable to make a specific estimate as to the increase in costs if these permitted mining companies were unable to supply the resource from these specific mines, nor did the witness testify about the ability of any of the permittees to access rock from other locations—even from their own company's other mines or sources. He noted that even though he had the ability to do so by running a computer program, Tr. 2966–67, he had "not done a study or analysis of [the cost impact to the Corps of an increase in crushed rock cost if Lake Belt production was shut down]," Tr. 2921, 2981 (Burch). Despite his failure to present the Court with a specific estimate of cost increases, the Corps' witness testified that an injunction against mining would cause 15–25% "across-the-board increases in Corps projects." Tr. 2953–54 (Burch). This figure, however, seems somewhat exaggerated in light of the witness' testimony that the limestone-related resources for an endeavor such as the Tamiami Trail project, which is emphasized as critical to CERP, do not constitute the majority of project's cost. Tr. 2968. *See also* n. 29, *supra*. According to a former Corps official, Dr. Terry Rice, the cost for the Tamiami Trail project is estimated at $156 million. The construction costs are $125 million and materials are approximately half of that cost, so the total cost for all materials would be approximately $55 million. Tr. 4863–64 (Dr. Rice). Applying the maximum cost increase estimated by the Corps, i.e. a 25% increase indicates that if mining is shut down, the increased costs for this project would be $13,750,000. In contrast to other cost increases in the Corps' Everglades restoration projects the amount of this increase, which has been estimated using the maximum estimates testified to by the Corps—despite the fact that no data to support those estimates was presented to the Court, this figure seems relatively low. For example, "when the contract was signed in 1994 [for the Modified Water Deliveries Project, which includes the

More pointedly, the project to reinforce the Hoover Dike at Lake Okeechobee will use limestone that is not likely to come primarily from the area mined pursuant to these invalidated permits.

The Court maintains hope that the corporations and their employees will make appropriate adjustments, and that Everglades restoration work will not be significantly delayed because of the Court's determination that this mining must be stopped. In fact, the Court has structured the remedy in an effort to provide the "gradual shift" noted in the "Strategic Aggregates Study," prepared by consultants for the Florida Department of Transportation earlier this year:

> Therefore, if there are to be closures, a gradual shift may allow time for the development of comparable new supplies and help mitigate the negative economic

consequences that would otherwise burden the state, especially if the alternatives come from in state sources.

Strategic Aggregates Study, Part II, dated March 12, 2007, pp. 2–3. It must not be forgotten that limestone is a non-renewable resource,[95] and at some point under a future mining scenario, the rock reserves would be exhausted; each day that this mining proceeds under these invalidated permits fosters the expectation that mining will continue to be permitted in wetlands,[96] an expectation which cannot be fulfilled.[97]

In summary, the Court has determined that these permits must be set aside until the Corps completes the SEIS. A partial stay of this Order is granted, solely on the basis of the Intervenors' claims of a catastrophic result from a total prohibition of this mining; the stay will allow those min-

Tamiami Trail project], the price of this project was $84.5 million. Right now, given all the changes that have been made, it's up to $400 million." Tr. 4863–64 (Dr. Rice).

95. As noted in this Court's prior opinion, the Corps itself believed that mining of the 5,000 acres subject to permits in existence before those issued in 2002 would last only fifteen years, at which time rock would have to be brought in from elsewhere in any event. 423 F.Supp.2d at 1334.

96. "Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice, simply by asking the agency administrator to read some new document, will prove an exercise in futility." Sierra Club v. Marsh, 872 F.2d 497, 503–504 (1st Cir.1989) ("The district court explicitly found that any 'harm' would prove reparable (not 'irreparable') on the ground that removal of the [island causeway proposed to be permitted] would 'substantially restore the environmental status quo,' and 'removal' was 'practicable.' To rest the determination solely on this ground is to overlook the increased likelihood that residents, workers, businesses, as well as government agencies, may, for example, all become ever more attached to the

causeway and to the island development as the project nears completion. They may prove ever more willing to put up with any concomitant environmental harm.")

97. For example, White Rock has $225 million in capital investments in its Main and South (Continental) quarries operating under these permits, Tr. 5533 (Hurley), and would be forced to default on millions of dollars of construction contracts if mining under these permits is limited in any substantial manner. Docket N. 94, p. 9. Recently, Tarmac invested $249 million in a new concrete block plant adjacent to the Lake Belt mining operations. Tr. 4984 (Townsend). When these permits were issued, mining companies owned less than half of the entire Lake Belt area, but since the permits were issued, at least some of the permittees have been acquiring additional property. White Rock, for example, has been purchasing property for as much as $160,000 per acre—the purchased property is outside the ten year permit, but within the EIS, and was bought for the purpose of mining. Tr. 5560–61 (James Hurley). The Corps' actions to date may have created an impression that permits would be available in the future. Corporations acting on that impression would have made investments in the area and certainly expected a return on those investments.

ing operations to continue which are either taking place in non-wetlands or are located at a sufficient distance from the Wellfield that they pose a slightly lower risk of contamination of the production wells and municipal water supply.[98]

## III. THE PERMITS MUST BE SET ASIDE DUE TO THE CORPS' FAILURE TO CONSIDER SIGNIFICANT ADVERSE ENVIRONMENTAL IMPACTS OF THIS MINING

The Biscayne Aquifer "is the source of the most important water supplies developed in southeastern Florida,"[99] and its characteristics, including the fact that it is "highly transmissive,"[100] render it particularly vulnerable to the mining activities which the Corps has approved. Mining requires the complete removal of the surface, even if it is a protected wetland, to allow access to the limestone in the Aquifer which lies beneath the surface. The limestone is then extracted to depths of as much as 80 feet,[101] and sometimes more, below the surface—creating large quarry pits. The newly created quarry pits fill with water and become "lakes" which directly interact with the Aquifer. This direct interaction between the mining activities and the Aquifer may have been a significant factor in allowing the Aquifer to become contaminated with benzene, as discussed in further detail below.

The County operates fifteen public wells in the Northwest Wellfield which are located in the center of the area where the mining activities are occurring.[102] The Wellfield was originally conceived to be a "pristine" Wellfield. William Pitt, Chief of the Planning Section at WASD, testified that it "was envisioned that it would always be out at the western reaches of the county and that it would never experience any potential pollution from development, from different uses above the land surface and that type of thing." Tr. 1206 (Pitt).[103] The Wellfield has been in service since the early 1980s and serves as the main raw water source for the John E. Preston Water Treatment Plant. CAP.[104] The wells in the Wellfield collectively draw water up

---

98. The evidence before the Court is inconclusive as to the location of private wells near these areas, i.e., outside the Wellfield but near the mining operations on the periphery of the project area, but it is clear that mining activities, including blasting and the remnant quarry pits, pose risks to the Aquifer generally. To the extent that private wells draw from the Aquifer, they also may be exposed to the same risk.

99. Johnnie E. Fish and Mark Stewart, "Hydrogeology of the Surficial Aquifer System, Dade County, Florida," USGS Water Resources Investigations Report 90–4108, published 1991, p. 13 (quotations omitted). The Court hereby GRANTS Plaintiffs' request to admit this USGS Report, which was attached as Exhibit A to Docket No. 266, filed September 26, 2006.

100. In other words groundwater moves through it in a relatively free manner. See Plaintiffs' Exh. 9, R.A. Renken, K.J. Cunningham, M.R. Zygnerski, M.A. Wacker, A.M. Shapiro, R.W. Harvey, D.W. Metge, C.L. Osborn, and J.N. Ryan, "Assessing the Vulnerability of a Municipal *Supra* to Contamination in a

Karst Aquifer, Environmental & Engineering Geoscience," Vol. XI, No. 4, November 2005, p. 329.

101. White Rock, for example, mines to a depth of approximately 80 feet at their main mining location. Tr. 5547 (James Hurley).

102. As noted in the Court's March 2006 Order, another County Wellfield, the West Wellfield, is located to the east of the mining by Rinker which is occurring south of Tamiami Trail (on the site owned by Kendall Properties).

103. To the east of the Wellfield is a protective canal; the water level in this canal is kept at a high level in order to prevent runoff from industrial and residential areas in the east (the canal is east of the Turnpike) from entering the Wellfield area. Tr. 5137 (Carlos Espinosa).

104. Miami–Dade County operates both the Hialeah and John E. Preston water treatment plants, which process water from the North-

from the Aquifer (drawing up to the current permitted maximum of 150 million gallons per day ("MGD")) to supply 40% of the County's drinking water.[105] AR617, p. 5, AR1028, p. 5. The wells in the Northwest Wellfield are not screened, i.e., not enclosed in a protective casing, but rather are open to the raw groundwater in the Aquifer at a depth of approximately 40 to 70 feet. While the wells draw water from that depth primarily because that is the "most permeable" interval, they also draw in water from above the 40 foot depth. Tr. 1407 (Pitt). Once the wells draw up the water, the water is then delivered to a treatment plant several miles away. One of the County's most important concerns is that the Aquifer not be subject to reclassi-

fication as "groundwater under the direct influence" of surface water ("GWUDI")— such a reclassification (from the present classification as "groundwater") would require a costly modification of the County's water treatment facilities. AR1175 (Northwest Wellfield Watershed Protection Plan, prepared for the SFWMD by DERM, dated August 16, 2000).[106]

## A. Risks affecting the municipal water supply

Prior to issuance of the mining permits by the Corps, the County expressed its concern that continued limestone mining in the area of the Wellfield would trigger a GWUDI classification.[107] Despite this earlier position, and despite the recent incidents of benzene contamination, County

---

west Wellfield and deliver it to residents in the northern part of the County. As the plants are adjacent to each other, they often are referred to jointly as the Hialeah–Preston water treatment plant. The Court's use of the term "water treatment plant" in this Order indicates the Hialeah and Preston water treatment plants collectively.

105. "The Northwest Wellfield is a major uncontaminated source of municipal drinking water for Miami–Dade County, Florida. The Wellfield consists of fifteen wells that supply a current demand of 150 million gallons per day (MGD) and a planned future capacity of 225 MGD.... The South Florida Rockmining Coalition is proposing to mine 8,400 additional acres, totaling almost 20,000 acres eventually mined out in the Lake Belt area. This would leave most of the Northwest Wellfield occupied by open water." AR1175 (Northwest Wellfield Watershed Protection Plan, prepared by DERM, dated August 16, 2000).

106. See, e.g., Intervenors' Exh. 96, Intervenors' Exh. 16, Plaintiffs' Exhs. 175, 176, Tr. 110 (Dr. Stavros Papadopulos) 4254, 4266–71 (Dr. Yoder).

107. For example, WASD clearly was concerned about the adverse impacts of limestone mining.

In 1997, the State of Florida determined that well # 10 in the Northwest Wellfield

was GWUDI, based on the results of microparticulate analysis (MPA) conducted by the State. Following this determination, the MDWASD conducted an extensive investigation of this well and concluded that the well lacked proper grouting. The well has been rehabilitated and it has shown, on subsequent MPAs, not to be GWUDI. On May 20, 1999, the State of Florida cleared this well from the GWUDI designation. In addition, the MDWASD is in the process of rehabilitating wells # 15, 14, and 13 as a result of slightly high MPAs. The MDWASD rehabilitation program will provide additional protection from surface water influences under current conditions.... [The EIS for fifty years of limestone mining] does not provide reasonable assurance that the Plan will protect the wells from contamination by surface water influence and prevent the reclassification of the wells in both Wellfields. Either case will result in two adverse impacts: Public health risk—the influence from surface water increases the risk of introducing disease-causing microbial contaminants ... in the water supply.... Economic—the water treatment plants' process will have to be modified to provide additional filtration and disinfection which is required for surface water sources. The estimated cost of these improvements is $235 million.
AR608 (letter from William Brant, Director, WASD, to Corps, dated May 28, 1999).

representatives Wilbur Mayorga of DERM, Tr. 4710, and Douglas Yoder,[108] Deputy Director of WASD, Tr. 4239, testified that mining presently does not pose a risk to the County's drinking water.[109] DERM's acting Director, Carlos Espinosa, also testified that DERM doesn't believe that the Wellfield will be reclassified as GWUDI based on continued mining over the next 18 to 36 months. Tr. 5134 (Espinosa).[110]

Miami–Dade County protects the quality of the Wellfield resource by enforcing protection zones around the wells; these zones, or setback lines, prohibit any activities from occurring within the area of the Wellfield determined to be most vulnerable to contamination of the production wells. When the County's wellfield protection ordinance, Chapter 24–12.1, Code of Miami–Dade County, was enacted in 1985, it established protection zones based on the theoretical distance a pollutant might travel toward a production well during a specific number of days. AR1175, p. 6, 9.

The "travel time" protection zones were based, in part, on very generalized survival times of bacteria and viruses in soils and groundwater. The majority of pathogenic bacteria die off within an average of 10–30 days and viruses within 30 –100 days. Because very soluble chemical pollutants travel farther than microbiological pollutants and a few viruses can survive more than 100 days, the 210–day zone was included. *Id.*[111] The ordinance imposes an absolute ban on all mining activities within a distance of 30–days travel time to the production wells. This prohibition is designed to protect the wells from contamination by those pathogens that could survive travel-

---

**108.** Note that Yoder, who had retired after working for DERM for 29 years, was rehired in August 2006 and detailed to WASD (from DERM) as Deputy Director (for administration, finance, and planning). Tr. 4223 (Dr. Yoder). Dr. Yoder testified in his official capacity with the approval of WASD's Director John Renfrow and Miami–Dade County Manager George Burgess. Tr. 4230 (Dr. Yoder).

**109.** This testimony is somewhat inconsistent with that of WASD's former Director, William Brant, who testified credibly that "if the surface waters created by the rock pits got too close to our groundwater system ... it would [then] become a surface water system." Tr. 1573–75. Defendants acknowledge that "County officials disagree with each other" on this issue. Docket No. 350, p. 19.

**110.** Espinosa's testimony that continued mining will not lead to a reclassification of the Aquifer is somewhat questionable in light of the benzene contamination over the past two years. *See* discussion *infra.* According to the Miami–Dade County Health Department, the Department must be notified immediately by WASD if the raw water (i.e., the water at the wells themselves) "shows that benzene concentrations have increased in any significant manner from the previous levels or are de-

tected above 20 ppb." Docket No. 366 (Health Department letter, dated March 14, 2007, regarding CAP). Given that the raw water rarely had benzene contamination in the past, and now is expected to have elevated levels of benzene, it appears that the Aquifer may be in trouble. The Defendant's brief asserts that it is

> unlikely that water resources will be harmed from continued mining during the "remand period" because there has been no evidence "to date" that "contaminants or water-borne diseases are present in the existing wells in the permit areas or that such contamination was *caused* by continued mining."

Docket No. 350, p. 34 (emphasis added).

**111.** The protection zones were established in 1981 and were "based, in part, on an existing (1970s) understanding of bacterial transport rates and rates of viral die-off in soils and ground water." Plaintiffs' Exh. 9, R.A. Renken, K.J. Cunningham, M.R. Zygnerski, M.A. Wacker, A.M. Shapiro, R.W. Harvey, D.W. Metge, C.L. Osborn, and J.N. Ryan, "Assessing the Vulnerability of a Municipal Well Field to Contamination in a Karst Aquifer, Environmental & Engineering Geoscience," Vol. XI, No. 4, November 2005, p. 321.

ing from an origin point within the 30–day setback line to the production wells in the center of the Wellfield. As a precaution, the ordinance also bans mining activities from occurring deeper than 40 feet below the surface [112] within the 210–day line. SAR1323 (Risk Assessment and Groundwater Modeling, prepared for DERM by CH2MHill, October 2001).[113]

According to County documents, several years ago a mining consultant [114] proposed a "theoretical 60–day travel time" setback

which would allow mining below 40 feet at a location closer than the 210–day line; [115] the 60–day [116] line was not modeled nor codified as a specific distance from the Wellfield.[117] The Corps embraced the "60–day" proposal when it issued the mining permits,[118] and imposed a "double cross-hatched area" condition, which denoted areas temporarily off limits to mining, in an attempt to address concerns that mining close to the production wells poses significant risks.[119] The prohibited area is

**112.** This is designed to avoid interaction between mining activities and the deeper, faster areas of groundwater travel (the depth from which the production wells draw water for processing at the water treatment plants).

**113.** Fortunately there are some layers, described as semi-confining, between the surface of the land and the depth from which the production wells draw water which slow the downward movement of pollutants which may be at the surface of the land. Plaintiffs' Exh. 4, pp. 33–34. Tr. 5176 (Espinosa). Without those layers, for instance if you have only lakes, the risk of contamination increases.

The more lakes you have ... the water is going to move quicker because water—in essence water moves faster through a lake than it does having to be strained through rock .... something would get to the wells quicker because it's going through water rather than through rock.
Tr. 5215–16 (Espinosa).

**114.** "[A]n approximation of the 60–day travel time setback was interpolated by a consultant in a rockmine permit application." SAR1323.

**115.** The 60–day travel time reflected the mining companies' lack of interest in mining when limited to a depth of 40 feet. AR1175, p. 48 Northwest Wellfield Watershed Protection Plan, prepared for the SFWMD by DERM, dated August 16, 2000.

**116.** Intervenors now admit that "there is nothing inherently important about 60 days of travel time in the groundwater when discussing the risk of pathogen contamination." Docket No. 352, p. 10, n. 2.

**117.** The line is located approximately half a mile from the wells. Plaintiffs' Exh. 4, p. 11, Exh. 6, Exh. 7, Exh. 29, pp. 1–4, 2–1 and 2–2; SAR 1323, p. 1–4.

**118.** "The 404 Permit to Lake Belt provides various restrictions on mining that is further then [sic] 60 days, and provides for a review of those restrictions 3 years after issuance.... Mining further then [sic] 60 days [is] OK by the current county wellfield protection ordinance and the county study may or may not lead to a change in the ordinance. In any case, the County will also likely present that study for consideration when you do your permit review." SAR1307 (email between Corps staff members, December 2003).

**119.** The Corps stated that "no mining will be permitted in protected areas within the buffer zones ... designated by double cross hatching on the maps incorporated in the existing permits." Docket No. 350, p. 33. The Corps' record of enforcement of these protected areas is somewhat unclear. For example, White Rock's mining operations (pursuant to permits issued to APAC), appear to be inside of a surrounding double cross-hatched area, i.e., are closer to the production wells than some of the surrounding double cross-hatched areas. Plaintiffs' Exh. 16 (Lake Belt 2005 Annual Report). White Rock already has demucked and removed the muck from the site, and has continued the pad preparations that are allowable by the permit, including the filling of 40 acres; and a blasting event took place in April or May of 2006. Tr. 5582 (Hurley). This blasting occurred along the eastern side of Section 16 of T53S, R39E. There are production wells approximately one mile away, along the eastern edge of the neighboring section, Section 15.

generally the same as the theoretical 60–day setback area.[120] While mining is permitted adjacent to the "double cross-hatched areas," Defendants' Exh. 4, it remains prohibited within those areas.[121]

In the late 1990s, while the Corps was preparing the EIS in this matter, the County was studying its Wellfield protection measures and recognizing that the protection zones were insufficient. More recent data and modeling suggested that pathogens and water traveled much more rapidly through the Aquifer to reach the production wells than the earlier studies (on which the ordinance was based) predicted. The County hired the United States Geological Survey ("USGS")[122] to perform several field studies including tracer tests.[123] The USGS scientists and others determined that there are areas of the Aquifer, called preferential flow zones, through which water moves much more quickly than previously understood.[124] In fact, some of these zones coincide with the depth of the production wells in the Wellfield. Tr. 5174 (Espinosa). Notably, the studies in 2003 revealed a much faster transmissivity in the Aquifer than expected. In one test, USGS injected red dye into the Aquifer using an injection well; the USGS then monitored various areas of the Aquifer, as well as the production wells, for the red dye. The red dye used to conduct the tracer test moved so rapidly through the groundwater of the Aquifer to the production wells, and the water treatment plant that public consumers received pink water that day before the utility shut down the pumps.[125] In light of the emerging field data from USGS and other

120. "The purpose of the double-cross hatched areas was to provide additional protection. The Corps acknowledges that the double-cross hatched areas don't extend the entire [sic] 2500–foot buffer, but it ... did extend portions of the 2500–foot buffer.... [such that some] areas extend beyond the present 60–day setback line originally estimated by the mining companies." Tr. 2744–45, 2754 (Studt).

121. It is clear that Intervenors hope for those lines to be removed. Tarmac's representative testified that they are "running up against the end of ... our ten-year permitting" and that they already have cleared/devegetated everything under the current permits "until [they] get special condition seven [restricting the double cross-hatched area from mining] lifted." Tr. 5064 (Albert Townsend). "I hope [special condition 7] is lifted now, since the county has money to be able to build their water treatment plant that they feel is necessary." Tr. 4962 (Townsend).

122. The County paid $700,000 to the USGS to gather data in 2003. In 2006, USGS was still in the process of publishing additional information based on those studies. Tr. 5113, 5173 (Espinosa).

123. Tracer tests introduce harmless dye into injection wells to determine the length of time for the dye to reach a particular location, e.g., a production well. Tr. 109–110 (Dr. Papadopulos).

124. The locations of these zones are unknown. Tr. 5125–26 (Espinosa). One of the County witnesses admits that the preferential flow zones are "unpredictable" and "we don't know where they are," and they also "could change over time." Tr. 5135 (Espinosa).

125. The dye "shot pretty quickly to the well and created a number of sort of factors, problems, because it sort of tainted the water and created some alarm to some of the residents that are supplied by that Wellfield. But it's sort of an illustration of sort of the problem that we found." Tr. 5134–35 (Espinosa).

The test [used red dye] to study and quantify aquifer characteristics in the vicinity of the Wellfield .... The amount of dye that was used in the initial test was calculated using currently accepted aquifer data for the area, including data used in both County and SFWMD groundwater models. Instead of arriving as predicted at the test well and ultimately the water plant in a period of several days at levels too low to be visible, most of the dye was noticed at the Preston Water Treatment Plant later that evening, within about 8 hours. MDWASD staff purged most of the affected water from the plant and much of the distribution system the same night, substantially minimiz-

sources, the County hired a private consulting firm, CH2MHill, to update their prior risk assessments for the County,[126] i.e., to recommend the extent of buffer zones necessary for efficient levels of protection.[127] Tr. 5118, 5120.

In early 2004, Plaintiffs hired Dr. Stavros Papodopulos, a groundwater hydrologist [128], to analyze data available from four sets of tracer tests conducted in the Wellfield.[129] Dr. Papadopulos determined that the tracer tests conducted to the west of the production wells, where mining under these permits is and will be taking place, were a better indicator than those tests which were conducted to the east of the production wells, particularly in light of the downgradient/eastward flow of groundwater in the Wellfield area and the likelihood that such downgradient affected the travel of potential contaminants in the groundwater.[130] Tr. 144—145. Dr. Papadopulos used a porosity-thickness product ("Nb") [131] to calculate travel distances.[132]

The reason that I analyzed for the product rather than for individual porosity

---

ing the number of customers exposed to pink tinted tap water the following morning.... [T]he field tracer test had to be prematurely terminated.
SAR1327 (Memo from County Manager George Burgess to County Commission, March 16, 2004, "Status Report—Northwest Wellfield Studies"). Clearly, the models and historical data are no longer accurate predictors of groundwater movement and contaminant transport in the Aquifer and Wellfield; nor were they considered to be accurate at the time the permits were issued by the Corps. "In 2001, Phase 1 of the Risk Assessment Study was conducted ... [t]he resulting setbacks [for mining] were greater than the current setback of '60-days'." Id.

126. SAR1323 (CH2MHill Report, October 2001). The CH2MHill firm was paid approximately $200,000 for the updating of their prior report. Tr. 5120 (Espinosa).

127. Protection levels are discussed in terms of "log removal"—which relates to the probability that an event, i.e., complete disinfection or elimination of the contaminant, will occur to a specified magnitude. A 90% probability is equivalent to a 1-log removal, 99% is equivalent to a 2-log removal, 99.9% is equivalent to a 3-log removal, and 99.99% probability is equivalent to a 4-log removal, etc. Tr. 344 (Dr. Papadopulos).

128. Dr. Papadopulos earned his Ph.D. from Princeton University. His experience includes work on several projects for federal agencies, including the Corps of Engineers; he has conducted research on groundwater

systems and has numerous professional publications. Plaintiffs' Exh. 1.

129. A test in 1998 measured the time for dye to travel from an injection well located near PW–8 (PW–8 lies to the west of PW–9, and these are the only two production wells which are aligned east to west—the others are aligned vertically from north to south), and another test in 1998 measured the travel time from an injection well to the east of all of the production wells (the injection well was located southeast of PW–9). Plaintiffs' Exh. 8. In 1999 a series of tracer tests were performed, each of which involved an injection of dye into a well to the east of any of the production wells. Finally, in 2003, a tracer test was conducted by injecting dye into an injection well located between PW–8 and PW–9 (the injection well was closer to PW–9 than to PW–8). Tr. 139—44 (Dr. Papadopulos).

130. A test location which is downgradient will affect the result (downgradient will move more quickly than if the groundwater is moving upgradient). Tr. 218 (Dr. Papadopulos).

131. The porosity-thickness product of a given aquifer is the porosity of the aquifer, usually depicted by the letter "N," times the thickness of the aquifer, depicted by the letter "b." Tr. 125 (Dr. Papadopulos).

132. "The smallest porosity-thickness product corresponds to a larger travel time—to a larger distance for a given travel time. A higher Nb results in a small distance for the same travel time." Tr. 128 (Dr. Papadopulos). Thus, the smallest Nb will result in protection zones which extend further than those related to a higher Nb.

and thickness separately ... [is because] there may be some questions on what is the effective thickness of the aquifer through which most of the groundwater is flowing. So to avoid the question of whether the effective thickness is correct or not, I preferred to evaluate the product of thickness and porosity.

Tr. 124–25. These values ranged from a low of 1.33 Nb for the 2003 test conducted by the USGS, which implied that a larger protection zone was necessary, to a higher Nb of 10.3 for the test conducted in 1999 by DERM, which suggested that a smaller zone might be adequate. Tr. 125. Dr. Papadopulos then used these values to form his recommendations as to the appropriate protection zones (each of which would vary depending upon the daily pumping rate applied, i.e., 150 MGD or 225 MGD) based on a high Nb and a low Nb. See Plaintiffs' Exh. 2.

> I am a civil engineer. The civil engineer always views a safety factor.... If there is [a chance that the Nb could be] as small as that indicated by the 2003 test ... then the appropriate value to use was [the one derived from the 2003 test].

Tr. 145–46 (Dr. Papadopulos).

The Court finds the testimony of Dr. Papadopulos to be very persuasive; with more than four decades of experience, including several years' familiarity with the facts of this case, Dr. Papadopulos was the only expert utilizing the most recent testing data from the Wellfield. Plaintiffs' Exh. 2 and Exh. 5. Dr. Papadopulos testified that the existing setback lines are flawed because they are based on the introduction of a contaminant starting at the surface; that assumption is inappropriate in the context of mining pits because the pits are in direct contact with the production zone of the wells. Tr. 222, 523. Moreover, Dr. Papadopulos noted that the modeling done by CH2MHill did not include the preferential flow zones which are understood to be present within the Aquifer, and therefore greatly underestimates the amount of protection required. Tr. 161. Essentially, the relevant factors are the existing downgradient toward the production wells, the easterly flow of groundwater,[133] the porosity of the limestone in the Aquifer (before it is removed by mining), and the preferential flow zones. Dr. Papadolus testified that the County's CH2MHill original model used a higher porosity than what is indicated by recent tests, and also only considered die-off of the cryptosporidium pathogen rather than filtration or dilution, suggesting that the model's prediction of 180 to 230–day pathogen travel times are inaccurate.[134] Tr. 161–62. Even when travel times are adjusted for the straining out and dilution of pathogens (instead of merely tracking the travel rate of a particle of groundwater), more distance is needed to protect the Wellfield from contamination than what is

---

**133.** The velocity of groundwater is affected by regional gradients, which in turn are "controlled by the hydraulic ... gradient and the porosity" of the Aquifer and the proximity to the production wells. Tr. 132–33 (Dr. Papadopulos).

**134.** The CH2MHill models do not delineate the location of setback lines; instead they use field data to develop risk assessments and determine how many days of pathogen travel time should be considered and what levels of risk relate to the different protection zones.

Tr. 5117–18 (Espinosa). CH2MHill's original report discussed proposed setbacks of 180 to 230 days, SAR1323; the draft of their updated technical memorandum suggests that 80 to 130 days should be considered as the transport time for pathogens, based on an analysis of target removals of 3.5–log for the mined pits and lakes which have use restrictions, and 4.5–log if the pit or lake use is unrestricted. Plaintiffs' Exh. 10, p. 3 (technical memo, prepared for DERM, 2005 update to the CH2MHill modeling efforts in 2001).

reflected in the present 60–day protection zones.[135]

The coalescing view that the setbacks were insufficient was expressed by a senior professional staff member of DERM's, Dr. Susan Markley:

> There has been some consciousness for a while, even prior to the publication of the USGS studies, that the study outcomes were going to suggest, because we know now that the water moves faster through layers of the aquifer than we thought it did before, that the travel time zones will be farther away.

Tr. 526 (Dr. Markley).[136] In a June 14, 2005, memo to the leadership of DERM [137], Dr. Markley voiced her concerns surrounding the likely inadequate models and protective zones:

> There is new evidence from local studies, and other studies elsewhere, that many past assumptions concerning transmission of water and particles through the aquifer were not correct. Generally, the emerging view is that past models do not adequately describe the physical attributes, transport characteristics, variability, and travel time—distance relationships.... [I]t is likely that published reports will conclude that highly transmissive zones are prevalent throughout the aquifer, and that groundwater and substances in it may move much faster between two points. There is capacity for particle removal, but potential is poorer than previously assumed.... It will be necessary to

change the zones (and all consequent regulatory actions), ordinance, or some combination of both should it be determined that travel time—distance relationships are different than previously simulated or measured.

Plaintiffs' Exh. 24 (memo from Susan Markley, Chief, Ecosystem Restoration and Planning Division, to Carlos Espinosa, Deputy Director, and John Renfrow, Director, DERM, June 14, 2005). According to Dr. Markley, she received no response to her memo. "I didn't get a specific response to this memo.... We didn't have a meeting, which I was asking for. I didn't get a written response to it." Tr. 527. She noted in her testimony that then Director Renfrow's memo to Joseph Ruiz, Assistant County Manager, on January 17, 2006, (which Dr. Markley had no part in drafting but appears to be based in part, on the concerns she had expressed months earlier), conveyed to County management that the Wellfield setbacks would have to be very large to assure that the regulatory requirements for protecting the groundwater from the influence of surface water were met and that it was unlikely that such action would be able to be accomplished.

The only witness who did not accept the larger protection zones in principle was Intervenors' witness James Rumbaugh (who did not appear in person before this Court) but he had not carefully reviewed the most recent data, e.g., the USGS 2003 study, nor the articles discussing that data.

---

**135.** In fact, CH2MHill's recent work recommends that the appropriate travel time should be 80 days or more in order to guarantee the removal of contaminants equivalent to what the water treatment plant could provide with its chemical processes. Tr. 5207 (Espinosa).

**136.** DERM's Director, Carlos Espinosa, testified that under the new information from USGS, the 60–day setback line "would be much greater than [the present] 2500 feet."

Tr. 5183 (Espinosa). Espinosa also acknowledges that some of the information in the Northwest Wellfield Watershed Protection Plan of August 16, 2000, (AR1175), must be "updated based on the information that we have now." Tr. 5169, 5172 (Espinosa).

**137.** At that time, John Renfrow was Director and Carlos Espinosa was Deputy Director, of DERM.

Deposition Tr. 31–33, 64–65. The Court has decided that the testimony of other witnesses, particularly that of Dr. Papadopulos, presents a far more accurate assessment of the hydrogeologic conditions of the Wellfield and the risks of contamination posed to the Wellfield by these mining activities.

Despite the almost universal understanding that the Wellfield protections, on which these challenged permits are based, are inadequate,[138] the Corps has done nothing to increase the level of protection specified in these permits. The Corps ignored specific evidence presented by Plaintiffs in early 2004 that the Wellfield protections are "no longer accurate." SAR1317 (Letter from NRDC to Corps, dated February 16, 2004).[139] The Corps

previously had pushed for a rapid approval of these mining permits and did not wait for the County to complete its risk analysis [140]—even though the County had asked the Corps to postpone approval of the mining until completion of the studies.

Dade County believes the [EIS] that is being developed in response to a proposal for rock mining in the region, must not be completed with a recommendation to issue the General Permit until studies are performed which provide answers to the [questions of water quality protection of the water supply, adequate buffer between the lakes and the Northwest Wellfield ("NWWF") to prevent reclassification to GWUDI, [and] quantity of water needed to meet the County's future water needs].

138. The County's current setback lines are viewed as inadequate according to the USGS study (Plaintiffs' Exh. 9, p. 319); reports prepared for *DERM:* Tr. 431 (Dr. Markley), Plaintiffs' Exh. 23; WASD officials: Tr. 4248–49, 4276 (Dr. Yoder), Tr. 1438–40 (Brant); and by Plaintiffs' expert, Dr. Papadopulos.

139. The Plaintiffs provided the Corps with Dr. Papadopulos' review of the USGS data, and referenced the tests conducted by "several agencies, including the [USGS] and DERM" to evaluate pathogen transport in the Aquifer near the Wellfield, concluding that the indicated travel times boundaries would reach "well into areas targeted for mining." SAR1317. The Corps responded to Plaintiffs' comments, noting that the Corps "was very concerned about potential impacts to the County's Northwest Wellfield" and would consider whether any action was required. "One course of action would be to accelerate our initiation of the 3–year review ...." SAR1328 (letter from Corps to NRDC, dated March 30, 2004). The Corps admitted during the hearing that it never discussed the 2003 USGS study with the USGS. Tr. 2751 (Studt).

140. These permits were issued before the County completed its study. AR1028, p. 54. A senior Corps staff member noted that he had .

buttonholed [a staff member] of DERM, pushed him pretty hard to get something to the County Commissioners to amend their Wellfield ordinance. As you may recall, the permit conditions related tot he [sic] Wellfield protection are 'interim' and are up for review in 3 years (well, almost a year has gone by now). The the [sic] concept was that they would expire and whatever new restrictions are called for by the risk studies would then be adopted by an amendement [sic] to the County Wellfield Protection Ordinance. [The DERM staff member] indicated to me that they don't have enough data to go to the commission. Jean Evoy [of DERM] said [that it] would be difficult. So we have a situation where in 2 years County staff will still want us to have these various restrictions ... that are above those in their ordinance. The permit condition has a provision that if the ordinance is not passed that the Corps will review whatever new information is available ... but again this will put us in the position of determining acceptable risk. I reminded Jim of our position that we are concerned about public health but that they are putting us in a bad position .... the risk-$-tradeoff-etc. discussion is best done in a County Commission forum.

SAR1237 (message from Bob Barron to John Studt).

AR477 (letter from County Manager Armando Vidal to John R. Hall, Corps, May 13, 1997).

The Corps' ongoing disregard for this critical information violates several statutory and regulatory provisions. For example, the CWA specifically provides that unacceptable adverse effects on municipal water supplies are sufficient grounds for denial of a 404(b) permit. 33 U.S.C. § 1344(c). The implementing regulations of the CWA also direct that the Corps consider water quality and water supply issues (as part of the "Public Interest Review"). 33 C.F.R. § 320.4(a)(1) [141]. Additionally, the special nature of wetlands that perform water purification, 33 C.F.R. § 320.4(b)(2)(vii), or natural drainage functions, 33 C.F.R. § 320.4(b)(2)(iii), should be considered. State water quality standards must be followed in CWA permits according to 40 C.F.R. § 230.10(b), and the Corps must consider the significant degradation of water as well as the persistence and permanence of any risk to that water supply. 40 C.F.R. § 230.10(c).

It appears that the County has determined that the best way to address the acknowledged inadequacies of the current wellfield protection zones, particularly since mining continues in the area, is to upgrade or replace the current water treatment plants in an effort to maintain the quality of the municipal water supply.

> [T]he risk of concern is that the Wellfield eventually may be designated 'groundwater under the direct influence of surface waters' (GWUDI) under future mine-out conditions, land use scenarios and projected Wellfield demands of 220 million gallons per day. A GWUDI designation of the Northwest Wellfield will mandate treatment upgrades to the Hialeah and Preston water treatment facilities to achieve the same level of treatment as surface water sources. [Data and modeling by our staff indicate] that the combined '60–day' travel time area extends well beyond the 2000 land acquisition area. Furthermore, a preliminary risk assessment study conducted by County consultants indicates the '60–day' area might not be sufficient to minimize the risk to the public from cryptosporidium sp. Oocysts.... [T]here is sufficient information emerging to conclude that the amount of land necessary to be set aside as a protective buffer will be substantially greater than the areas currently controlled by regulation and owned by the County and may be unattainable due to the cost and ownership of the land. Even if a large buffer area could be acquired, there is still no guarantee the public would be completely protected given the high uncertainty about the subsurface geology. Therefore, the most effective approach to provide assurance in protecting public health is to upgrade the Hialeah and Preston water treatment facilities, rather than solely relying on an expanded buffer area.

Plaintiffs' Exh. 149 (Memo from John Renfrow, Director, DERM, to Joseph Ruiz, Assistant County Manager, dated January 17, 2006, "Risk assessment of future rock-mining and land use activities in the Northwest Wellfield.") [142]

---

141. The Corps' decision to approve these permits without waiting for the County to complete its assessment of the adequacy of the setbacks based upon updated data was a mistake—a mistake which may be responsible for the persistent incidence of benzene contamination in the Wellfield. If the Corps had waited for the County to revise its Wellfield protection plan, mining (including blasting activities) at locations nearest the production wells might not have been permitted (and the risk of contamination would have been reduced).

142. Espinosa says the County could use an unmined setback to protect the Wellfield or "upgrade the plant to do the same thing." Tr. 5135 (Espinosa). "[T]he uncertainty of

Regardless of the recommendation to upgrade the water treatment plant, DERM insists that there will always be a minimum buffer area,[143] probably the current 60–day or 2500 feet, around the production wells themselves. Tr. 5202 (Espinosa).[144] In addition, DERM would like to take ownership of those lakes in the surrounding area—beyond the 60–day line— in order to protect the Wellfield in perpetuity. Tr. 5215.[145] As Dr. Markley has explained, "[a] treatment plant that addresses the cryptosporidium issue in and

of itself wouldn't address ... some of these other concerns related to the travel time maps and ... all of the rest of the requirements of the code that depend on them." Tr. 531 (Dr. Markley).

While DERM has reached a conclusion and sent its recommendation to the County Manager, DERM's representative was unable to explain what actions WASD has recommended. Tr. 5200 (Espinosa).[146] According to correspondence dated March 17, 2006, from WASD's current director, John Renfrow:

these preferential zones around the Wellfield and the fact that we don't know where they are ... you would have to have pretty substantial areas, I mean, very large areas in terms of setbacks." Tr. 5139–5140 (Espinosa). "[Y]ou could go through a scenario that you could be buying hundreds and hundreds or possibly thousands of acres around the Wellfield and still have a problem because of these preferential zones." Tr. 5140 (Espinosa). It would require that the County "try to secure those lands from certainly companies that are not willing sellers," Tr. 5140 (Espinosa), and there would be "significant economic implications in trying to secure thousands and thousands of acres, significant expense to the residents of Dade County... [and] even if you went through that scenario, you spent the money, you still don't have the assurances that you are protecting the Wellfield because you still could have these preferential zones, and in essence it could short circuit through to the well heads." Tr. 5140 (Espinosa).

**143.** "Removal of the [industrial] zoning also served to reduce the perception that industrial development is acceptable in this wellfield area. Accommodations were made for rock-mining because it was an established land use in the Northwest Wellfield area when the protection zones were created and the risks posed were significantly less than other development and believed to be acceptable, with the prescribed restrictions." AR1175, p. 11, Northwest Wellfield Watershed Protection Plan, prepared for the SFWMD by DERM, dated August 16, 2000.

**144.** "[O]ne of the key issues ... in wellfield protection is land use control." Tr. 5093 (Espinosa).

**145.** This suggests that the County believes that the open pits or lakes pose certain risks.

**146.** DERM's Acting Director reported to County management in April 2006, that:

[a] number of studies have been ongoing to determine the correlation between rock-mining in the proximity of the Northwest Wellfield and possible risk of pathogenic organism [sic] reaching the wellheads. [DERM] concluded and informed the Manager's office by memo dated January 17, 2006 [from Renfrow] that the water treatment plants should be upgraded to deal with the possibility of pathogenic contamination.... It needs to be understood that the Wellfield issues are commingled with larger and separate issues between environmentalist [sic] and the rock mining industry concerning the impact to wetlands ... which are part of a federal lawsuit.... WASD is engaged in discussions with the rock mining industry regarding the funding requirements for upgrading the treatment plants. WASD Director John Renfrow will be able to provide details concerning the dialog with the rock mining industry. [DERM] will assist WASD in its negotiations with the rock mining industry and will participate in the new Corp [sic] of Engineers permitting process as per Judge Hoeveller's [sic] ruling. Intervenors' Exh. 115 (Memo dated April 11, 2006, from Carlos Espinosa, Acting Director, DERM, to Roger Carlton, Assistant County Manager, "Status of Water Supply Issues in Relation to Future Rockmining and Land Use Activities in the North West [sic] Wellfield.")

[WASD] is currently assessing the probable costs and financing mechanisms that might be available to formulate a complete proposal [to install appropriate filtration technology].... and all policy recommendations will be available for public comment and input through workshops and hearings prior to final actions being taken.

Plaintiffs' Exh. 194.

As the rock mining activities encroach on the Wellfield, the risk of being designated UDI increases.... If the Wellfield pulls in water from nearby surface waters containing [algae and diatoms or other indicators of contamination by surface waters] in sufficient concentrations, the Wellfield could be determined to be UDI even without the presence of any pathogens. The ultimate concern is that the Environmental Protection Agency has identified certain disease-causing pathogens which can survive in surface waters, but not ground waters. As surface water (rock pits) encroach on the Wellfield a habitat is created, which can harbor these pathogens.... It does not appear that compelling results [of the DERM contracted USGS study] will be available in time to modify the Wellfield protection zone prior to the April 2005 deadline [in the permits, before the Corps will lift the restriction in the cros-shatched areas.] Even if the study were ready on time, it would likely show a significantly expanded Wellfield protection zone to the west of the Wellfield, and a resulting ordinance modification would take away anticipated mining

rights owned by rock miners in that area.... If the County is not able to present compelling data that such mining will impose a risk to public health, the Corps may modify the permit to remove the restrictions. Removing the restrictions will allow the rock miners to proceed with their mining activities right up to the existing 60–day Wellfield protection buffer zone. Thus, the Wellfield would eventually be surrounded by surface water up to the existing buffer zone. Thus, the risk of being designated UDI increases, with no funding available to upgrade the water treatment plant.

Intervenors' Exh. 17 (memo from William Brant to County Manager George Burgess, June 14, 2004) (emphasis omitted).

Because this represented a substantially larger zone of protection around the Wellfield, the County determined that it could not afford to acquire the land within the zone necessary to protect the production wells.[147] The limestone miners

were not going to be willing sellers.... [T]hey pretty much indicated to us that all the equipment that they have, all the cement plants, and all those other extensive amount of investment [sic] that they have is based on rock reserves, and therefore, you know, a taking issue would—they would defend themselves.

Tr. 5208 (Espinosa). This Court's prior Order addressed the mining industry's advocacy with the Corps when seeking these permits and the industry's pointed reminders to the Corps that a takings challenge would be filed if the permits were not issued. *Sierra Club*, 423 F.Supp.2d at 1300—02.[148]

---

**147.** In light of the direct interaction between the quarry pits and the Aquifer, and the widely acknowledged increased risks of contamination of the municipal water source related thereto, the Court found it disturbing to hear the Director of WASD (a former Director of DERM) testify that if the full fifty years of mining were to occur: "I guess ultimately, you know, it may be essentially the Wellfield's

an island among a mine-out area, or essentially a very large lake area." Tr. 5133 (Espinosa).

**148.** This Court notes that it is somewhat unusual that private purchasers of wetlands might succeed with a takings claim when the regulatory prohibitions on destruction of wet-

The Defendants urge this Court to "exercise great caution in reaching any conclusion about the adequacy of the County's regulatory efforts" because "the County is not on trial here." Docket No. 350, p. 13. While that is generally true, the Corps has taken every opportunity to place responsibility on the County for the Corps' water quality assessments and cannot now claim that the County has no role in this matter. Furthermore, this new posture of deferral to the County represents a dramatic change in approach by the Corps from its previous decision to issue these permits in 2002 regardless of the County's objections.[149] The Corps' failure to adequately consider the results of tests performed by another federal agency, or to take any action related thereto, is another example of its failure to base its decisions on credible scientific evidence, 40 C.F.R. § 1502.22(b), and accurate scientific studies, 40 C.F.R. 1500.1(b).[150]

Moreover, the Corps' emphasis on the County's plans to upgrade its water treatment facilities masks the underlying fundamental fact that there is an increased risk of contamination, in the first instance, from these permitted mining activities—regardless of whether such contamination may be remediable.

### 1. Contamination issues as to cryptosporidium, giardla, and other pathogens

Several pathogens and other contaminants threaten the safety of a municipal water supply. Cryptosporidium and giardia are "microorganisms that during their life cycle form spores, cysts, or oocysts ... [and] can survive for long periods in the environment and can be very resistant to conventional treatment practices at drinking water facilities." AR1175, p. 37 (citations omitted). The Wellfield protection zones and the mining setback lines are designed to keep these pathogens (and other contaminants) away from the production wells, based upon the likelihood of the contaminants' survival.

Giardia, cryptosporidium, and relatives such as cyclospora and microsporidium can survive for months in some water environments. Cryptosporidium can survive greater than six months in some water environments and is also resistant to conventional chlorination. Additionally, there are other pathogens emerging as a concern to municipal drinking water supplies. One such pathogen is a bacteria, Mycobacterium avium, which is also chlorine resistant and, unlike giardia and cryptosporidium which need a host

---

lands clearly have been established for at least two decades.

**149.** If the Corps had engaged in a more complete evaluation on its own, or done *anything* to suggest that it was in command of the situation with respect to possible drinking water contamination, then this Court might have reached a different conclusion.

**150.** It is ironic that the committee which had a role in proposing the seriously ambitious "50 year" mining plan (the Dade County Lake Belt Plan Implementation Committee), was established to develop a plan "to enhance the water supply for Miami–Dade County and the Everglades, including appropriate Wellfield protection measures; to maximize efficient recovery of limestone while promoting the

social and economic welfare of the community and protecting the environment; and to educate various groups and the general public of the benefits of the plan." Fla. Stat. § 373.4149(1). As noted by the Court, that committee's legislative directive was that:

> Miami–Dade County shall strongly consider limestone mining activities and ancillary operations, such as lake excavation, including use of explosives, rock processing, cement, concrete and asphalt products manufacturing, and ancillary activities, within the rock mining supported and allowable areas of the Miami–Dade County Lake Plan adopted by subsection (1); *provided, however, that limerock mining activities are consistent with Wellfield protection.*

Fla. Stat. § 373.4149(4)(emphasis added), *Sierra Club*, 423 F.Supp.2d at 1302.

to reproduce, regrows in the environment.

*Id.* "[T]here is no safe level of ingestion [by the public of cryptosporidium and giardia]. There is no [maximum contaminant level ("MCL")] because at this point in time the [maximum contaminant level goal ("MCLG"), which is the target level for public water supplies] is zero."[151] Tr. 269 (Dr. Huffman). The challenged permits require that the Wellfield's water quality be monitored regularly for any indication of impacts from mining, but this monitoring appears to have started much later than intended and is poorly designed. In January 2003, almost one year after the permits had been issued, the required Wellfield monitoring report was still in draft form.[152] The Corps' failures with respect to requiring an adequate monitoring plan are consistent with this Court's assessment that the Corps rushed through the approval of this mining and was determined to permit the mining regardless of the outcome of the analysis regarding environmental impacts.

Plaintiffs' expert witness, Dr. Debra Huffman, testified that the Wellfield monitoring program, as finally adopted, was not a perfect system, and that past data indicates that "[sampling] methods are relatively imprecise." Tr. 290 (Dr. Huffman).[153] Dr. Huffman, whose expertise on water-borne diseases (including the fate and transport of cryptosporidium and giardia) was unchallenged by Defendants and Intervenors,[154] testified that the permit-

151. The presence of these pathogens is expressed in the number of oocysts per hundred liters. A maximum contaminant level goal [MCLG] "is not an enforceable standard .... [T]he maximum contaminant level [MCL] would be the enforceable standard." Tr. 269 (Dr. Debra Huffman).

152. A senior Corps staff member noted that he would be getting "revised submittal on the Wellfield groundwater plan to review." SAR1237 (message from Bob Barron to John Studt, January 2003). Apparently the Corps staff member, who in early 2003 was newly charged with monitoring these permits, was uninformed as to the precise nature of the "groundwater monitoring plan" when she assumed her duties. A senior Corps staff member advised her that the "groundwater monitoring plan" had been adopted by the Corps' issuance of a permit to install four monitoring wells. "Sounds like you have already approved their plan via a permit authorization! Just be sure to keep those in your LakeBelt [sic] files. I presume in your documentation for the verifications you noted/referenced the purpose/linkage to the Lake Belt permits.... you just have to be able to show that that permit requirement has been 'checked off.'" SAR1279 (message between Corps staff members). This suggests very little analysis of the monitoring plan occurred prior to its "adoption" by the Corps.

153. The Northwest Wellfield Watershed Protection Plan describes the County's sampling schedule:

The original water monitoring well network for the Northwest Wellfield was designed and installed in 1985–86.... Water levels and water quality data were collected monthly from each well beginning in September 1986.... By the end of 1987, sufficient water level data had been collected to depict wet and dry season conditions .... By 1993, sufficient water level and water quality data had been collected to determine that the ... wellfield was free of contaminants.... At this time, water quality and water level monitoring was reduced to 4 times per year and the number of water level wells monitored was reduced. The monitoring program has subsequently been scaled back twice more .... Currently [in 2000] the monitoring program is a requirement of the water use permit issued by [the State]. The current water quality program includes 3 annual samplings of 9 sites ... and two production wells.

AR1175, p. 30.

154. The Court found Dr. Huffman's testimony to be very credible, particularly in light of her nearly two decades of experience studying pathogens and contamination of drinking water sources in her laboratory at the University of South Florida. Dr. Huffman has eighteen years' experience working with cryptosporidium and giardia and has published a number of book chapters and peer-reviewed articles

tees' mining sites are only sampled quarterly and the samples that are taken are too small to be accurate, particularly if the recovery efficiency of the sampling is unknown. Tr. 291–94 (Dr. Huffman).[155] DERM's current Director also testified that the mining companies are no longer sampling or at least are not reporting the results of the sampling from the surface water of their mining pits; nor is DERM sampling the surface water of these pits. Tr. 5218–19 (Espinosa). DERM still samples the groundwater and canals in the area. Tr. 433–34 (Dr. Markley). Tellingly, a senior member of DERM staff testified that she thought DERM was meeting its requirements, but "would like to see [DERM] do more to monitor water quality in the Northwest Wellfield." Tr. 507 (Dr. Markley).

In light of the infrequent (or discontinued) sampling and its noted problems, Dr. Huffman testified that "the number of negative samples [for pathogens does not reduce] the . . . risk of contamination or [the possibility that] . . . these organisms [are present] in surface waters." Tr. 290 (Dr. Huffman). "[T]he negative sampling results do not tell me definitively that there is no cryptosporidium in the lakes." Tr. 334 (Dr. Huffman).She continued:

> [B]elow detection limit in this case is 12 oocysts per hundred liters. Therefore, any count less than 12 oocyst[s] per hundred liters, if that's the volume that they sampled would be a nondetect. [It][d]oesn't necessarily mean the organism wasn't present.[156]

Tr. 328 (Dr. Huffman). Nonetheless, a positive indication of giardia *was* found in a sample of water collected on December 28, 2005, from the surface water in the center of a mining pit located immediately adjacent to the area in which Continental (now owned by White Rock) was permitted to mine. The sample of water had 14.2 cysts [157] of giardia per hundred liters. Plaintiffs' Exhs. 19, 20; Tr. 260–61 (Dr. Huffman).

According to Dr. Huffman, it is "very significant to ever get a positive result [for

related to these pathogens. Dr. Huffman has worked for the EPA to develop test protocols for drinking water and has studied the "fate and transport," i.e., the survival and movement of pathogens under certain conditions, in aquifers throughout Florida. Tr. 250–53. Indeed, Dr. Huffman was contacted earlier by counsel for Intervenors who apparently was interested in "pursuing [her] opinions" and possibly hiring her as an expert witness. Tr. 364 –65. The Court found that Dr. Huffman's testimony reflected a far greater expertise in the relevant area than the testimony offered by Intervenors' expert, Dr. Joseph Cotruvo. Dr. Cotruvo had little experience prior to this case in the specific issues relating to a potential reclassification of the Aquifer to GWUDI, contamination by cryptosporidium or giardia, and groundwater flows generally.

155. Dr. Huffman testified that quarterly monitoring is not frequent enough (noting that the EPA requests monthly monitoring in its new drinking water treatment rules) because concentrations of cryptosporidium are somewhat seasonal, and the smaller size of the collected samples of groundwater, i.e., only 50 liters instead of the 100 liters provided for in the monitoring plan, makes detection more difficult. Tr. 291–93. Dr. Susan Markley, chief of the ecosystem restoration and planning division of DERM, agreed that the sampling frequency could be improved. Tr. 441 (Dr. Markley). She also noted that she had recommended continuing sampling longer than the three years in the original monitoring plan. Tr. 441–42.

156. "[B]ecause of that, the fact that this monitoring program only collected 50–liter samples [of groundwater] is an indication that I'm not surprised that they're finding negative results. Clearly they would have had twice the chance if they had collected a larger volume sample." Tr. 292 (Dr. Huffman).

157. "In the case of giardia, we refer to the environmentally stable form [of oocysts] as a cyst." Tr. 260 (Dr. Huffman).

these pathogens] because the recovery efficiencies of testing methods often miss low numbers of oocysts [i.e., the pathogen]." Tr. 273–74, 289–92, 353–54 (Dr. Huffman). Unfortunately, adding to the difficulty of discovering the presence of pathogens in the raw water supply, is the fact that the manifestation of diseases related to these pathogens in humans is substantially underreported; experts suggest that individuals of average health discount an upset stomach or occasional diarrhea which may be symptoms [158] of exposure to these pathogens.[159] Moreover, cryptosporidium is a pathogen "that is not easily controlled with conventional disinfection practices ... setting the target concentration at the consumer tap is not appropriately conservative in estimation of incremental risk." Plaintiffs' Exh. 29, p. 2–2.[160]

The risk of pathogen contamination underscores the importance of respecting accurate Wellfield protection zones and ensuring the County's process of updating its Wellfield protection zones with current modeling results and data. Dr. Huffman testified that

> [T]his is the first place that I have been to, having known all of what I have .... First time in my life that I looked at the tap water and drank my bottled water when I brushed my teeth this morning. I'm embarrassed to say that .... I've actually limited my consumption of the drinking water here in Miami–Dade County since I've been here, and I was very uncomfortable.... I travel throughout the country and I listen to people complain very often about the taste of their drinking water, the odor of their drinking water.... And aside from taste and odor issues, I think most utilities work very hard to provide a safe product .... And it struck me as being the first time—that I really took some pause in a hotel about drinking the tap water.

Tr. 350—51, 362–63 (Dr. Huffman).[161] Dr. Huffman explained that her concerns about drinking the local tap water were based on the information she reviewed in this case, which revealed that some of the monitoring wells showed high levels of algae and were very close to being considered GWUDI. Tr. 363. "[T]he fact that [the miners have] removed ... 60 feet of soil and aquifer material [in such close] proximity [to the production wells is also of concern]." Tr. 364.

---

**158.** Those individuals whose health already is somewhat compromised, e.g., the very young or the very old, may experience more severe symptoms.

**159.** Intervenors' witness Dr. Cotruvo agreed with Dr. Huffman that cryptosporidium-related disease is substantially underreported and that established test methods are unlikely to detect the pathogens before contamination. Tr. 4493–94, 4496, 4499 (Dr. Joseph Cotruvo).

**160.** Dr. Huffman also testified about two major outbreaks of cryptosporidium in groundwater—one in Texas which resulted in 1400 people getting the pathogen from groundwater from a Wellfield (a sewage spill occurred in a stream that was one mile from the Wellfield at issue, and the river water was drawn in faster than expected because it had been a very dry season), Tr. 283, and the other in Wisconsin in 1993 which killed more than one hundred people and caused illness in another 400,000 (despite the existence of a functioning water treatment plant—which subsequently was retrofitted and upgraded), Tr. 299–300.

**161.** In addition, Dr. Huffman referred to a report from the National Academy of Sciences ("NAS"), which discussed the proposed use of certain of the mining pits as reservoirs for future water storage as part of the overall Everglades restoration project. "[The NAS was] concerned that mining activities, which included blasting in the area of those lake mines that [might be used for] reservoirs, could in fact affect the lake mining pits and the subsurface and the aquifer material in that area." Tr. 305–306.

## 2. Benzene in the Wellfield

As an initial matter, the Court restates its decision to deny Defendants' and Intervenors' requests to have evidence about the benzene contamination of the Aquifer excluded from consideration.[162] Defendants' counsel suggested that the Court "lacked jurisdiction" over the matter because benzene contamination was not specifically identified in Plaintiffs' Amended Complaint, Tr. 785, 795.[163] This case is in post-summary judgment proceedings to determine remedies for serious violations including the Corps' failure to adequately study the risks of Aquifer contamination, as well as multiple instances where the Corps disregarded public notice and participation requirements of relevant statutes and violated numerous regulations. As the Court indicated at the evidentiary hearing, the Court has determined that Plaintiffs' Amended Complaint and this Court's ruling granting summary judgment[164] are sufficiently broad to allow consideration of the evidence relating to benzene contamination.[165]

Benzene was detected in the raw untreated water delivered to the Hialeah–Preston water treatment plant on January 4, 2005; benzene levels were initially at .25 parts per billion ("ppb")[166] but increased

162. Intervenors' counsel described the benzene contamination as a "red herring" and "beyond the scope of the issues before the Court," Tr. 769, and attempted to frame the issue as one involving proof of pollution by the mining companies—clearly not an issue before this Court. Later in the hearing, on July 26, 2006, Intervenors' counsel assured the Court that "there aren't problems you need to be concerned about going forward." Tr. 2712. This prediction turned out to be inaccurate; the Court later learned that another benzene contamination incident was detected in July and August 2006 in production wells which weren't previously affected. See discussion infra.

163. Defendants also argued that because the production wells which had been contaminated were not in operation, there was little risk from the benzene contamination. Docket No. 350, pp. 18–19. This argument is moot as those wells now are back in production. See CAP.

164. As was noted in the March 2006 Order, "[t]he Court ... granted Plaintiffs' request to amend their complaint to include claims based upon new information submitted to the Corps after the permits had issued (in light of all defendants' representations that they had no objection to such amendment)." Sierra Club, 423 F.Supp.2d 1273, 1280. Plaintiffs' Motion to Amend the Complaint was filed on March 25, 2004. On March 30, 2004, the Corps responded to correspondence from one of the Plaintiffs and "request[ed] that [Plaintiff] provide any additional information ... regarding the Wellfield, including the various documents ... reference[d] in [Plaintiffs' submitted] report, as well as any other information you wish us to consider, so that we may address these and other pertinent concerns in a timely manner." SAR1879.

165. At the very least, the Court notes that it would be a waste of resources to require the Plaintiffs to commence a new challenge related to the benzene contamination which, but for the Corps' failure to advise the Court and the public (including the Plaintiffs) at the time the contamination occurred, might have been raised more than two years ago either before this Court or in an administrative challenge. The Corps simply will not be permitted to keep from revealing such damaging information and then argue that it is not ripe for judicial review because no one yet raised the complaint before the agency. Indeed, it seems odd that the Defendants would attempt to shield the benzene issue from this Court's review by the summoning of legal principles, e.g., standing/exhaustion doctrine, evidence rules, etc. This Court finds that evidence of the benzene contamination is admissible in this proceeding; even it if were not, there would be some merit to it being discussed by the parties prior to the entry of a remedies order by this Court. The benzene issue is clearly relevant to the question of whether this mining should be permitted in the Wellfield.

166. Parts per billion is equivalent to micrograms per liter. Tr. 1211 (Pitt). The State water quality standards are found at Table 4 of F.A.C. 62–550.824, and provide that the

to 14 ppb during February and April. During this incident of contamination, the levels in the production wells rose as high as 14 ppb in PW–1, and 7.1 ppb in PW–2. Docket No. 366 (Executive Summary of Northwest Wellfield Benzene Investigation, prepared by DERM, February 2007 ("Executive Summary of Investigation"), p. 3). During the same time period, the finished water, after treatment at the plant, was Below Detectable Limits ("BDL"), i.e., not measurable, for benzene. As this was the highest level of benzene ever detected at the plant,[167] the local agencies clearly considered it important[168] to conduct a search despite their assertions that the water treatment plants could handle the contamination.[169] County Management also monitored the investigation:

> The results, so far, indicate that benzene extends to at least a distance of 1200 ft from [PW–1]. The highest concentration found so far is approximately 20 ppb, at a depth of about 60 ft near [PW–1] .... The source has not been identified, but we continue to search for potential sources.

Plaintiffs' Exh. 100: Memo from George Burgess to Mayor and Board of County Commissioners, March 17, 2005.

Monitoring wells were installed in the Wellfield to delineate the area of contamination. A cluster of wells was installed at each monitoring well location. Each location included a shallow well, an intermediate depth well, and a deeper well. DERM's investigation concluded that for this first contamination incident (2005), "the highest contaminant concentrations occurred at depth: the shallow wells exhibited the lowest and the 60–foot wells the highest concentrations." Executive Summary of Investigation by DERM, p. 4. The agency determined that the contamination plume (the path of the contaminant) was delineated as follows: "a narrow, elongated plume extending from the southwest ([monitoring well] NW–126) to the northeast ([monitoring well] NW–119) and a separate localized area of impact located approximately 3000 feet to the south of the PW–1; [at] assessment well NW–109." Executive Summary of Investigation, p. 4.[170] It is important to note that 3000 feet is outside the current mining setback in

Maximum Contaminant Level ("MCL") for benzene is .001 milligrams per liter (mg/L). One microgram equals one millionth of a gram (.000001), and one milligram is one thousandth of a gram (.001); thus, .001 milligram/L equals 1 microgram/L.

167. Benzene had been observed before, despite the limited nature of the sampling and monitoring conducted until recent years. William Brant, former Director of WASD, testified persuasively that, looking back at sampling over the years, "there were occasional hits of benzene.... [Y]ou would see it one time and then it would not be there for another year or so." Tr. 1494 (William Brant).

168. Ana Caveda, a supervisor in hazardous materials management at WASD, testified that the expenses associated with the benzene investigation were more than $1 million, paid by WASD. Tr. 2377–79; Plaintiffs' Exh. 144.

169. Benzene had been sporadically detected in DERM's sampling of the production wells since Jan. 2001, Plaintiffs' Exh. 203, Tr. 6551, but was being detected in early 2005 at levels which "are several times higher than had been previously detected anywhere in the vicinity of the NWWF." Executive Summary of Investigation, p. 2.

170. "The benzene groundwater plume in the vicinity of PW–1 is delineated both horizontally and vertically; however, to date the source of the contamination has not been found. DERM will continue to work with [WASD] to monitor groundwater quality in the vicinity of the impacted production wells and to conduct any additional investigation necessary." Docket No. 366 (DERM letter to County Health Department, dated Feb. 12, 2007).

the challenged permits, i.e., mining is proceeding or is entitled to proceed at that distance from the production wells according to the Corps' permits. The benzene incident in early 2005 revealed the Wellfield's, and the municipal water supply's, vulnerability to contamination:

Well, it's all one aquifer. . . . [I]f you detect benzene at 60[ppb] in a monitoring well, and then you also have benzene in a production well, the logical conclusion is that the groundwater is being pulled into the production well, bringing the benzene with it. . . . The cones of influence of these [production] wells reaches [sic] out miles.

Tr. 1475–76 (Brant).

Benzene was detected in the production wells again in June and July 2006, Tr. 2364 (Ana Caveda). Benzene was detected at a maximum of 9 ppb in PW–1, 5.8 in PW–2 (it was .99 ppb of benzene when benzene was first observed in June 2006), and 1.5 in PW–3 (rising from an original detection of .24 ppb in June 2006). Executive Summary of Investigation, p. 3. The only sampling for benzene by the County at that time was in the cluster of wells near Monitoring Well 109 ("NW–109") and the cluster near NW–126. Tr. 2364–65 (Caveda). Plaintiffs' Exh. 135. For this second major incident of contamination, DERM reached similar conclusions—the greatest impact of the concentration was seen in the deeper wells, i.e., at 60 feet. The data

for this episode showed a wider plume extending from the west and southwest (near NW–124 and NW–115) and narrowing in the vicinity of PW–1, then extending to the north (NW–105) and northeast (NW–115) of PW–1. The highest concentrations (17.1 ppb at the deep level monitoring, and 12.7 at intermediate depth) were at NW–124—a location which had not previously shown benzene. A set of monitoring wells was installed near a mining lake operated by White Rock, approximately 5400 feet west of PW–1, and low concentrations of benzene were found.

A total of 86 monitoring wells were installed, ranging from shallow to deep depths, during WASD's investigation of the benzene contamination, and samples were obtained detecting as much as 60.5 ppb of benzene. Executive Summary of Investigation, p. 3. Groundwater levels of benzene in NW109 (3000 ft south of PW–1), were detected at 14.9 to 50.9 ppb. The record is unclear [171] as to how much sampling for benzene presently is being conducted, other than at the production wells,[172] e.g., what other locations are being sampled, and by whom.[173]

DERM's investigation of the benzene contamination revealed that certain sources (other than blasting related to mining) were not the cause of the contamination, e.g., a submerged vehicle in a rock mining pit, contaminated soils from a mining dragline [174] assembly area.[175] Nor does DERM believe that benzene is the

---

**171.** It is clear, however, that the Defendants have initiated no investigation into this matter whatsoever, despite having been informed of benzene and the possible connection to mining in the spring of 2005, Tr. 2774–76, Plaintiffs' Exh. 150.

**172.** "It should be noted that although the plume [of contamination of benzene] appears to be vertically delineated, the source has not been identified. Consequently, contaminant levels will continue to be evaluated in the production wells on a biweekly basis." CAP, p. 6.

**173.** Previously DERM had "implemented a monthly sampling program" of the monitoring wells. Tr. 4687 (Mayorga).

**174.** A dragline is a type of heavy equipment used to remove the limestone from the quarry pit. Large draglines must be assembled at the site of the mining activity. For example, the website for White Rock Quarries (the company which mines pursuant to permits issued to Vecellio & Grogan, Continental, and APAC/Pan American Construction) reports that White Rock uses the "world's largest aggregate dragline" with a 105–cubic yard bucket large enough to hold 130 tons of blast-

result of a gasoline spill, Tr. 4759, nor of any "continuous source" of discharge, Tr. 4761. While Wilbur Mayorga, of DERM, claims that the County has "not been able to find ... specific information that could link [the benzene contamination] to the blasting," Tr. 4752, the Court finds this testimony to be at odds with the weight of the evidence. Mayorga himself admitted that "there were some samples targeted to prior to and after the blasting .... We found [NW]109 with elevated levels, and that's when we started investigating [NW]109 .... [the investigation revealed that levels went up] from 47.5 to 60.5" after a blasting event. Tr. 4750–51.

The County's initial investigation of potential sources of the benzene included an evaluation of the mining activities. William Pitt, a senior professional staff member at WASD, testified that his prior experience working as a subcontractor for the County on a blasting investigation in the Wellfield provided him with background information regarding the blasting associated with mining and the potential for such blasting to be the source of the benzene. He described the blasting process used by the mining companies, stating that core holes are drilled to depths of up to 100 feet, "almost to the bottom of the aquifer," and then filled with as much as 300 pounds of a blasting agent, ammonium nitrate fuel oil ("ANFO"), which contains fuel, e.g., diesel, of which benzene is a component. Tr. 1268–70. Ana Caveda,[176] the WASD staff member who conducted the field investigation of the benzene contamination, testified that after the blasting holes [177] are drilled, a cardboard tube is inserted with the explosives and placed at the deepest point of the hole, e.g., 60 feet, continuing

ed rock. "With an average mining cycle of 75 seconds, the machine can yield 24 million tons of limestone per year." The dragline took a year to be reassembled when it was moved from New Mexico to Miami aboard 175 semi-trucks, and has been operating at White Rock's quarry since September 2005. The dragline works around the lakes by "walking" on "shoes" that measure 12–ft. wide by 60 ft. long. The dragline runs on electricity, and "requires its own nearby, dedicated power substation." "White Rock Steps Up Capacity With World's Largest Aggregate Dragline," dated 1st/2nd Quarter 2006. Available at *http://www.wrquarries.com/ newsphotos18.htm*, last visited June 19, 2007.

175. Defendants argue that "there is no need for the Court to determine whether mining is the source." Docket No. 350, p. 19. The Court agrees—there is no need for this Court to make a conclusive determination that mining is *the* source; rather, environmental statutes and regulations merely require that the agency—as monitored by this Court—properly weigh risks of adverse environmental effects. Benzene is a symptom of the Corps' failures to monitor water quality issues adequately under these permits, and none of the governing statutes require direct causal proof of contamination before determining that a

risk is significant. Nor is the Court required to find that the County acted in "bad faith"— as peculiarly implied by the Defendants, Docket No. 350, p. 19—in order to assess whether the Corps performed its federal legal duties. Intervenors argue that Plaintiffs' evidence was "entirely unfocused, addressing at most 'potential' future harm from mining generally but not any harm from mining under any of the permits during the short remand period." Docket No. 352, p. 7. Such an argument misapprehends the nature of judicial inquiry in these proceedings. This Court will not require further "concrete" evidence of harm, e.g., additional benzene contamination, or proof beyond any reasonable doubt that the benzene is caused by the blasting/mining before taking action to enforce the environmental statutes and regulations which the Corps has violated.

176. The Court found Ms. Caveda's testimony to be credible and candid. Ms. Caveda's total of twelve years of experience at WASD and DERM and her direct role in the benzene investigation made her a very persuasive witness.

177. Tarmac uses six inch wide vertical holes. Tr. 5028 (Townsend).

until approximately 10 feet below the surface. The top 10 feet then are filled with "blasting caps" and the holes are connected by wires so that they detonate together. Tr. 2320—22. Sometimes more than 100 of these blasting holes would be connected in a row. Tr. 1268—70 (Pitt).[178]

Ms. Caveda was in the field, collecting samples in late April 2005, when she noticed that blasting was occurring nearby.

I have notes from being there and pictures and personally witnessed a driller actively drilling rock piles from active mining efforts after the blasting takes place all along the edge—western edge of the south White Rock lake .... During the month of ... April ... I was present on-site at a sampling event taken or performed April 28th, and I witnessed, just from going there to the site all the time, that western edge was being mined actively from day to day. The progression along the lake's edge from the southern corner to the northern corner along the west wall of the lake was—it was progressing. It had reached the northern corner closest to monitoring well 109 .... [I knew blasting was going on] [because I had seen the orange caps in place on some days, then the following days visited those areas,] the ground didn't exist and the area was actually being mined and the piles of rock were getting higher. We had an actual like crane or deadline, whatever they call it, piece of heavy equipment that digs the soil out, the loose rock out from the water, and piles it up at the lake's edge.

Tr. 2352–54. *See also* Plaintiff's Exh. 185.

Ana Caveda collected a sample from the shallow well at NW–109 immediately following a known nearby blasting event to determine if it would detect benzene and it did. Ms. Caveda testified that the WASD team responsible for the investigation:

witnessed blasting caps in the northwest corner of the White Rock south lake on April 28th [2005] on the occasion of our sampling out there, and the results appeared or revealed benzene at 42 parts per billion for the [mining] consultant's lab, 47[ppb] for the [WASD] lab and 23.5[ppb] per billion for the DERM lab in the 40–foot well. And the shallow was below detection limit, and the deep had 28[ppb] by the consultant's lab, 34[ppb] by the [WASD] lab and 17[ppb] per billion by the DERM lab. And then resampling of the same well on May 3rd revealed benzene at higher levels. 61.6[ppb] in the [intermediate depth well at NW–109], and 50.9[ppb] in the [deep well at NW–109] .... And the photos show that those [blasting] caps that were in place at the previous sampling event were already blasted by the second sampling event .... [H]e drew the conclusion that there was a spike due to the blasting effect. I mean, it was just a possibility that needed to be evaluated.

Tr. 2358–59.

On one occasion, Ms. Caveda saw a "cloud of yellow fumes of some sort" and

**178.** "Blasting activity reports" filed with the state's Bureau of Fire Prevention, Regulatory Licensing Section, reveal that Tarmac had seven separate blasting events between mid-January 2005 and mid-May 2005; blasting holes were drilled to 70 feet, and at least fifty holes were used for each event. Plaintiffs' Exh. 189. The amount of explosive material is listed in the activity report along with the amount of explosives used—there is no indication of the unit of measurement, but if it is pounds, then the blasting events are using at least 20,000 pounds and often as high 60,000 pounds. *Id.* (reporting the amount of explosive per event as 20,010 to 70,570.5). Tarmac's representative also testified that the blasting emulsion used at the mining site is brought "in as a gel in tankers," Tr. 5069 (Townsend), which suggests that a rather large quantity of ammonium nitrate and blasting compounds may be present in the immediate vicinity of the mining operations.

discussed it with a representative of permittee/Intervenor Florida Rock who told her that it "was a dud, an explosion or a detonation that didn't work or didn't happen properly, and that is what comes off of an explosion that doesn't work, I guess, in the ground." Tr. 2323–24. Reportedly, duds or misfires "happen[ ] all the time" Tr. 2324.

It appears that there were several items of information related to the blasting which weren't investigated by DERM. For example, DERM didn't obtain information about "partial detonations and their frequency and magnitude in and around the Northwest Wellfield," Tr. 4757,[179] DERM never tested the blasting material itself, Tr. 4762, DERM also "didn't consult with any blasting ... experts" and "did not conduct any lab or field experiments to determine whether the blasting and what it did to the blasting agents might be the source of the benzene," Tr. 4759.

In contrast, WASD professional engineering staff, who conducted the field investigation and who evaluated its results, found the blasting to be the most likely source of the benzene. Blasting related to mining "was the most likely of the sources that we identified, yes. It was a source that was the only thing in the area that had the same depth where the contamination was found, the mining activity introduces materials at the same depth as the benzene that was found, and also the same depth as the flow zone to our production wells." Tr. 2366 (Ana Caveda)[180]. While the specific source of the benzene remains unidentified, the Court finds the results indicating benzene's persistent presence at depths of 60 feet to be significant.

> Benzene is a low density chemical, significantly lighter than water, it is not likely that the concentration at the 60-foot depth could have resulted from an above-ground surface spill that leaked downward into the Aquifer, nor is it likely that it could have resulted from a buried tank that leaked or from any other similar disposal at the top of the aquifer.... [It appears likely] ... that benzene must have entered the aquifer at depth and then moved with the water in the preferential flow layers of the aquifer, maintaining a higher concentration in those flow zones as the benzene plume moves through the aquifer. Day-to-day fluctuations in benzene concentration within the flow zones could be the result of plume pulsations caused by plume direction changes when the flow lines are affected by variation in Wellfield pumpage rates and by the wells actually in operation.

Plaintiffs' Exh. 81 ("Evaluation of the Occurrence of Benzene at the NW Wellfield," undated[181] memo from William Pitt to William Brant). Mr. Pitt, whom the Court found very credible,[182] explained to this

---

**179.** Ana Caveda noted that DERM did not issue its standard "notice of required testing" ("NORT") to any of the mining companies regarding the benzene contamination, which Ms. Caveda described as "unusual," Tr. 2300 –01, but Mayorga said that a NORT was not issued because the sampling results already had reduced to below criteria. Tr. 4689.

**180.** The highest concentration of benzene was detected at MW–109, and "was probably caused by the blasting of [ANFO] in the process of mining lakes." Tr. 1285, 1300 (Pitt).

**181.** Mr. Pitt testified that the memo was written "early during the investigation." Tr. 1217.

**182.** Prior to joining the management staff of WASD, Mr. Pitt worked at the USGS for twelve years, and worked for approximately twenty years at private consulting firms. While working as a consultant, Mr. Pitt was hired to conduct the hydrogeology aspects of a County investigation into the effects of mining-related blasting on homes and neighborhoods near the Lake Belt. Tr. 1268—69. He has published numerous articles and has written reports on the interconnection between

Court that the benzene was

found in high concentrations, ten parts per billion or higher, in the 60–foot zones of the aquifer, and in much lesser concentrations, one parts per billion or less, in the shallow zones. Furthermore the data show that the high concentrations appear to be to the south and southeast of the southernmost well, well number 1.

Tr. 1223–24 (Pitt). *See also* Plaintiffs' Exh. 81. The County's CAP, prepared by WASD, also notes that:

As groundwater flow in the vicinity of the Wellfield is towards the production wells, not away from the production wells, the source of the high concentrations of benzene must originate from

surface water and groundwater. Tr. 1193–98.

**183.** Dr. Hennet specifically did not seek to replicate precisely the conditions that occur when an ammonium nitrate emulsion is detonated, because it has a range of conditions, and "not everything happen[s] at one single temperature, one single pressure or the such." Tr. 6531 (Dr. Hennet). "[W]ithin that range of extremes you have conditions that are conducive to the formation of the [benzene and other hydrocarbon by-products]." Tr. 6532–35. Dr. Hennet testified, for example, that no one could make calculations to determine how much of the by-products from the detonation of a blasting emulsion are released into the atmosphere above ground because every case will be different, depending on the depth below the surface at which the explosives are placed, the amount of explosives, etc. Tr. 6533.

**184.** Dr. Feenstra testified that EPA's "sector notebooks," which describe specific industrial sectors and the types of risks they pose do not indicate any concern by EPA with regard to groundwater contamination by benzene from blasting operations. Tr. 5340–41 (Dr. Feenstra), but this Court wonders whether EPA has seen ANY limestone mining operations on top of an Aquifer in the middle of a pristine Wellfield anywhere in the country other than

south of the Wellfield, and from production well 1.

CAP, p. 2.

In addition to the evidence as to the location from which the benzene originated, the Court is particularly impressed with the testimony of Dr. Hennet regarding the nature of blasting and the release of benzene—regardless of whether benzene is present in the blasting emulsion. His relevant experience, and his careful testimony,[183] indicated that his opinion was thoroughly developed. The Court found that Dr. Hennet's testimony was much more relevant and credible than that of either Dr. Feenstra,[184] or Dr. Machacek, who was unaware even as to the concentration levels of benzene detected in the Wellfield. "I thought parts per million, but I don't know." Tr. 7014.[185]

Miami–Dade County. Dr. Feenstra also appears to have narrowly defined the problem, despite the existence of "16,000 references related to groundwater and groundwater contamination" in his library. Tr. 5340. "I reviewed the EPA sector notebooks for metal mining and nonmetal mining, and basically looking for any indication that there was a concern by the EPA with regard to groundwater contamination by benzene from blasting operations... I found no such notation, no concern indicated with regard to that particular type of potential pollution." Tr. 5341.

**185.** Dr. Machacek's experience in the testing of commercial explosives was impressive, but ultimately his testimony was not persuasive. For example, after testifying that he knew of no incidents where there was a correlation between blasting and benzene contamination in groundwater, he admitted that benzene probably had never been specifically looked for as a result of blasting. Dr. Machacek testified that he did not believe that benzene is created by the use of either diesel fuel nor mineral oil in blasting emulsions. Tr. 7030–31 (Machacek). Aside from his beliefs as to the chemical processes, Dr. Machacek conceded that he wasn't aware of any investigation that had been designed or would have been able to detect the type of benzene contamination problem we have here. Tr. 7014–15.

The evidence is compelling that when a blasting compound contains fuel oil, or any other component which includes benzene, that benzene may be released into the groundwater. While Intervenors' expert, Dr. Feenstra, attempted to dispute this, he was unconvincing. Dr. Feenstra is not an expert in combustion byproducts, as acknowledged by counsel for Intervenors. Tr. 6217. Dr. Feenstra tried to establish that the benzene was related to a distant gasoline spill, but each aspect of his opinion testimony was rebutted convincingly by Plaintiffs' expert Dr. Hennet. Tr. 6577, 6582 (Dr. Hennet).

Dr. Hennet relied on the "state of the art" in the combustion sciences, the most "modern, very recent research in combustion chemistry," Tr. 6531, in forming his expert opinion. He relied on combustion chemistry, and studies of the "chemical pathways that explain what happens during combustion of the products that are present in the blasting mixtures." Tr. 6532 (Hennet). Dr. Hennet testified that the data from the Wellfield, while limited, did reveal that there was an "excellent correlation," Tr. 6448, between the levels of benzene and the levels of corresponding chemicals styrene and ammonia, for example, found in the samples in the deep and intermediate depth wells at NW–109, which supports his opinion that it is inevitable that benzene will form during the combustion of ANFO.[186] That correlation indicated a similar source for both the benzene and the ammonia in those levels at that location. Tr. 6498.[187]

Dr. Hennet testified that even if fuel oil is not being used, the formation of benzene is still probable. "So you do not need to start with benzene or anything else to go and yield benzene. You start with hydrocarbons, you break them down through combustion, you form those type of very reactive compounds that are called free radicals that recombine and start to form those aromatic compounds." Tr. 6446–47. The starting product is not that important, as long as it includes hydrocarbon compounds that will break down to form those free radicals. Tr. 6448. Even if fuel, or diesel, oil is not used in the blasting agent, benzene still may form as a result of the combustion of hydrocarbons.

> [W]hen you combust or you heat up vegetable oil, you're going to go through the same process, and you're going to produce those free radicals and then you are going to produce some benzene.... So even if you cook a hamburger, you are going to produce free radicals, and some of them will combine to form benzene, and that has been documented, measured, and it is ... in the literature.

Tr. 6448. "You start with hydrocarbon mixtures, you bring enough heat to them to break those compounds into free radicals, and those will recombine to form those type of compounds." Tr. 6448. "The combustion of mineral oil will yield to the formation of benzene under appropriate conditions, ... [conditions which] are [definitely possible] in the Lake Belt." Tr. 6579 (Hennet).

**186.** Dr. Hennet testified that the fingerprint of the compounds found in the Wellfield is similar to that produced during combustion experiments. Tr. 6463–70, Plaintiffs' Exh. 237. Styrene is not a very persistent compound in the groundwater environment, and is not found in a groundwater plume from a gasoline spill, because it tends to degrade relatively quickly Tr. 6519. Dr. Hennet also reviewed the ammonia concentration in the groundwater and noted that it varies from place to place. "It's actually very high relative to other locations that I a familiar with." Tr. 6583. Ammonia is detected in the Wellfield in hundreds of parts per billion. Tr. 1332 (Pitt).

**187.** Dr. Hennet noted that all of the following compounds had been detected in or near the Wellfield: ethyl benzene, xylenes, and styrene. Tr. 6443.

Intervenors attempted to establish that the temperature of the explosions in the Wellfield is too high to have allowed for the release of benzene,[188] but Dr. Hennet credibly testified that the cool temperature of the groundwater surrounding the four-to-six inch blasting holes would maintain the temperature at a range which is conducive to the formation of benzene. It is "very likely, and . . . probably unescapable [sic]" that the use of ammonium nitrate blasting agent that contains a hydrocarbon mixture "will form some benzene." Tr. 6581. The blasting process itself may be responsible for the benzene if the hydrocarbon burning during the blasting is the source of the benzene, it may not matter that the source of the hydrocarbon is from diesel fuel or mineral oil. Tr. 6397, 6448, 6494, 6548, 6579 (Dr. Hennet). Benzene spikes occurred at same time as spikes of styrene (hydrocarbon similar to benzene and also produced by the combustion of hydrocarbon mixtures), Tr. 6487–92 (Dr. Hennet), as well as ammonia (the primary ingredient of the blasting agents). Tr. 6341 (Dr. Hennet), Plaintiffs' Exh. 227 & 239.

"[W]hat I am able to establish with confidence as an expert in my field is that when ANFO blasting agent is used, products such as benzene, toluene, styrene, ethyl benzene, xylenes are going to be produced." Tr. 6548 (Dr. Hennet). Dr. Hennet was careful not to testify as to exact amounts, but rather relied only on estimates, noting that it is impossible to know exact amounts based on the insufficient data in this case regarding the amount of explosives used, the depth at which they are placed in the Aquifer, the temperature of the blast, etc.

We do not have sufficient data from the field to give quantitative answer of how much is being produced for styrene, benzene, toluene, [etc.]. What we know is that it is produced. . . . We know it by the science . . . and we see exactly what we expect [we] would find if we were contributing those compounds from the use of [ammonium nitrate] blasting agents. That's for certain.

Tr. 6549.

Intervenors argue that the lack of prior incidents of benzene contamination despite decades of mining in the area prove that the mining cannot be the source of the benzene. The Court disagrees.

Whereas before, that Wellfield had never been operated, consistently every well. So at that point we had the most—I guess had reached a certain level of pumpage that may have brought the things in. . . . by aerial photographs . . . it indicates that the lakes were further away in the past. Now they've reached the closest locations.

Tr. 2431 (Ana Caveda).[189] Moreover, the benzene data sampling in the area only started in early 2000, and was so limited that it may not have detected benzene simply because the sampling was performed at a great distance from any blasting occurring at the time.

[After 2000,] it appeared that samples were collected maybe once a year, maybe a little bit more often than once a year, until 2003, when it was collected three times a year. Then it continued—the frequency of sampling started to increase 2004, 2005[sic], and then ben-

---

188. The Court notes that Intervenors offered no testing results or data to demonstrate the temperature of the blasting event.

189. "I learned that there is an approximate ballpark of eight hours lag time between the production well and when that water is received at the entrance to the plan, and an additional eight hours of when that particular water is discharged as drinking water, finish water." Tr. 2363 (explains benzene drop) (Ana Caveda).

zene was starting to be detected and you have a lot of data. But early on, before 2000, you do not have a lot of data, even though you may have 40 years of blasting. In the early years of this, when you have very few samples, low levels of benzene were detected, not very high. [T]his data ... [is] not sufficient to understand what happened for the last 40 years.... I think the data is pretty sparse for 40 years of blasting, and I don't think anybody can say whether or not it happened before.

Tr. 6552–53 (Hennet).

At some time after a meeting with the permittees' representative, Kerri Barsh, in June 2005, the mining companies reportedly began to use mineral oil as a substitute for fuel oil in the emulsion mixture. Tr. 4763–64 (Mayorga).[190] Tarmac substituted a "food grade mineral oil for the fuel that had the diesel—the benzene component," Tr. 4969, but had been using diesel fuel until February 2006, Tr. 5026, i.e., had been using a product with benzene as a component. Intervening Defendants' Exh. 112. Intervenors' counsel has asserted that his clients have voluntarily stopped using the product "which theoretically possibly could be" the cause. Tr. 2448. On July 25, 2006, Intervenors' Counsel stated that reportedly one company stopped using benzene/fuel oil in 2002, others stopped in 2005, and "nobody's using it anymore." Tr. 2450. The Court notes that the mining companies obviously have a record of compliance with regulations, etc., but the Court finds nothing in the record that suggests that the Corps has taken enough interest in this issue to even verify that the companies are not using a benzene-containing oil. The Corps apparently has not asked for assurances, has imposed no conditions, has conducted no independent analysis—or at least no such efforts have been brought to the Court's attention.

The Corps was aware of the benzene contamination by at least March 2005, see Plaintiffs' Exh. 150. Despite this knowledge, they filed a preview of the "Three Year" report in September 2005, as well as the "Three Year" review report in April 2006 without a single mention of the incident.[191] Moreover, Studt testified that in late 2005 the Corps was "about to propose lifting [the prohibition on the double cross-hatched areas] because we had not been completely made aware of the County's position, and we were made aware by communicating with the County and receiving this [January 17, 2006] memorandum [Plaintiffs' Exh. 149]." Tr. 2759. Studt testified that the Corps was not "imminently" prepared to remove the restrictions but the fact that the Corps was even considering removing them at all after having learned from the County in early 2005 that the benzene posed an "immediate public health hazard to ... [the] County's public water supply," Plaintiffs' Exh. 150, is troubling.[192] Studt testified that the Corps normally "[defers] to the county experts who are delivering the water .... If the County came to the Corps ... and expressed a concern, then we would certainly carefully evaluate that ... and talk to experts in that area." Tr. 2583.[193] The

---

**190.** A proposed pilot project to test the use of mineral oil in the blasting emulsion instead of diesel fuel wasn't implemented because the companies proceeded to use the mineral oil shortly thereafter. Tr. 4765.

**191.** The Court has expressed its views on this topic already.

**192.** Indeed, it appears that the benzene contamination is related to mining in an area that is outside of the currently imposed setbacks. Plaintiffs' Exh. 4, pp. 15, 43; Tr. 1251 (Pitt).

**193.** When questioned as to whether there is a regulatory provision that directs the Corps to defer to local authorities on issues of protecting municipal water supplies, Studt was unable to identify any specific provision. "The

Corps has as of this date [194] decided to retain the restrictions on mining in the double cross-hatched area until the SEIS is completed,[195] but it is unclear what the Corps will decide at that time.

The Corps' claim that the benzene contamination was not seen as a problem by the County,[196] is interesting when compared to the County's prediction, more than fifteen years ago, of almost this exact occurrence. On July 29, 1992, John W. Renfrow (then Director of DERM, now Director of WASD),[197] identified the follow-

... deference provided to other state and federal agencies is generally within the Clean Water Act itself [and the 404(b)(1) Guidelines] may have a reference to deference to other agencies. I don't recall." Tr. 2676–78 (Studt). In fact, the CWA only defers to states regarding the question of "quantities of water," but as to water quality issues the CWA requires federal agencies to "co-operate ... with ... local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources." 33 U.S.C. § 1251(g), and the Corps' governing regulations specifically require consideration of effects on "municipal water supplies," 40 C.F.R. § 230.10(c)(1) (404(b)(1) Guidelines), and "water quality," 33 C.F.R. § 320.4(a)(1), and provide that final action by the Corps "will normally not be delayed pending action ... by state or local agency." 33 C.F.R. § 320.4(j)(1).

194. The Corps reported in its "Three Year" review report that

The County has not amended the Wellfield Protection Ordinance .... [T]he Corps believes that the County is no longer entertaining the option of expanding the County established mining setback within the Lake Belt area. Additionally, the Corps believes that the County's concern, which is that the Corps should not authorize mining outside the setback area prior to allowing the County sufficient time to evaluate whether to expand the setback, *has now been resolved.* "Three Year" review report, p. 6. (emphasis added).

195. The Corps "chose to delay any mining in those areas, and therefore not modify the permits to allow mining in those areas until [the Corps] complete[s] the SEIS." Tr. 2755 (John Studt).

196. This lack of concern from the Corps is particularly alarming in light of the fact that the Corps knew about the benzene contamination from the County since at least February 16, 2005, when a message between two

DERM staff regarding the benzene was forwarded directly to two members of the Corps' staff. The County's "brief written description of the emergency" revealed that there was an "immediate public health hazard to Miami–Dade County's public water supply" from benzene contaminating the production wells in the Northwest Wellfield. Several of the wells were to be shut down permanently "until the source of the contamination is found and mitigated." The message sent to the Corps staff sought information from them about "what State and Federal requirements are possible for an emergency situation [placement of a monitoring well to detect the source of the benzene]." Plaintiffs' Exh. 150 (email dated February 16, 2005, from DERM staff to DERM and WASD staff, forwarded to two Corps staff members on the same date). Another message was sent to Corps staff members on March 4, 2005, asking "what permits will be required for the proposed work in wetlands [placement of the monitoring wells] and if there is an emergency authorization under the State and Federal programs." On that date, a Corps staff member responded, inquiring as to the level of contamination, and noting that "the EPA target for benzene is not more that [sic] 5 ppb with a goal of zero. Knowing what level has been found so far may help me move this forward faster." Within minutes, a DERM staff member responded that the concentrations detected in the groundwater were as high as 19.7 ppb. The Corps staff member replied: "Thanks!" See Plaintiffs' Exh. 150. Counsel for Defendants told the Court that "there were only two or three e-mails or reports in total that comprised the information that was before the Corps .... And the bottom line is that although benzene had been detected, ... there was no evidence linking this to the mining. And the County did not bring this to the Corps of Engineers as a concern." Tr. 7166–67.

197. Interestingly, Mr. Renfrow was one of the few witnesses previously identified by Interve-

ing as an issue in the proposed development of the mining plan: "Does the cumulative use of explosives over the lifespan of the project result in some sort of contamination?" AR44.[198] In any event, regardless of the local government's failure to determine precisely[199] the source of the benzene, this Court concludes, based upon the evidence presented to the Court, that

the mining activities are a likely source of the benzene.[200]

### 3. Treating the water, or not—costs and delays in upgrades to the water treatment plants, and the question of private wells

The federal and state government have established drinking water standards

---

nors who ultimately did not testify in this case, as noted by Plaintiffs' counsel in closing argument: "Where was John Renfrow? If there was one witness that the Intervenors could have called, sits at the crossroads of all these issues—he was at DERM when the benzene issue was being investigated, he's the director of the Water and Sewer Department now. He was the one involved in the Bill Brant resignation [former head of WASD, forced to resign in January 2006]. He was their guy.... Sometimes you can learn more about the witnesses you don't hear from than those you do." Tr. 7089. Intervenors' counsel retorted that if Plaintiffs "thought that Mr. Renfrow's testimony was so relevant, they could have subpoenaed him." Tr. 7195. The Court hopes that Mr. Renfrow's predictive power from 1992 is no longer as accurate, as he apparently suggested—in response to WASD's efforts to conduct a study to determine the source of the benzene contamination—that terrorists might have been the source of the benzene in the Wellfield. Tr. 1493–94 (William Brant).

198. Further, in May 1999, DERM proposed additional language for the draft EIS as follows: "the following potential consequences of the proposed [mining] plan were identified: Accidental spills of fuels, lubricants or other hazardous materials during mining operations and related activities." SAR1323 (email between two DERM staff members). The Corps also was aware, from its own process of publishing the EIS and ROD, that there were predictions that the presence of the mining pits would subject the Wellfield to a change in its classification from ground water to ground water under the direct influence of surface water ("GWUDI")—a change which would necessitate tens of millions of dollars in water treatment plant upgrades, at a minimum. Based upon that context alone, the Corps should have been particularly alert for

warnings about contamination of the Wellfield.

199. The "source of the high concentrations of benzene must originate from south of the Wellfield." CAP, p. 2.

> [I]mplementation of the CAP as proposed with production wells PW–1 and PW–2 optimally operated to function as recovery wells, will provide a hydraulic barrier preventing the northerly migration of the contaminant plume towards the other production wells and will provide for the rehabilitation of the impacted groundwater.

Docket No. 366 (Letter from Mayora (DERM) to County Health Department, dated Feb. 12, 2007). Remediation activity will continue as long as the benzene contamination is present in the NWWF. *Id.*

200. Indeed, apparently the only other potential source identified by DERM in its contamination assessment is the South Florida Reception Center, located more than one mile south of the southernmost production well; that source appears, however, to be unrelated to the first contamination episode which lasted from January 2005 to February 2006. "On August 28, 2006 DERM was notified of an approximately 200 gallons [sic] diesel spill at the South Florida reception Center .... Soil and groundwater samples conducted September 27, 2006 reported low levels of volatile organic compounds (acetone and MEK) in soil and napthalenes in groundwater. All results were below the applicable clean up target level." Docket No. 366 (Intervenors' Notice of Filing, filed March 16, 2007, Attachment 2, Executive Summary of the Northwest Wellfield Benzene Investigation (2005–2007), prepared by DERM, February 2007). The Court notes that DERM's report incorrectly identifies the South Florida Reception Center as a "federal facility." *Id.*, p. 7. The Center is operated by the Florida Department of Corrections. *See* http://www.dc.state.fl.us/facilities/region4/402.html.

which vary depending upon the source water classification. Some regulations apply to surface water and GWUDI but not to groundwater. Various improvements at the water treatment plants will be required if the Wellfield is classified as GWUDI. The County has received estimates that the total present worth cost of constructing, operating, and maintaining the required plant improvements would be between $97,900,000 to $188,000,000 based upon a 20 year time period.[201] (These figures include an estimated $2.4 to $4.9 million annual cost to operate and maintain the upgraded plants.) Intervenors' Exh. 90, Estimated Present Worth Costs for the GWUDI related improvements, Table 8, p. 14, Miami–Dade Water & Sewer Department, John E. Preston and Hialeah WPS, Update of GWUDI Impact Report, July 2006.[202]

Presently "the [water treatment plants] fall short of the regulations for GWUDI facilities with regards to filtered water effluent turbidity, filter backwash water recycle and disinfection." *Id.* p. 5. The water treatment plants will have at most eighteen months in which to comply with new standards following reclassification of the source water as GWUDI, *id,* but it is estimated that the upgrades to the water treatment plants will require three to five years to be completed. Tr. 4291 (Dr. Yoder); Tr. 1576 (Brant).[203] In addition, efforts to upgrade the plants may be complicated by other factors.

> Both [water treatment plants] have been upgraded and expanded several times since their original construction. The expansions have utilized practically all available land at both sites. Additionally, the plants are bordered on three sides by residential streets, leaving no potential land to be readily acquired for expansion. Any treatment upgrades required due to reclassification as GWUDI will need to be carefully sited and the cost estimates will need to reflect the difficult construction requirements due to the congested sites.

Intervenors' Exh. 90, p. 11. More importantly, the processing of benzene in the raw water may raise issues of air pollution.

The treatment at the water treatment facilities involves a technique known as air stripping; that method of treatment can effectively process at most 280 ppb of benzene from source water in order to result in a maximum of .1 ppb output (1/10 of max level of 1 ppb (FAC Chapter 62–550)). CAP, p. 3.[204] The Hialeah/Preston water

**201.** In 1999, DERM noted that it could cost at least $235 million to add more filtration and disinfection to the Northwest Wellfield. AR605, p. 85.

**202.** In 2004, the Director of WASD attempted to identify possible sources of funds for upgrades to the water treatment plant. "Engineering studies have indicated that the cost to upgrade the existing treatment at the Hialeah–Preston Water Treatment Plant to provide surface water treatment would be approximately $70 million. The funds to provide this upgrade are not in any of the County's plans." Intervenors' Exh. 17 (Brant memo to Burgess, June 14, 2004, recommending negotiation with mining company to receive $70 million in royalties for permission to mine County's lands, designating such royalties for the exclusive purpose of WTP upgrades.) This $70 million estimate did not include operating, monitoring, or transaction costs (bonds, etc.) related to the upgraded plants, Tr. 1576, and Brant testified that he would not have recommended this negotiation if blasting had been shown to introduce benzene to the Wellfield, Tr. 1576–77.

**203.** "The proposed improvements will typically take between 30 and 42 months to design and construct; therefore, no watershed activities that would reclassify the source water as GWUDI should take place until treatment upgrades have been completed, unless a variance to [Florida code] is successfully obtained." Intervenors' Exh. 90, p. 11.

**204.** WASD spent $41.6 M to install air-stripping towers at Hialeah and Preston, and that air stripping system has been in service since the early 1990's. (CAP, p. 3).

treatment facilities are classified as a "Major Source of Air Pollution" by Florida code. FAC Chapter 62–210 (limits on air stripping activities). "While there is no specific limitation in the permit for Benzene, there is a limit for total VOCs emitted of 59 tons in any consecutive 12–month period.... Benzene is classified under Chapter 62–210, F.A.C. as a hazardous air pollutant (HAP) and must be evaluated as such." CAP, pp. 6–7.

> The results show that a maximum of 52 ppb of Benzene in the raw water can be effectively treated to an effluent concentration of 25% of the MCL (Department of Health criteria) with an Air to Water Ratio of 30:1. If the Air to Water Ration [sic] was increased to 60:1 then a maximum concentration of 100 ppb Benzene can be effectively treated to an effluent concentration of less than 25% of the MCL.

CAP, p. 5 (essentially, this indicates that the processing of benzene-contaminated raw water from the Wellfield may raise issues of air pollution at the water treatment facilities).

The former Director of WASD testified that upgrades to the treatment plant would not have been necessary but for the encroachment of the rock pits. Tr. 1575 (Brant). "[I]f one of the *existing* lakes causes the County to be designated [GWUDI], we would not have the money to immediately respond. Of course, this is true today and has been true for a number of years." Intervenors' Exh. 17 (Brant memo to Burgess, June 14, 2004).[205] In addition, the record suggests that the costs of the million-dollar benzene contamination investigation and other Wellfield monitoring activities are being paid by the general public—and not by the mining corporations.

According to Intervenors, a new amendment to Fla. Stat. § 373.41492 will increase mitigation fees associated with limestone mining and also create a new fee of $.15 per ton to pay for upgrades to the water treatment plant that treats the water coming from the Wellfield. Docket No. 153, filed June 8, 2006 (Notice of Legislative Development by APAC–FLorida).[206] Intervenors estimate that the new fee will generate $7.5 million a year.[207] Even if the mining were to continue for the five years remaining in these permits, the total collected pursuant to this new fee would be only $37.5 million. This figure is far below the County's prior reasonable estimates as to the costs of the upgrades. Therefore, Intervenors' arguments that the fee will "enable the issuance of bonds to pay for the water treatment plant upgrades" are somewhat misleading. Docket No. 153.[208] Also, it is unclear whether any

---

**205.** The Corps' "Three Year" review report noted that the County was considering an application for a rock mining permit on County lands within the Lake Belt area, and that "[i]f approved, proceeds from the County's rock mining would be used to pay for upgrades to the water treatment plant." Presumably, this involves a leasing of mining rights to a private mining company in exchange for payments made to the County. Docket No. 103, p. 14 of Exh. B, "Memorandum for Record," dated April 19, 2006, to Exh. 1, "Declaration of John F. Studt, Chief, South Permits Branch, Regulatory Division, Jacksonville District," dated April 24, 2006.

**206.** The fee "shall be used solely to upgrade a water treatment plant that treats water com-

ing from the Northwest Wellfield in Miami–Dade County.... necessary to treat or filter a surface water source or supply or both." Fla. Stat. § 373.41492.

**207.** The calculations are as follows: $.15/ton times 50 million tons/yr produced by the mining companies in the Lake Belt equals $7.5 million.

**208.** For example, Intervenors' emphasis of the following passage: "[t]he fee ceases once the total amount collected reaches the necessary levels to pay for the design and construction of the water treatment plant upgrade," Docket No. 153, suggests that the fee collected potentially might exceed the cost of design-

fees will be owed once the mining has stopped. The quarry pits already exist, and continue to grow as mining continues—it may be that the reclassification of the water source as GWUDI is inevitable. The Corps should have been more vigilant at evaluating these risks prior to issuing these permits. The Corps' failure to include sufficiently cautious restrictions on mining in the Wellfield and near the pumping wells may already have allowed an irreversible harm to occur: reclassification of the Wellfield and the Aquifer.[209] The former Director of WASD, William Brant,[210] testified that:

> [t]he approach of providing drinking water in Dade County in my 35 years of experience has always been to protect the groundwater quality, not have to rely on a manmade water treatment plant, where, you know, things can go wrong, and frankly which isn't in most cases designed to handle the variety of chemicals that exist.

Tr. 1449 (William Brant).

The Court is very concerned about the potential contamination of private wells operating near ongoing mining operations. The evidence on this issue was unclear. The parties focused on the existence of private wells in the Wellfield area,[211] but did not comment on the existence of private wells in the areas near those mining operations which are not located in the Wellfield. The former Director of WASD testified that there are:

> thousands and thousands of private water supply wells throughout [Miami–Dade County] that people rely on, some for sprinkling but for some drinking. Quite a bit for drinking. Water is used. It's very accessible. It's very easily obtained. You can put a well in 20 feet and get water.

Tr. 1449 (Brant). This testimony informs the Court that there may be private wells in the rural residential development within the Lake Belt area and the surrounding housing developments to the north, south, and east of these mining operations—clearly visible in photographs in the record. In short, the evidence is missing as to private well owners in surrounding areas and the effect this mining may have on the Aquifer from which they get their water; thus, it is unclear whether landowners in surrounding areas are at an increased risk of potential exposure to benzene, cryptosporidium, giardia or other contaminants as a result of the mining which has occurred pursuant to these improperly issued permits.

**4. Establishing a temporary protection area to protect the production wells from further contamination, to be adopted immediately**

In light of the overwhelming evidence and nearly unanimous opinion [212] that the

---

ing and construction of the upgrades—an unlikely event. The fee is not designed to cover ongoing operation and maintenance costs for the upgraded treatment plants.

**209.** To be clear, the Court's ruling is not based solely on harm to the Northwest Wellfield, but also harm to the Aquifer itself.

**210.** The Court found Mr. Brant to be an impressive witness as to the operations of WASD regarding wellfield issues, having served as WASD's Director for seven years, and also as an Assistant Director at DERM for ten years. Tr. 1428–29 (Brant).

**211.** The Defendants again confused the facts by assuring the Court that the private wells issue is a "red herring" since the County's Director of WASD reports that there is no residential development in the Northwest Wellfield area. Docket No. 350, p. 20.

**212.** As previously noted, experienced scientists, policy makers, the USGS, and others all conclude that the lines are inadequate to protect the Wellfield from contamination.

current Wellfield protections provide an inadequate buffer,[213] and the Corps' failure to acknowledge that fact, the Court reluctantly has determined that it must impose a specific prohibition on mining near the Wellfields' production wells. The Court is not a hydrologist, and is extremely reluctant to make a decision as to which lines would be adequate to protect mining which the Corps continues to authorize; however, at an absolute minimum, the Court has determined that the line represented in Plaintiffs' Exh. 3b, i.e., the 60–day[214] line based upon the current permitted maximum pumping rate of 155 MGD[215] and the lower porosity-thickness product (Nb of 1.33 ft), as derived by Dr. Papadopulos from the 2003 and 1998 tracer tests, Plaintiffs' Exh. 3b, must be the mining setback distance for the duration of this brief interim period until the Corps completes its SEIS. The Court has selected this proposed delineation of risk based upon the fact that it relies on the only tests which were located to the west of the wellheads—i.e., taking into account the east-flowing groundwater and relevant gradients.[216] Thus, the partial stay of this Order vacating the permits does not apply to mining within the protection area indicated in Plaintiff's Exh. 3b, included as an Appendix to this Order. In other words, all devegetating, demucking, scraping, blasting, and harvesting of limestone from the Aquifer must stop in those areas immediately (*no later than 5:00 p.m. on Tuesday, July 17, 2007*). The Corps shall ensure compliance with the Court's Order. Any

**213.** Not only are the Wellfield protections universally viewed as inadequate, but it appears to be undisputed that the necessary upgrades to the water treatment plants will take at least three years to complete.

**214.** The Court has selected the 60–day line for consistency, as that was the estimated level of risk incorporated in the mining proposals several years ago (reportedly estimated and derived by the mining companies), and to be as protective as possible in light of the record before this Court: the Corps' deliberate and consistent refusal to impose necessary restrictions on mining near the production wells despite nearly unanimous scientific opinion that the existing protection zones are inadequate.

**215.** The Court has determined that the appropriate pumping rate to provide the best protection of the Wellfield is the rate associated with the Wellfield's current maximum permitted capacity, i.e., 155 (225 MGD is the planned future use of NWWF). Dr. Papadopulos' model uses a rate of 150 MGD, which approximates the 155 MGD. The Court finds that average daily rates of pumping are not a sufficiently strong indicator of future risks. Moreover, the original lines were based upon planned maximum pumping capacity at the Wellfield. AR1175. ("The outer regulatory boundary established for the NWWF Protection Area is located where it was estimated that the surrounding water table will be drawn down 1/4 ft. when the Wellfield is pumping at 220MGD. The travel-time protection boundaries within the outer boundary assume the same pumpage rate.") Should there be any increase in the pumping rate from the Wellfield beyond the presently permitted 155 MGD, the 60–day setback lines (based on 225 MGD) proposed in Exh. 6 (Plaintiffs' Exh. 4b is an incorrect version of this exhibit) shall be observed and all mining within that boundary must cease within 48 hours of the Corps receiving notification of the change in pumping rate.

**216.** The results of the first tracer dye test in 1998, at Injection Well G–3253, and the test in 2003, at Injection Well G3773, provide the most conservative extrapolations of protection zones in the record before this Court. The other tests, i.e., the second and third tests in 1998, the fourth test in 1998, and the test in 1999, were located to the east of the production wells—which suggests that their results may have been affected by the eastward movement (i.e., away from the production/detection wells) of the groundwater. The Court has determined that the estimates calculated with the more conservative approach (i.e., more protective of the Wellfield), are the better choice for the immediate future, until the SEIS is complete.

rock which already has been removed, i.e., is above the surface, may be hauled away and processing in plants or any other above-ground activity may continue. The Court's review indicates that the following mining operations are affected by this prohibition, but the Corps shall determine precisely which mining operations are affected:

*Tarmac*—there shall be no devegetating, demucking, scraping, blasting or harvesting of limestone from the Aquifer as to all mining in Sections 10 (nothing done yet) and 3 of T53S, R39E; as to all but the northern half of the mining in Section 34 of T52S, R39E; and as to all but the northern and eastern areas of the mining Section 1 of T53S, R39E. The permittee may continue to process rock which already has been removed or stockpiled and may continue to conduct other above-ground operations not prohibited by this Order.

*Florida Rock*—there shall be no devegetating, demucking, scraping, blasting or harvesting of limestone from the Aquifer as to all mining in Sections 9, 15, 21, and 22 of T53S, R39E. The permittee may continue to process rock which already has been removed or stockpiled and may continue to conduct other above-ground operations not prohibited by this Order.

*APAC/White Rock* [217]—there shall be no devegetating, demucking, scraping, blasting or harvesting of limestone from the Aquifer as to all mining in Sections 16 and 23 of T53S, R39E. The permittee may continue to process rock which already has been removed or stockpiled and may continue to conduct other above-ground operations not prohibited by this Order.

The Corps shall confirm to the Court no later than 5:00 p.m. on Monday, July 16,

2007, whether the mining operations identified above are the ones which would be within the area identified in Plaintiffs' Exh. 3b as the 60–day travel time protection zone. To be clear, the Court is ordering this remedy, and setting aside these permits until the SEIS is completed because the Corps has failed to fully consider the impacts on the Wellfield caused by this mining, in violation of, *inter alia,* 33 C.F.R. § 320.4, 40 C.F.R. § § 230.11, 230.10, and 40 C.F.R. § 1502.

In making the ruling announced today, which requires that White Rock, Florida Rock and Tarmac cease mining in certain areas of their operations, the Court has considered primarily the need to protect the Wellfield and the Aquifer. The Court notes, however, that for at least two of the three corporations which will experience these limits on mining, the record suggests that they will be able to adapt. For example, the Court has considered that White Rock has alternative locations in which to mine, including its main quarry at the north of the Lake Belt area, and that Florida Rock apparently has the ability within its new corporate identity, i.e., as Vulcan Materials, to absorb the loss. The Chairman of Vulcan Materials, the new owner of Florida Rock, has stated that

> Florida Rock [is] extremely well positioned, regardless of the outcome of the Lake Belt litigation.... Florida Rock can [completely] recover from the loss of all of the 4 million tons that it could possibly lose as a result of an adverse ruling in the Lake Belt litigation.... [T]he combined Vulcan/Florida Rock company will be well positioned on any of those possible outcomes [of the Lake Belt litigation].

*See* transcript of discussion between Don James, Vulcan Materials Company, Chair-

---

217. The Court has been unable to determine from the record what portions of APAC's permit are being mined by White Rock; thus, the

prohibition applies to both companies— whichever is mining in the prohibited area.

man and CEO, and John Baker, Florida Rock Industries President and CEO, SEC minutes of February 29, 2007, available at *www.secinfo.com/dsvr4.u2dh.9. htm# 1stPage*.[218] The President and CEO of Florida Rock, John Baker, noted that the company had been approached by Vulcan Materials in December 2006, and that the deal had been in negotiations since then. Mr. Baker reported that:

> by double shifting Fort Myers, we feel like we could make a lot of money on the second 4 million tons out of Fort Myers where we have really, really long-term reserves and could afford to do that. When you bring Vulcan into the picture, there are so many positive ways this could turn out, it's really an appealing situation.... [T]he combination of the two companies has taken the Lake Belt, ironically, from being a threat to being an incredible opportunity perhaps.

Vulcan Materials' Chairman and CEO continued by stating that:

> given our ability to produce aggregates in the State of Florida, and our ability to bring aggregates into the State from offshore [from Mexico by ship] and from Georgia and Alabama [by rail], we are very well positioned ... we already have existing facilities to supply much larger quantities of material to the State of Florida with very little additional capital cost.

As to Tarmac, the Court notes that most of the areas allowed to be mined under these permits already have been cleared. Tarmac is "running up against the end" of its ten year permit and already has cleared/devegetated everything under the current permits "until [they] get special condition seven [restricting the double cross-hatched area from mining] lifted."

Tr. 5064 (Albert Townsend). The BO, published in August 2006, indicated that Tarmac had 653 acres to be cleared. It appears that of that amount, approximately 340 acres are located in Section 10, T53S, R39E, and subject to the Corps' double cross-hatching restrictions at this time in any event.

**B.  The permits must be set aside because the Defendants' conduct to date with respect to mitigation requirements has been arbitrary, capricious, or otherwise not in accordance with law—and has resulted in the unnecessary destruction of hundreds of acres of wetlands and other adverse environmental effects**

The Court's March 2006 order analyzed the mitigation insufficiencies as well as the groundwater seepage issues. No evidence or testimony presented to this Court has altered the Court's conclusions that these are important issues which should have been more completely analyzed before these permits were issued. Moreover, the state of the evidence today clearly reveals that the mitigation strategy has serious flaws including the inadequacy of the cost estimates with respect to the acquisition of acres of wetlands in the Pennsuco, the insufficiency of the available land in the Pennsuco, and the failure to have a developed plan for the construction of littoral shelves related to mining which occurred years ago—all as predicted. In contrast, the issues as to groundwater seepage remain somewhat undefined, as discussed below, and suggest a need for much further study prior to determining appropriate mitigation for anticipated impacts.

As discussed in the Court's March 2006 Order, the mitigation requirements which were included in the permits were widely criticized as insufficient. *Sierra Club v.*

---

**218.** To be clear, the Court is not making a determination that this evidence, i.e., the transcript of a telephone conference call announcing the purchase of Florida Rock, is admissible. Rather, the Court simply notes the statements made during that call, to provide context for the impact of today's ruling by the Court.

*Flowers,* 423 F.Supp.2d 1273, 1322–27.[219] Senior Corps staff predicted that there would be a "a deficit [of mitigation in the] early years" of the permits. SAR1230.[220] The Corps also has been criticized nationally for its failure to ensure compliance with the mitigation required in all CWA § 404 permits pursuant to 33 C.F.R. § 325.4(a)(3). Plaintiffs' Exh. 174, Government Accountability Office Report to the House Committee on Transportation and Infrastructure, "Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure that Compensatory Mitigation is Occurring," September 2005 ("GAO Report").

> The Corps' priority has been and continues to be processing permit applications .... Until the Corps takes its oversight responsibilities more seriously, it will not know if thousands of acres of compensatory mitigation have been performed and will be unable to ensure that the section 404 program is contributing to the national goal of no net loss of wetlands.

*Id.,* pp. 26–27.[221] The Corps' failure to include "reasonably enforceable" mitigation requirements for the impacts of mining authorized in these permits violates the Corps' governing regulations, 33 C.F.R. § 325.4(a), and the Corps' failure to date to include mandatory provisions regarding the acquisition of the Pennsuco or the transfer of mined property to the public compel this Court to order that the permits must be set aside.[222]

As predicted, the costs of acquiring land in the Pennsuco, the targeted area for mitigation, have increased far beyond the costs estimated in the permits' mitigation scheme. The current market value is five times higher than the $3,000 per acre acquisition costs assumed by the Corps at the time it approved the permits. Tr. 3292 (Janet Llewellyn). The Corps' "Three Year" review report notes that it is "increasingly more difficult to acquire adequate mitigation land in the Pennsuco within the limits of the fees collected." Docket No. 103.[223] Intervenors have start-

---

**219.** The mitigation provisions of the mining permits were confusing even to the Corps' own staff. See SAR1277.

**220.** "The '50 year' projection (Table E attached to the permit) shows the companies will have a deficit (WRAP units impact > mitigated) in the *early years.* So even if they are behind (because of difficulty in buying land, etc.) that is OK so long as we think will [*sic* ] 'catch up' later. If one of the 'fixes' is to raise the 5 cents/ton rate, the legislature provided that the Mitigation Committee submit a report to the Legislature 'no sooner than 31Jan2010 [*sic* ].' " SAR1276 (email between two senior Corps staff, June 2003)(emphasis added).

**221.** The Corps agreed with each of the report's recommendations for improvement in the Corps' section 404 compensatory mitigation program. GAO Report, pp. 40–41.

**222.** "The proceeds of the mitigation fee [per ton of mined rock] must be used to conduct mitigation activities that are appropriate to offset the loss of the value and functions of wetlands in the Lake Belt area as a result of mining activities and must be used in a manner consistent with the recommendations contained in [the state legislature's Lake Belt Plan]." AR1028, p. 61 (ROD, Evaluation of the 404(b)(1) Guidelines: 9.b.(4)(b)(i) Minimization of adverse effects, Compensatory mitigation).

**223.** Oddly, the Corps' "Three Year" report states that the permittees "have remitted a total of $12,922,387 in mitigation fees ... [between] 1999 and the end of 2004. By comparison, the total fee collection estimated in the Lake Belt Permits (appendix A) was $11,883,164." Three Year, p. 7. There is no context for this statement—for example, it may be that the permittees owed $12,000,000 in mitigation for the period from 1999 until April 2002, i.e., PRIOR to these permits. The comparison is meaningless, and misleading.

ed paying higher mitigation fees for each ton of the limestone mined. It is unclear whether the newly increased mitigation fee will be sufficient. *See* discussion, *supra*, page 1196. If the Corps had conducted further study of the mitigation needs at the time it decided to issue these permits it seems that it would be more likely that the originally intended mitigation of the Pennsuco would occur. The present evidence suggests that it might not, due to the high prices being demanded by unwilling sellers who own property in the Pennsuco. Indeed property elsewhere in the Lake Belt is being sold at significantly higher prices; White Rock recently paid $160,000 per acre for property in the Lake Belt that is not presently within the permitted areas. Tr. 5560 (Hurley).

In addition, there may not be enough property available in the Pennsuco to accomplish all of the required mitigation. *Sierra Club*, 423 F.Supp.2d at 1328.[224] The permits require that "[c]ompensatory mitigation for the ecological impacts to the wetlands associated with land clearing activities authorized by this permit will be provided by acquiring, restoring and managing lands within the Pennsuco." *See, e.g.,* p. 4 of AR1055 (Permit issued to Sunshine Rock, Inc., Permit No. 200002285).[225] An internal email between Corps staff members supports this proposition:

> You can go outside of the [Pennsuco] basin without modifying the Corps permits. The Lake Belt Plan 'Phase II Plan' report on page 18 lists the 'priority ranking of locations of off-site mitigation,' Pennsuco is first. However, *the Corps decision document discussed the benefits of acquiring the Pennsuco lands, so if you don't buy the Pennsuco, you will run into the problem that you have implemented something different from the ecological benefits that were described in the decision document. The decision envisioned the Pennsuco occurring PLUS ... in addition ... 'other mitigation'. So PLEASE don't take the pressure off the Pennsuco stuff ... or if you do, you will have to do an*

---

**224.** The Corps reported, in February 2002, that there would be enough area in the Pennsuco to accommodate the first ten years of mining, AR990, but a senior Corps staff member noted that the permitted acres actually will take sixteen years to mine and there will be insufficient acreage available for mitigation in the Pennsuco for that period. AR978.

**225.** The following colloquy is revealing—the permittees continue to promote the idea of full public ownership of the Pennsuco despite the demonstrated difficulties in acquiring any additional lands from unwilling sellers even though there are funds available in the Lake Belt mitigation account to purchase property. In response to Intervenors' closing argument in favor of the mining activities, claiming "what you end up with is publicly-owned lands in the Pennsuco that are going to be preserved for future generations," the Court asked: "How can we be sure?"

> Counsel: Well, Your Honor, all I can say is that if the public owns the lands—

Court: Well, the public doesn't now.
Counsel: Well, Your Honor, I think actually the record is to the contrary? ·
Court: Pennsuco?
Counsel: Yes, Your Honor. The public—
Court: A great part of it—
Counsel: Your Honor, there is approximately 13,000 acres in the Pennsuco.
Approximately a third of that is already owned by the Government is my understanding.
Tr. 7263. Approximately 37% of the Pennsuco already was in public ownership prior to the issuance of these permits in April 2002, with another 25% identified as "District–Pending, District Mitigation, or District—City National," i.e., apparently under the control of SFWMD. FAR61 (Ownership Status of Pennsuco Wetlands, March 18, 2002). Rinker still owns 1700 acres in the Pennsuco. Tr. 5847 (William Glusac), (i.e. more than 13%), and is the only permittee with property in the Pennsuco, Tr. 334 (Llewellyn). It is unclear what efforts have been made to acquire that land from Rinker.

*elaborate re-analysis of the mitigation plan as an amendment to the ROD!* Now the permit instrument provides you can adjust the mitigation plan at the first review period.

SAR1277 (June 5, 2003, email message between Corps staff) (emphasis added).[226]

Despite this clearly stated preference for lands in the Pennsuco, the Corps has readily approved permit modifications with respect to mitigation requirements, i.e. requirements which should be enforced rather than amended.[227] The Defendants have advised the Court that "[I]f the Corps determines that the mitigation has become inadequate, the permits will be modified to ensure adequate mitigation." Docket No. 350. However, the next scheduled review of these permits by the Corps does not occur until near the end of the permitted "10 year" period. A former elected official who was called to testify on behalf of Intervenors said:

I believe anything that the Court needs to do to ensure [that the entire Pennsuco be acquired by the public and managed from a fund paid for by the mining companies] is entirely appropriate .... My strong commitment is to see that the rock miners do what they claim they were going to do, and that is to make sure that [the entire 13,000 acres of the Pennsuco are] added to the permanent protection of the Everglades by public ownership, and I will be very disappointed if there's any question about that going forward.

Tr. 3448–49 (Richard Pettigrew). The Corps evinces a disregard for the public participation requirements of the CWA and NEPA when it modifies permits without first alerting the public to substantial changes, e.g., significant alterations in mitigation requirements. The failure to provide adequate mitigation for lost wetlands indicates that the Corps' public interest review, 33 C.F.R. § 320.4(a)(1), was flawed.[228]

226. The decision to focus mitigation in the Pennsuco was based on several factors. For example, the wood stork foraging habitat should be restored in a location which provides true mitigation. In response to a colleague's remark that a portion of the Lake Belt "seem[ed] to be a popular spot for birds—even woodstorks!," SAR1235, a senior Corps staff member said "[that's one] reason I want mitigation to stay within the Lake Belt area ... not far away ...." SAR1235 (email message between Corps staff).

227. A new condition, added to the permits in response to the Biological Opinion, Plaintiffs' Exh. 244 ¶ 16, creates even more uncertainty as to whether, or how much of, the Pennsuco will in fact be converted to public ownership. In light of the admitted problems with the cost of acquiring property in the Pennsuco, the Corps has indicated that "[I]f lands are not available for acquisition, preservation and maintenance," the permittees' mitigation plan now "may include alternative, equitable mitigation options outside of Pennsucco [sic]." Docket No. 325, filed November 22, 2006, "Permit Modification."

228. Despite the already insufficient mitigation provisions in the permits, the permittees advocated in January 2003 for more favorable terms. The permittees sought "the same mitigation deal that developers receive"—e.g., the mining companies' fee per ton goes up to pay for any increase in cost of land, etc., but in permits issued to developers, the Corps requires that the developer provide a specific number of acres of restoration, the value of which is paid to the SFWMD (presumably before the work is completed). If there is a shortfall in acres of mitigation, it is unclear who makes up the shortfall "SFWMD or the developers?" SAR 1230 (email between two senior Corps staff members, January 2003). The permittees sought these more favorable terms for mitigation even though there was incomplete mitigation remaining from the impacts of prior mining under their earlier permits.

By the first review date (Apr 04) the miners are suppose [sic] to have worked out with us the quantity and how to provide their 'mitigation debt' ... that is, how many WRAP units they owe us for mining prior to the new permits ... the 29 old permits each had mitigation requirements and they

The controversial "land swaps" reveal that permittees who have transferred property in the Pennsuco to public ownership, i.e., Florida Rock and Tarmac, have done so only in exchange for other property to be mined.[229] It is unclear what appraised values were utilized for those permittees' acres in the Pennsuco, or in other areas in which mining is prohibited under the permits. For example, on Nov. 25, 2003, the State of Florida approved a land exchange in which the state gave permittee Florida Rock 238.9 acres located in areas where mining is allowed in exchange for 202.5 acres from the mining company, all of which are in areas where mining is prohibited.[230] Another permittee, Tarmac, traded 320 acres of land it owned in the Pennsuco for mining-eligible land from the State of Florida.[231] These land exchanges raise questions as to whether the Corps is adequately monitoring the mitigation requirements to ensure land is being acquired in the Pennsuco.[232] The Court has

only mined out only a partial amount of the total area of lake authorized ... so we have to pro-rata the total mitigation required. If all the companies agree to do it in the Pennsuco & tc. [sic]. ... I think they will but if 90% of the debt, say, is Rinkers, then the other companies may re-think ... then will add to the 'impacts' that have to be covered by the mitigation committee.

SAR 1276 (email between two senior Corps staff members, June 2003). Apparently some of the mitigation required under the prior permits was designed as (or the Corps allowed it to evolve into) an "end of project" goal rather than requiring that mitigation occur contemporaneously with the impacts of the mining.

229. The exchange of lands between the mining corporations and the State of Florida did not appear to be dependent upon these permits, and may have been done according to fair market value appraisals. If so, it may be improper to consider the acquisition of those exchanged lands as a benefit of the permitted activity. The Court notes with some concern that Rinker still owns 1700 acres (of 13,000 total). Florida Rock and Tarmac exchanged theirs for other mine-able land in the Lake Belt.

230. Of the 202.5 acres transferred from Florida Rock to the State, 160 acres are located in the Pennsuco and 42.5 acres are within the 60–day mining setback line—none of which were permitted to be mined in any event. The acres received by Florida Rock from the State include 90 acres in Section 15 of T53S, R39E (maps identify mining sites by Townships, Ranges, and Sections), located just west of the present 60–day setback line, and 148.7 acres in section 9 of T53S, R39E, immediately east of the Pennsuco. Plaintiffs' Exh. 160. The terms of the exchange included a provision that Florida Rock grant the County an exclusive and irrevocable option to Purchase the properties in Section 15—presumably in the event that the wellfield protection ordinance was amended to include those 90 acres within the area in which mining is prohibited. If the County exercised the Option to Purchase, the purchase amount for the properties was the then-current appraised value of $10,000 per acre. The option to purchase was not exercised before it expired on March 15, 2006. SAR1307 (news article regarding land exchange with Florida Rock).

231. Tarmac received 270 acres in Section 3 of T53S, R39E from the State in exchange for 320 acres of land in the Pennsuco that was owned by Tarmac. Tr. 5008–09 (Townsend). In 2004, William Brant, then Director of WASD, attempted to negotiate a land exchange with Tarmac for the purpose of acquiring $70 million (this estimate did not include operation or maintenance costs) for necessary water treatment plant upgrades. He predicted that the modification of the County's wellfield protection ordinance would eliminate mining rights in the section that Tarmac proposed to swap. The negotiations were not successful, in part because a competitor, Lowell–Dunn (also a permittee, although not included in this challenge to the permits), offered a similar land exchange to the County for twice the amount of money, i.e., $140 million to be paid to the County. There is no information in the record as to why the Lowell–Dunn transaction was never completed.

232. "[M]iners gained control over lands in the mining-appropriate areas," Tr. 3287–90 (Llewellyn), which were outside the "10 year" footprint but within the "50 year" proposed

doubts as to whether the mitigation being attempted at this point even remotely resembles the mitigation announced in the permits.

As a general matter, the Corps apparently is aware of its questionable record of wetlands permitting in South Florida. The Statement of Finding ("SOF") for Regional General Permit SAJ–86, dated June 30, 2004, includes the following:

> Northwest Florida is environmentally pristine with little development when compared to other parts of the State. With the increasing development pressure, it is expected that without some proactive environmental approach, the landscape would be fragmented, and densely developed, mirroring many areas found in South Florida.

P. 16 of SOF, Exh. 4 to Docket No. 52, Case No. 3:05–cv–00362–TJC–TEM, *Natural Resources Defense Council v. United States Army Corps of Engineers* (also page 3816 of the related administrative record in that case). This statement by the Corps is noted by Judge Corrigan in his decision to approve the Corps' actions (issuance of a regional general permit for housing development in northwestern Florida) "by the slimmest of margins." *Sierra Club v. Army Corps of Engineers,* 464 F.Supp.2d 1171, 1176 (M.D.Fla.2006). "[T]he Corps [felt that] its experience in

South Florida ... left wetlands insufficiently protected." *Id.* at 1228.[233]

The record before the Court in this case reveals that the Corps failed to include sufficient plans for mitigation in these permits. This failure exposed those plans to requests for substantial changes by the permittees and left the Corps with few enforceable terms. That result supports this Court's conclusion that these permits suffered from fundamental flaws when they were issued and that those flaws have not been remedied; consequently the mining pursuant to these permits must stop until the SEIS is completed.

*The long awaited littoral shelves*

A senior Corps staff member admitted that the permits' requirements relating to the construction of shallow borders, i.e., littoral shelves, along the quarry pits "[are] an example of where [the Corps] did not get the 'detailed monitoring plan' into the permit before issuance." SAR 1280 (email message between Corps staff members, June 2003). This appears to be yet another violation of the Corps' governing regulations which require that permit conditions be "reasonably enforceable." 33 C.F.R. § 325.4(a). As part of their mitigation requirements, the permits required the mining companies to submit a design proposal for the construction of littoral

---

footprint. The permittees have the right to sell this property at fair market value if they aren't allowed to mine all of the acres. As the Court noted in its Order of March 2006, "nothing in the permit makes them sell their land [to the government]." Tr. 3335 (Llewellyn). The witness who testified from the Florida Department of Environmental Protection ("DEP") testified that permittee Rinker's land in the Pennsuco [1700 acres of it] is "one key that they have to making sure that we all stick to the plan and make sure it moves forward." Tr. 3335 (Llewellyn).

**233.** The Court notes that the Jacksonville District of the Corps, the District responsible for

these mining permits, was specifically mentioned in the GAO Report.

> In December 2001, the Corps approved a 2,100–acre mitigation bank in Florida to restore native tree species and enhance the site's hydrology. The agreement between the Corps and the mitigation bank sponsor required the sponsor to submit annual monitoring reports to the Corps for 4 years. The file contained no evidence of any monitoring reports submitted by the sponsor or compliance inspections conducted by the Corps.

GAO Report, p. 20.

shelves based upon data from existing littoral marshes before April 2004, and then to construct littoral shelf wetlands prior to the expiration of the permits in 2012. In the "Three Year" review report, the Corps notes that the EPA has approved of the permittees' proposed littoral shelf design. It also notes that the Corps "plans to determine, no later than 31 December 2009, the exact locations of the littoral shelf mitigation" to be constructed.[234] A Corps staff member, after having first announced an intent to "rely pretty heavily on [noted expert] George Dalrymple, since he's the one on our [Lake Belt Mitigation] subcommittee . . . with the most field time in the Lake Belt area . . . and . . . he was one of the evaluators for the . . . process that determined the functional values of, for instance, the littoral areas as contemplated in the permits." SAR1270 (message from Corps staff member to DERM staff member, May 27, 2003),[235] then ignored Mr. Dalrymple's strong criticism;

the Corps staff member noted that the report simply was "not the best thing I've ever seen, but I feel like we just need to finalize and move on." SAR1278 (email between Corps staff members, June 2003). This suggests that, yet again, the Corps chose expediency over enforcement. The NEPA CEQ regulations mandate that federal agencies will use "existing credible scientific evidence," 40 C.F.R. § 1502.22(b) and "accurate scientific" information, 40 C.F.R. § 1500.1(b). The Corps' rush to judgment guarantees neither of these regulatory directives will be followed.

*Groundwater seepage issues*

The Court's previous Order addressed the insufficiency of the Corps' analysis of the potential seepage impacts of the mining activity and found that the Corps' failure to consider these indirect effects[236] rendered the EIS "fatally flawed." *Sierra Club*, 423 F.Supp.2d at 1319.[237] Testimony and additional evidence supports the

---

**234.** DERM staff criticized the first drafts of proposals from the permittees, e.g., SAR 1199 (October 30, 2002, letter from mining consultant regarding Littoral Marsh Demonstration Project), regarding the collection of data for the development of the littoral shelf design. "The sampling plan is inadequate and poorly designed. The goals are never stated. One sample per site per season is insufficient and will not permit statistical sampling, etc." SAR1253 (message from DERM staff member, Feb. 2003); *see also* SAR1208 (message from DERM staff member, Nov. 2002).

**235.** George Dalrymple submitted harsh criticism of not only the permittees' original proposal, but also the revised proposal submitted in February 2003.

[The proposal is] no better than the first version. They are completely missing the point of the monitoring. They were supposed to have the first 9 years to come up with a good design of littoral shelves, and it was supposed to benefit wood stork foraging—that's what the permit said. The [proposed] scale at which they evaluate these littoral zones will never make it clear how to design them for wood stork foraging.

They don't even have a schedule for monitoring wading bird foraging use during the best/most important time of the year to see such foraging. The whole thing is a mess! The FWS should kick some but [*sic*] on this, and let the corps [sic] know the study is limp.
SAR1262.

**236.** Indirect effects include those that will occur later or at some distance, as long as they are reasonably foreseeable. 40 C.F.R. § 1508.8. It appears certain, from the record before the Court, that mining will have an effect on groundwater seepage near the area of the mining—what is not clear is how significant the impact will be, particularly in the context of projects proposed with CERP.

**237.** The Corps was aware, when it issued the permits, that the question of mitigation for seepage impacts was unanswered. "In 3 years we have to (as part of the 3 year review required by the permit) discuss how the industry is mitigating groundwater seepage." SAR1223 (senior Corps staffer to another Corps staffer).

Court's earlier conclusion. The record to date clearly illustrates that the groundwater in the area of the Lake Belt moves generally toward the east, that the void left when the mining pits are excavated reduces the amount of natural resistance to seepage that is observed when the limestone rock is left undisturbed, and that there are ongoing studies regarding the cost and effectiveness of various proposals for the mitigation of seepage. This eastward movement is driven, at least in part, by the higher water levels in the Water Conservation Areas and in Everglades National Park (located immediately to the west of the Lake Belt mining areas).

The highest water levels in Dade County are maintained in Water Conservation Areas 3A and 3B. The September average water levels are about 10 to 11 ft above sea level along the Dade–Broward County line in Conservation Area 3A, and about 7 to 8 ft above sea level in Conservation Area 3B .... During the wet season, ground-water seepage from the water-conservation areas is partly captured by the peripheral canals, but large quantities of water pass under the canals or across the canals, especially through openings in the south bank of the Tamiami Canal. From a regional perspective, ground water moves eastward or southward from the water-conservation areas to the sea. Canals, control structures, or large well fields cause local variations in flow pattern. Although the highest monthly average water levels occur in September, nearly all of the urbanized areas of Dade County have water levels less than 4 ft above sea level during that month. The lowest water levels are within the cones of depression around the major well fields .... low coastal water levels and the low, but continuous, seaward gradient ... indicate the very high transmissivity of the aquifer, the high degree of interconnection between the aquifer and the canals, and the effectiveness of the present canal system in rapidly draining floodwaters .... The contour map of average water levels for April, near the end of the dry season, indicates the same ground water flow pattern as under wet-season conditions. However, the average water levels and the water-level gradients are lower in the dry season than in the wet season .... The largest declines (about 2–3 ft) occurred from the area east of Everglades National Park to just east of Krome Avenue.

Hydrogeology of the Surficial Aquifer System, Dade County, Florida, USGS Water Resources Investigations Report 90–4108, dated 1991, by Johnnie E. Fish and Mark Stewart, pp. 44, 47 (citations omitted). The Corps' failure to study this issue in more detail prior to authorizing these mining permits in April 2002, violates the NEPA CEQ regulations, 40 C.F.R. § 1502.22(b) and 1500.1(b) which require the use of credible scientific evidence and accurate science. As noted above, the Corps has failed to provide for adequate mitigation of groundwater issues, in violation of 40 C.F.R. § 1502.14(f). The 404(b) Guidelines also require that the Corps account for obstruction of groundwater flow, and any changes in the hydrological regime, 40 C.F.R. § 230.11(b); this includes consideration of currents, and substrate characteristics, 40 C.F.R § 230.11(e).

ENP noted that the mining was proposed to be as close as 1,000 ft to the L–31N levee, which would directly impact the hydrologic conditions in the adjacent marshes of ENP, and that "mining has never been permitted this close to a primary water supply conveyance canal, such as L–31N." AR825. Mining in the first ten years is permitted as close as 1,000 ft from the L–31 canal. AR977 (email between Corps staff and others, dated February 15, 2002) ("[W]e are only permitting 1/2 of the

2,000 ft buffer [in which ENP objects to ] mining." AR977.) During the hearing, Intervenors' counsel referred to the following statement in the 2006 modification to the Kendall Properties' permit:

> The overall permitted acreage for fill has not expanded beyond that originally authorized. The modification must be completed in accordance with the . . . enclosed construction drawing which replaces [the drawings] from the original permit.

Plaintiffs' Exh. 73 (April 18, 2006, permit modification). The Court has compared the two drawings, and concludes that the "10 year mining plan" revised July 2005 (attached to the 2006 permit modification) appears to allow mining further to the western edge of the property than did the "10 year mining plan" map included with the original permit, AR1047, p. 24. The original permit specifies that

> no mining will be permitted within 2000 feet of the L–31N levee until June 30, 2004, while the Corps continues to refine its seepage analysis in this area. If the land within this 2000-foot strip covered by this permit is not purchased for a public purpose by June 30, 2004, mining is permitted to proceed. If at anytime after June 30, 2004, the Corps determines this land is necessary for a public purpose, mining will continue until the purchase is complete.

AR1047, p. 10.

The Court understood the testimony of Dr. Punnett (and others who addressed seepage issues) to be, essentially, that while the mining lakes *will* have an effect on seepage, it isn't clear yet how much of an effect the lakes will have. Also, it is possible that even if the mining lakes increase groundwater seepage significantly, it may not have a harmful effect because some seepage is beneficial to the system, i.e., by keeping saltwater from intruding in the Aquifer or keeping freshwater from leaving the conservation areas. The witnesses also testified that the planning for Everglades restoration projects suggests that the presently engineered hydrological system (canals, pumping stations, etc.) will change significantly, possibly rendering many of the results of the present seepage models less than useful. Tr. 3707–15 (Dr. Richard Punnett). The Court will address a select few other aspects of the seepage issue below, but at this point is unable to determine anything other than that the Corps must not ignore the issue of seepage. The Corps must assure the public that the seepage impacts from already existing mining pits—including those recently added and any others to be added—are being adequately mitigated for, if necessary.[238]

The Court also has been advised that the Everglades restoration planning process is evaluating the potential impacts of seepage throughout the system. The L–31N canal running along the eastern edge of the Everglades National Park and to the west of the Kendall Properties Krome Quarry (mined by Rinker), contributes to the seepage from the Park. At least one seepage mitigation proposal includes installation of a barrier underground between the canal and the adjoining property or quarry pit. Other projects being proposed through the Comprehensive Everglades Restoration Plan ("CERP") process include raising the canal height, or introducing additional water from the regional system. The likelihood of success of the latter proposal seems to be limited by current restrictions on withdrawals of water from the regional system. Miami–Dade County's request to increase its with-

---

**238.** Perhaps appropriate regulators and those developing the regional restoration plans will address any seepage impacts which already have occurred or may occur because of the quarry pits.

drawals of fresh water from the Biscayne Aquifer and the regional water supply by approximately 30% over its current 346 MGD was denied a few years ago by the State.[239]

In sum, while it appears that analysis is occurring regarding the acknowledged effects of the quarry pits on seepage, the permitted mining activity has continued without change—rendering it difficult to establish baselines against which impacts may be measured and mitigation required. The mitigation fee imposed on Kendall Properties for seepage impacts generates approximately $50,000 annually, or approximately $380,000 over the course of the permits (based upon an estimated 535 acres of impacts times 71,428 tons per acre mined each year by Rinker). Tr. 5775 (Glusac). This amount seems somewhat meager in comparison to the costs of the construction and restoration projects that have been discussed in this case. The Corps, therefore, has failed to require adequate mitigation as of this date. Again, it appears that the Corps has evolved its mitigation-related requirements throughout this process with seemingly little attention to their governing regulations and statutory duties while exerting far greater attention and resources on expediency for the benefit of approving continued mining. As one of the Intervenors' witnesses suggested, the Court "could require monitoring to see if seepage, in fact . . . has been exacerbated, and that appropriate steps would have to be taken . . . to mitigate for that." Tr. 3428–29 (Pettigrew). While the Court finds that additional monitoring undoubtedly would be helpful, the Court's proper role at this time is to vacate these permits and direct the agency to monitor the seepage that has occurred.[240]

*IV. Defendants' lack of compliance with ESA, NEPA, and the CWA resulted in the "take" of wood storks through foraging habitat destruction; Defendants also failed to recognize that other protected species are in the mining area*

Plaintiffs prevailed on their claims that the Corps and FWS erred by deciding not to enter into formal consultation under the ESA regarding the potential impact on the wood stork population and by not taking required steps to protect other species. Order, 423 F.Supp.2d at 1368–79. In the "Three Year" review report, the Corps maintained the position, which already had

239. Plaintiffs' economist suggested that the permittees' mining operations consume approximately 10% of the entire amount of freshwater withdrawn from the Aquifer in Miami–Dade County for public consumption. Tr. 1972 (Weisskoff). According to data compiled by the USGS, water users in Miami–Dade County withdrew 394.29 MGD in 2000 for "public supply" and 41.65 MGD for "Commercial-industrial-mining" (a category which includes mining and other industries). Plaintiffs' Exh. 112. Drafts of SFWMD staff reviews of some of the permittees' State Water Use Permit applications from 2004 and 2005 indicate that more than 60 MGD is drawn from the Biscayne Aquifer by just these three permittees: Rinker, Florida Rock, White Rock (with an even higher permitted capacity available). Intervenors' Exh. 19. (If the other permittees' water usage was included, this number could easily exceed 70MGD.)

Miami–Dade County presently is authorized by the state, SFWMD, to withdraw 347 MGD from the Aquifer; thus, it appears that mining under these permits is responsible for nearly 20% of the entire daily amount of water withdrawn from the Aquifer. Although intervenors' consumptive use permits estimate that 90–95% of the water seeps back into the Aquifer after it is used for washing the mined rock (which suggests that the quantity of initial withdrawal may be less significant than it first appears), this is yet another example of mining impacts which appear to have been ignored by the Corps. Intervenors' Exh. 19.

240. Perhaps appropriate regulators and those developing the regional restoration plans will address any seepage impacts which already have occurred or may occur because of the quarry pits.

been criticized by the Court as problematic, that the mining plan was "not likely to adversely effect the wood stork." Docket No. 103.

The Corps subsequently has published a Biological Assessment, Docket No. 240, filed August 28, 2006 ("BA"), and the FWS has completed its Biological Opinion, Docket No. 241, filed September 1, 2006 ("BO"), which announces that—unsurprisingly— the wood stork *will* be adversely affected.[241] The Biological Opinion makes a specific statement as to the "take" of the species [242] which is occurring from the on-going mining. FWS estimates that mining "will result in reduction in the production of as many as 1.8 wood storks per year, which equates to 18 nestlings over the duration of the 10–year permit." BO, p. 59.[243] Of the 1400 nests in the Tamiami West wood stork colony in 2001, "it's quite likely that most of those failed." Tr. 899 (Dr. Gawlik).

These losses will occur because mining over the "10 year" period "will result in the direct loss of about 4,521 acres of wetlands, of which 1,281 acres are considered suitable for foraging by wood storks" due to the location and particular qualities of these wetlands. BO, p. 57.[244] Generally, wood storks forage in wetlands within 25 km (approx. 15 miles) of their colony site; the Lake Belt area east of the Pennsuco wetlands (which are located along the western edge of the central Lake Belt area) is within 25 km of a colony of wood storks identified as the Tamiami West colony. Tr. 820–22 (Dr. Gawlik). The Biological Opinion reports that, even after accounting for mitigation to date, there is a predicted "net loss of 181 acres [of very short hydroperiod wetlands, which may be very desirable foraging habitat]." BO, p. 59.[245]

The Biological Opinion explains that because wood storks seek areas which are not covered with a dense tree canopy and hunt for food in shallow wetland areas where fish concentrate during the dry sea-

---

**241.** Neither the BA, nor the BO, are before this Court for full judicial review, as they have not yet been challenged through the administrative process. Reference to these agency documents in this Order reflects no opinion of this Court as to their legitimacy.

**242.** " 'Take' is defined as 'harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct.' " BO, p. 58.

**243.** Nestlings are the young chicks. Fledging means "raising the young chicks to the point at which they leave the nest, with an average of 1.5 chicks per nest." Tr. 900 (Dr. Dale Gawlik). This equates to the loss of the productivity of 1.4 nests per year—note that a mating pair of wood storks tend to produce only one to two live chicks each year—in other words, at least one wood stork pair will not yield offspring each year that this mining continues. According to FWS, the number of wood stork nests in the three wood stork colonies in the Lake Belt area has ranged from a low of 0 in 1996 and 1998, to a high of

1450 in 2001. In 2002 only 355 nests were observed, and in 2003 the number had increased to 460; but in 2004 and 2005 only 130 were observed each year. A total of 412 nests were observed in the 2006 season. Tr. 3074 (Souza). To place these numbers in perspective, there must be an average of 2,500 nesting pairs annually in this region (which includes the Everglades and Big Cypress area) over a five year period, with 1.5 chicks per year per nest, in order to remove the species from the endangered list. In 2006 the region had slightly more than 2,710 nesting pairs, and in 2005 the region had only 634 pairs. BO, p. 25, Table 2.

**244.** "No critical habitat has been designated for [the wood stork]; therefore, none [i.e., no critical habitat] will be affected." BO, p. 58.

**245.** The Court's citation of the Biological Opinion is for general information only and is not intended as any level of judicial review of that document—as it has not yet been presented for review through a challenge by the Plaintiffs.

son, experts classify wetlands with dense melaleuca as less favorable for foraging than wetlands without such tree coverage. Dr. Dale Gawlik, who has impressive credentials as to research on wading birds and their habitats in South Florida,[246] testified that the most important factors are the proper water depths and food density. Tr. 831. In addition, wood storks selectively use different wetlands depending upon the extent of drying of the area. P. 16. Dr. Gawlik testified as to his extensive research on the wood stork and his findings regarding the difficulty of the birds' search for food. Tr. 817 (Dr. Gawlik). "They depend in South Florida on these concentrated patches of prey. These animals are not particularly efficient feeders when prey are dispersed, but they're very efficient when prey are concentrated." Tr. 819 (Dr. Gawlik).

The Biological Opinion was issued just ten days after senior FWS staff member Paul Souza testified to this Court that the impact of the mining activity planned for the period leading up to late 2007, i.e., when the SEIS is due to be completed, "is impossible to measure and certainly would not rise to that level of injury or death that I mentioned previously." Tr. 3078 (Souza). Mr. Souza based his testimony on his visit to each of the sites where the permittees indicated that they would be mining in the next 18 months. According to Mr. Souza, "it's a combined situation, where it's a function of where those lands are in the mining sequence and Melaleuca." Tr. 3129 (Souza). Noting that the wetlands to be mined in the next year and a half had "largely been impacted already by some part of that sequence of mining or have a significant amount of Melaleuca," Tr. 3073 (Souza), Souza testified that there will be no adverse effect. The Court finds this reasoning troubling. The failure to perform an adequate environmental analysis before these permits were issued created the presently observed situation; acres of wetlands—perhaps what would have been suitable foraging habitat—now are denied protection because they have "been impacted already." Tr. 3073 (Souza). Defendants' actions have violated the ESA, the NEPA, 42 U.S.C. § 4332(c)(i), and the CWA, 33 U.S.C. § 1344(c), as each of these statutes require agencies to take endangered species into account.

The Defendants have failed to acknowledge that additional clearing and wetlands destruction continues under these permits; this Court previously rejected Defendants' attempts to use the "already degraded wetlands" argument to justify the continued mining. *Sierra Club*, 423 F.Supp.2d at 1295 n. 49, 1330, 1373 n. 275. Such self-generating justification for further destruction is simply improper in the context of the facts of this case and in light of the important regulatory duties being neglected by the Defendants. As noted by Plaintiffs' counsel in closing arguments, the CWA protects all wetlands.[247] "Most wet-

---

**246.** Dr. Gawlik's testimony was somewhat more persuasive than that of Intervenors' expert, John Ogden, as to the question of wood stork habitat. Mr. Ogden was impressive, particularly because of his forty years' of experience studying wood storks as part of his official duties at various government agencies in South Florida, including the Everglades National Park, the South Florida Water Management District, his current employer. Mr. Ogden recognized Dr. Gawlik as "a leading expert on the foraging behavior of [wood storks] in South Florida," and noted that Dr. Gawlik's research work is funded in part by the program managed by Mr. Ogden at SFWMD. Tr. 3597–98.

**247.** "The Clean Water Act does not protect only what the Intervenors have decided are unique or irreplaceable wetlands. The Clean Water Act makes a national policy determination that all wetlands of the United States are a unique and irreplaceable resource until the standards for having them be filled and destroyed are satisfied." Tr. 7311.

lands constitute a productive and valuable public resource," 33 C.F.R. § 320.4(b)(1), and, specifically, those wetlands "which serve significant water purification functions" are considered to "perform functions important to the public interest." 33 C.F.R. § 320.4(b)(2)(vii).

Souza testified that "roughly a thousand acres of wetlands had been mined, had been impacted" through 2005, Tr. 3093, "[a]nd I believe through that time maybe a similar number, maybe a thousand acres had been cleared. But ... I'm not certain." Tr. 3093 (Souza).[248] Clearly, if the proper level of analysis had been performed prior to issuance of the permits then wood stork foraging habitat could have been conserved from among the more than two thousand acres of wetlands which have been destroyed as of this date. Moreover, the NEPA CEQ regulations mandate that these type of permitting decisions be based on "existing credible scientific evidence." 40 C.F.R. § 1502.22(b). The lack of specific information about the number of acres of suitable habitat is just one example of the Defendants' failures to properly consider the protection of this endangered species, in violation of the ESA, NEPA, the CWA, and the respective regulations, e.g., those governing the Corps, 33 C.F.R.

§ 320.4(a)(1), as well as the CWA 404(b) Guidelines, 40 C.F.R. § 230.10(c)(1).

Despite earlier predictions that no protected species were involved in this area,[249] the Corps now has identified the threatened eastern indigo snake, but concluded that the mining activities "may affect, but [are] not likely to adversely affect" the snake. BA, p. 9. In addition, FWS identified that the endangered Cape Sable seaside sparrow and the endangered Everglade snail kite may occasionally be present in habitats near the project area. FWS concluded that the proposed mining activities "may affect, but [are] not likely to adversely affect the Cape Sable seaside sparrow, the Everglade snail kite, and the eastern indigo snake." BO, p. 4. Recall that in March 2002, the Corps' Revised Public Notice regarding the permits for the ten years of mining stated that the proposed project was "not likely to affect any known federally listed threatened or endangered wildlife species or their critical habitat." AR737. For the Defendants to base the issuance of these permits in 2002 on their assertions that no protected species were likely to be affected, and then—after being forced to comply with their own regulations by this Court—to determine that three endangered species

248. Souza testified that on May 31, 2006, he visited each site where the "precise mining impacts were going to be ... in the 18–month interval [from the date of this Court's Order in March 2006, to October 2007, the date by which the SEIS was anticipated]," Tr. 3070 (Souza), and "we were very methodical in visiting each of these sites to clearly see where those impacts would be over that period. And because of this sequence of mining activities that I mentioned ... [i]n many cases much of the area has been significantly impacted by some part of that sequence. In other cases there generally speaking is a significant amount of Melaleuca." Tr. 3077 (Souza).

249. A senior FWS staff member who testified before this Court acknowledged that one of

Plaintiffs' witnesses, Nancy K. O'Hare (formerly Nancy K. Dalrymple), was a co-author of the most extensive wildlife survey of the Lake Belt area. Tr. 3158 (Souza). This study was published in 1996, Plaintiffs' Exh. 42, by Nancy K. Dalrymple and George H. Dalrymple, "The Wildlife Studies of the Lake Belt Area of Northwestern Dade County, Final Report, June 1996." Despite the inclusion of this study in the Corps' Administrative Record, AR276 (draft of the final report), AR614 (final report, found at Appendix D of the EIS), and the specific statements in the study regarding the presence of eleven protected species (under either federal or state regulations, or both) in the Lake Belt Study Area, the Corps and FWS still issued these permits on the basis of there being an absence of impact on any protected species.

and one threatened species *may* be affected by the *very same mining* that previously was studied, leads to little confidence in these agencies. Moreover, these same mining activities which were predicted to be harmless now, strikingly, support a finding of a "take" of the endangered wood stork—all of which suggests that little deference to these agencies' actions in this case is required by this Court.

The Court also is surprised that the Corps frequently modified these permits, shifting mining footprints of several of the mining sites to "correct" earlier maps which were included in the permit documents but apparently were outdated.[250] The result is that while, for the most part, the total number of acres to be mined by each permittee stayed somewhat constant, a different footprint of mining was approved through these modifications all of which were done without consulting with FWS. In one modification, acreage in a neighboring section (the maps identify mining sites by Townships, Ranges, and Sections—which are one square mile, generally) is exchanged for acreage as much as a mile away. Tr. 2802–04 (Studt). It appears that these modifications to the mining footprints were approved without site visits or analysis of the specific types of habitats in the previously excluded acreage which is being added to the permits.[251]

According to the witnesses who testified knowledgeably about wood storks, the species forages as far as several miles away from its nest and each nest requires approximately 440 pounds of prey (comprised primarily of small fish) to support the chicks.[252] According to the witness who testified on behalf of FWS, and the Plaintiffs' expert, Dr. Gawlik, the nesting season begins at any time from late November through March, Tr. 3073 (Souza), Tr. 1034 (Dr. Gawlik), and the success of the nesting season is a function mostly of natu-

---

**250.** For example, a modification of Florida Rock's impact footprint was explained as follows: "original permit plan was based on April 2000 information, so since it took until April 2002 to get the permits generated, the phase timing is off and minor changes to the footprint are needed." SAR 1289.

**251.** In essence, the Corps' frequent permit modifications in order to "shift" mining footprints or to "revise drawings for consistency," BO, p. 12, include an implied determination that there would be "no effect" on the wood stork or other protected species—which appears to violate the requirement that the Corps, at a minimum, obtain written concurrence from FWS for the proposed action. 50 C.F.R. § 402.13(a). The Corps has indicated that these modifications were made only for acreage of "identical habitat quality," Tr. 2662 (Studt), but also states that "since the area was not open canopy, we . . . determined that there would be no affect [sic] and there would not be a need to consult [with FWS]." Tr. 1660 (Studt). However, wood storks will forage in wetlands with melalueca infestation as great as 75%, so the Corps may have applied an improperly narrow test as to what constitutes potential foraging habitat. "Canopy closure occurred when mature melaleuca tree cover increased beyond 75%." Plaintiffs' Exh. 42, Nancy K. Dalrymple and George H. Dalrymple, "The Wildlife Studies of the Lake Belt Area of Northwestern Dade County, Final Report, June 1996," included as Appendix D of the EIS. This error in assessing suitable foraging habitat might have been avoided if the Corps, at a minimum, had conferred with FWS.

**252.** Intervenors' expert John Ogden agreed with Dr. Gawlik's theory that wood storks feed in different places, under different conditions—described as the "checkerboard" concept, Tr. 3515, 3624, and only disagreed as to the quality of the foraging habitat available in the Lake Belt mining area. Mr. Ogden testified that wood storks have better sources of food in other areas so they would not rely on the Lake Belt primarily, but he admitted that there may be some areas in the Lake Belt with sufficient prey density to attract wood storks. Mr. Ogden's views were based on a "general impression of the area" and his experience with similar areas in the past four years. Tr. 3636.

ral rainfall and hydrology, as well as human impacts on the hydrology of the environment.

> In the years where we've had really low numbers, what we've seen is there has been an unseasonable rainfall in the dry season, after the nesting season had begun. So the birds came in and they attempted to nest, and then the water came through at a very high level which caused the birds to abandon those nests .... hydrology is the predominant driver of this function.

Tr. 3074–75. "[I]t is reasonable to suggest the value of foraging habitat in the area for wood storks will be greater than the habitat available prior to mining activities outlined in the 2002 permits." BO, p. 60. The Court notes that this statement is conditioned on "[w]hen the full expected restoration and littoral shelves are complete"—a date which is at least several years in the future and may have little guarantee of ever arriving.

The senior staff member of FWS who testified before this Court said that he "[didn't] mean to paint an overly rosy picture. I mean, clearly habitat loss is a real issue .... But, you know, it stands to reason would wood storks migrate north [to North Carolina] if South Florida habitat had not changed? I don't know." Tr. 3148–3149 (Souza). "[I]f you want to gauge whether wood storks are using short hydroperiods [wetlands] you need to look at that time [between November and March]," Tr. 3159. The witness admitted that the FWS "has not crafted or funded a Lake Belt mining footprint [wood stork] monitoring study." Tr. 3159 (Souza).

According to the Biological Opinion, this permitted mining will lead to the death of an estimated eighteen nestlings over the ten years of the permits. It is heartbreaking to realize, five years into these improperly issued permits, that nine nestlings already have been lost [253]—particularly when this Court and the public were assured by the Defendants that this mining was not likely to adversely affect the wood stork or any protected species. *Sierra Club,* 423 F.Supp.2d at 1318–19, 1368–79. This result is directly attributable to the Defendants' violations of the ESA in the issuance of these permits [254] and provides additional support for this Court's decision that these permits must be vacated.

**253.** The lack of food resulting from the destruction of foraging habitat leads to the nesting pair making fewer trips to their nests to feed the young. "The amount of food they bring with each trip is less. Sometimes they have to fly tremendous distances to find that food, up to 70 kilometers. And what you will see is they simply get to a point where either energetically they can't meet their demands or timewise they can't do it, and they simply stop coming back." Tr. 817–18 (Dr. Gawlik). Dr. Gawlik testified that "as a biologist we see a lot of pretty ruthless things out there in nature ... [b]ut one thing I can never get used to is seeing these chicks dying in the nest when the parents would abandon them. It's a pretty gruesome business." Tr. 818 (Dr. Gawlik).

**254.** The importance of the species protection provisions of the ESA is underscored by the decision of the Supreme Court in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). In *T.V.A. v. Hill* it was determined that the risk of eliminating the population of the endangered snail darter by destroying its critical habitat was enough, under the ESA, to halt completion of a nearly completed $100 million dam. "It may seem curious to some that the survival of a relatively small number of three-inch fish among all the countless millions of species extant would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million," *Id.,* at 172, 98 S.Ct. 2279, but the ESA represents "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.* at 185, 98 S.Ct. 2279. Congress subsequently amended the ESA in response to this decision, and the present version of the statute allows for exceptions in extraordinary circumstances (none of which are relevant to the mining permits at issue) for the ESA's absolute prohibition on destruction of critical habitat.

*V. Clarifying the impacts and analyzing alternatives, the "public interest" review*

The Corps' decision to permit the mining despite the unavoidable adverse environmental effects detailed above, e.g., risks to municipal water quality and destruction of wood stork foraging habitat, was based upon the Corps' decision that the public interest was better served by the production and sale of this limestone by the permittees. The Corps' decision process exposes a fundamental flaw: the agency's failure to give full consideration to alternatives to mining at this time, in this area, and in this quantity.[255]

> [T]he economists . . . opined that if limestone mining is halted in the Lake Belt during the remand period thousands of jobs will be lost in Miami–Dade County. The record evidence also establishes that billions of dollars of output and income will be lost. Public construction projects like roads, schools, hospitals, jails, and bridges will fail or falter. The mining companies and those businesses dependent upon them or their products will be shut down. The CERP will be compromised. South Florida will fall into a recession. . . . The funding source for mitigation fees needed to restore the Pennsuco, and to augment the Miami–Dade County water treatment plant will be lost.

Docket No. 352, pp. 60–62. These predictions of such extreme consequences, scattered with exaggeration, rendered many of the Intervenors' arguments regarding "economic" impacts unpersuasive.[256] Indeed, this Court has spent excessive amounts of time discerning the actual facts from what the Intervenors have argued in their briefs—their dramatic statements virtually obscure the facts.

The evidence demonstrated that the disruption that would be caused by *any* vacatur would be extraordinary—even under Plaintiffs' questionable economic scenarios, vacatur would cost thousands to tens of thousands of Florida jobs. In fact, the evidence was clear that far more than jobs would be lost; vacatur would cost the Defendant Intervenors hundreds of millions of dollars, would cost the Florida economy billions in lost productivity, would halt vital public works projects and, ironically, would halt or delay environmental projects from Pennsuco restoration to the Water Deliveries Project intended to protect and restore the Everglades. Balanced against this tremendous disruption and *incontrovertible environmental harm* is the rank speculation of Plaintiffs that mining during the remand period may potentially cause some unmeasurable increment of environmental impact.

Docket No. 352, p. 113 (emphasis added). The Intervenors' reference to "incontrovertible environmental harm" apparently relates to a possible delay of certain Everglades restoration projects;[257] however, it

---

255. The Corps' numerous violations of controlling regulations and statutory guidance as to the consideration of adverse environmental effects have been detailed above and in this Court's Order of March 2006.

256. For example, in opening statements, counsel for Intervenors claimed that any curtailment of mining ordered by this Court would resemble a "nuclear explosion." Tr. 67.

257. The Everglades restoration project includes several features which are recommended but have not yet been adopted. Docket No. 42, p. 9. The Court already has discussed the Defendants' somewhat exaggerated claims about the critical nature of this mining to construction and repair of the dike at Lake Okeechobee. Tr. 2954, 2956, 2958, 4861–64 (Burch). Defendants' witness notes that the Tamiami Trail Project, i.e., a bridge and roadway system designed to allow better flow of water into the Everglades National

is unclear that such "harm" would be an unavoidable [258] and direct result of this Court's decision to limit mining for a short term. At the hearing, Intervenors' counsel suggested that any potential decision by this Court to set aside these permits would be the same as a decision to grant an injunction.[259] In any event, the Court has crafted the remedy imposed in this Order, and the partial stay thereof, to allow a limited amount of the permitted mining to continue until the SEIS is completed.

*Consideration of alternatives to the proposed mining, as required by NEPA*

The Corps failed in its duty to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed mining. 40 C.F.R. § 1502.14(a). The Corps' EIS and ROD included illogical and senseless statements, *Sierra Club*, 423 F.Supp.2d at 1333, and it is clear from the record before the Court that the Corps never has identified the project's purpose with sufficient particularity. The state of this record, including the vagueness in the Defendants' descriptions of the precise impacts at issue in these permits, i.e., the number of acres to be destroyed and their specific locations, renders it impossible to assess properly any alternatives to the proposed mining.

The evidence presented at the remedies hearing did not cure the problem of vagueness in this record, e.g., it is still unclear precisely how many acres of wetlands will be destroyed under these permits. *Sierra Club*, 423 F.Supp.2d at 1342–43. The Corps' casual approach with regard to the quantity of environmental impacts violates NEPA's requirement that permitting decisions be based upon accurate scientific analysis, 40 C.F.R. § 1500.1(b), as it is impossible to conduct accurate analysis if the facts themselves are inaccurate. It also seems unlikely that the Corps is monitoring the progress of the mining activity since, for example, the Corps has yet to consistently report the number of acres which have been cleared but not mined; [260]

Park by passing under an elevated highway, needs concrete and road base materials which include limestone "which would generally come from mining in the Lakebelt region." Docket No. 350, p. 29; Tr. 2945–46 (Burch). The Court finds it interesting that the Defendants express concern that rock won't be available to sustain development needs throughout the region, i.e., attempt to make a larger argument about the public interest, when their previous approach has been to downplay the extent of the adverse environmental effects. As previously noted in this Court's March 2006 order, "it was inappropriate for the Corps to credit the mining permit applicants with stimulating economic growth but not to charge them with the costs suffered by the environment consequent to such growth." *Sierra Club*, 423 F.Supp.2d at 1316 n. 120.

**258.** It looks like the Intervenors have replaced the "save Walt Disney World and Cape Canaveral" arguments with "save the Everglades" arguments—neither of which are particularly persuasive in light of their tenuous connection to the facts. *Sierra Club*, 423 F.Supp.2d at 1297 n. 56.

**259.** Intervenors' counsel argued that "if you vacate the permits, it's tantamount to granting the injunction," Trans. 7196. Intervenors and Defendants, however, repeatedly told this Court that the only question before the Court is what remedy is appropriate for the brief period of time until the Corps completes the SEIS. Moreover, Plaintiffs' opening statements were clear: "at the conclusion of this hearing, we will ask you to vacate the permits that are under review." Trans. 40. It may be that, as Plaintiffs have suggested, the Intervenors' constant reference to an injunction was strategic because it supported the introduction of extensive argument and evidence regarding the more significant impact that a permanent and total injunction would have on these mining companies than what would be realized if this Court only vacated these specific permits for the limited time until the SEIS is completed.

**260.** If the permittees were not compiling their own reports as to the number of tons of limestone sold, it is unclear what source

nor does there appear to be a consistent definition of "cleared" acreage.[261] The Court briefly addresses the ever-changing who, what, where, and when of the mining pursuant to these permits.

Of the nine corporations receiving these permits in April 2002, three have been sold to other mining companies and two have leased their mining rights to other Permittees. Permittee/Intervenor Vecellio & Grogan, Inc., operating as White Rock Quarries ("White Rock"), purchased permittee Continental[262] for approximately $5 million in December 2004, Tr. 5563–64 (Hurley); White Rock also mines all of the property in APAC's permit pursuant to a lease agreement. Tr. 5564–65 (Hurley). Permittee/Intervenor Rinker (which mines all of the acres in Kendall Properties' permit) is in the process of being acquired by CEMEX (a Mexican multinational corporation).[263] Finally, Florida Rock recently was purchased by Vulcan Materials.[264] Thus, mining is being conducted by only six corporations: Tarmac, Sawgrass, Sunshine, White Rock, Vulcan, and CEMEX.

The Court previously noted that the Corps published inaccurate information about the impacts of Rinker (now CEMEX), the permittee with the largest mining footprint under these permits, and that such information was misleading to the public. *Sierra Club*, 423 F.Supp.2d at 1366 fn. 257.[265] Unfortunately, nothing in the extensive evidentiary hearing demonstrated that the Corps has since obtained a firm grasp of the number of acres being mined or impacted. The ROD itself announces various acreages as to each individual permittee, AR1028, p. 6, explaining that

> [t]hree sources of the number of acres are used in this memorandum. This situation is the result of the long time that this project has undergone review. The first is the one prepared for the EIS and ... [describes] the "50 year"

would be available to guide the Corps in the calculation of mitigation fees owed. In fact, it appears that the permittees' calculations are not verified by the Corps (at least certainly not by calculating the number of acres impacted and tons produced per acre); this raises numerous questions about the Corps' lack of concern as to compliance with the terms of these permits.

261. The permittees refer to "Disturbed" acreage in their Lake Belt Annual Reports, the Corps refers to "cleared acreage" in the BA, and the FWS refers to acres "cleared of vegetation" in the BO. Testimony by the mining witnesses explained that there are several steps between clearing wetlands of vegetation, i.e., removing trees and plants, and then actually mining the area. After devegetation, the miners remove the muck layer (a moist soil covering the top of the limestone rock); the muck is stockpiled into winrows and then removed from the site. Tr. 5578–80 (Hurley). A working pad for the mining equipment, including draglines, etc., is prepared by filling in a portion of the demucked area. Tr. 5582 (Hurley).

262. At present, White Rock conducts no mining under the permits issued to Continental. Tr. 5578–79 (Hurley).

263. "On June 7, 2007, CEMEX Australia Pty Ltd., a wholly-owned subsidiary of CEMEX S.A.B. de C.V., announced that it has received acceptances for more than 50 percent of Rinker's issued capital. CEMEX has declared its offer to be unconditional. Rinker's directors have recommended unanimously that, in the absence of a superior proposal, acceptance of the revise offer is in the best interests of Rinker's shareholders." *www.secinfo.com/d 11MXs.u1fDg.htm* (last visited July 11, 2007).

264. Vulcan initiated the acquisition of Florida Rock in early Dec. 2006. *See* SEC minutes of February 29, 2007, available at *www.secinfo. com/dsvr4.u2dh.9.htm# 1stPage* (last visited July 11, 2007).

265. The Court's prior Order noted that there had been an increase of 40% in the number of acres to be mined between the last public notice published prior to the ROD and the permit subsequently issued to Rinker. *Sierra Club*, 423 F.Supp.2d at 1366 fn. 257.

plan. The second is the analysis conducted by Biological Research Associates (BRA) used ... to describe the 10 year plan. The third is one prepared by Fortin, Leavy, Skiles, Inc. (FLS) provided to the FDEP for the permits for the 10 year plan. ... The actual impacts will be reported annually and the quantity of wetland compensatory mitigation required is linked to actual quantity.

AR1028, pp. 5–6.[266] For example, as to White Rock, the ROD estimates range from 729 (FLS and DEP) to 941.7 (BRA) acres of impact.[267]

An additional complication in tracking the environmental impacts of these mining activities is that some of the permits have been changed to allow mining in different areas than previously disclosed to the public.[268] Conditions imposed on the permits also have been modified, e.g., archaeological sites were destroyed inadvertently by mining at the beginning of the permit period and now the permittees are subject to additional conditions.[269]

266. The ROD provides further explanation for the differences in estimates:

The EIS figures are based on the estimated mining plan but those plans have not been refined to incorporate actual setback distances from such things as existing canals so the tabulation includes acres of canals. ... The BRA and FLS acres have slight differences arising from several causes, including: the BRA analysis included adjusting the map to georeferenced photos; the FLS analysis incorporated information from the applicants on the extent mining [sic] that has taken place since the photos; and, there are inevitable slight differences resulting from having two different persons drawing and measuring maps at two different sdcales (digitizing difference). Both sets of figures are used to provide an estimate of the acres that will occur within the mapped boundaries. ... The Corps has used the BRA figures since they are broken down by vegetation type so that an ecological assessment can be performed. The FLS numbers were used by the FDEP in their permits. The Corps is using the same maps as the FDEP.
AR1028.

267. The estimated impact from mining by Tarmac was estimated in the ROD to be as much as 1030.65 acres (FLS) or as little as 912.25 acres (DEP). The Corps, relying on the BRA estimate of 989.4 acres, noted an apparent "digitizing difference" between the BRA and FLS numbers, while the DEP inadvertently used just the "deep cut" acres, not the haul roads. AR1028, p. 6.

268. It appears that the Corps may modify these permits and even the imposed conditions again at any given time in the future—presumably without providing notice to the public or an opportunity for public participation, as they have not yet done so with regard to a number of modifications to the permits which have occurred since they were issued.

269. When Florida Rock inadvertently used a 15–acre area outside its permit's footprint for muck storage, the Corps issued a Notice of Noncompliance on Feb. 25, 2003, and then made changes to the timeframes of the mining footprint, SAR1289 July 2003. "They want to modify the permit to address the unpermitted clearing," SAR 1257; in the end, the noncompliance was "remedied" by an amendment to the permit after the fact. See modification of Florida Rock impact footprint: "original permit plan was based on April 2000 information, so since it took until April 2002 to get the permits generated, the phase timing is off and minor changes to the footprint are needed." SAR 1289. Most of the permit modifications by the Corps have been for the purpose of calculating new areas for mining, i.e., the "shifted mining footprint" described in the BO, p. 12. Defendants claim that these changes resulted in no net change in the acres to be mined. A Corps staff member announced shortly after the permits were issued in April 2002 that previously permitted areas—i.e., areas subject to other pre-existing permits of these mining companies—not within the 10–year mining footprint could be mined by a permit modification, provided that the total amount of mined area is not greater than what was permitted and what has been mitigated for. SAR1212 (November 21, 2002). This casual approach to modification without public notice is improper. Moreover, it is beyond doubt that the total number of acres to be mined has changed since issuance of these permits, despite Defendants' claims

The Court has little option but to attempt to clarify the acres of impact.[270] The following table summarizes the record regarding the anticipated number of acres of impacts and projected years for all permittees combined.[271]

| Source of estimate | Acres of wetlands to be filled/impacted | Years to do so |
| --- | --- | --- |
| ROD, AR1028, p. 5 | 5,409 | 10 |
| ROD, AR1028, p. 67 | 5,400 | 14[272] |
| ROD, AR1028, p. 116 | 3,315 (i.e., 331.5 acres/year times 10 years) | 10 |

to the contrary: the ROD declared that the mining would result in impacts to 5,400 acres, but the BO, p. 2, reports that 5,712.2 acres will be mined—of which only 4565.7 acres are wetlands.

**270.** The Court is extremely reluctant to analyze these permits individually but must do so at least as to the number of acres of impacts in order to evaluate whether the Corps' overall permitting decision was rational, as it appears that it was not. The Intervenors' also have suggested that the Court evaluate each mining location separately in the event that the Court planned to limit any mining.

**271.** "In April 2001, after the permit period was reduced and the total acreage was reduced to 5,400, a senior Corps staff member explained to a senior member of ... FWS that some of the mining companies still had permits that were being extended but were not going to be mined in the next ten years, e.g., Rinker's permit is 20 year permit." AR816 (Corps telling FWS not to worry about the question raised by FWS regarding the fact that "public notice drawings are not representative of whats [sic] going on on the ground.")

**272.** As noted by this Court previously, "[t]he ROD explains that the mining in this '10 year' footprint 'will not be mined out for 14 years,' AR1028, p. 67, to allow for certain companies that may need the additional acreage to continue mining, in the event that they mine more rapidly than the industry standard rate." *Sierra Club*, 423 F.Supp.2d at 1279 n. 5.

**273.** "In February 2002, Corps staff observed that the '10 year' footprint would 'actually ...

| Corps staff, Feb. 2002 | 5,400 | 16[273] |
| --- | --- | --- |
| BO, p. 2 | 4565.7 (plus 1146.5 of non-wetlands, for a total of 5712.2 acres) | 10 |

The question of prior impacts from mining activities of these companies is similarly unanswered by this record. According to the ROD, slightly less than 5,000 acres of quarry pits existed at the time the ROD was issued in 2002, i.e., approximately 10% of the Lake Belt area already was a quarry pit. AR1028, p. 58. The Corps failed to establish a clear baseline before issuing these permits [274]—and instead relied on es-

take 16 yrs to mine.' AR978." *Sierra Club*, 423 F.Supp.2d at 1279 n. 5.

**274.** According to the ROD:

The FLS drawing has larger lakes then [sic] the BLS drawing because FLS had information from this applicant on the lake excavation that took place since the date of the aerial photograph used by BRA. Since the current size of lake information is not available for all the miners, the Corps will use the BRA number for its estimate of impacts to maintain consistency in the numbers, even thought [sic] that results in an overestimate. The annual reports are the method of providing the actual impacts by which the Corps will judge the progress of the mitigation plan.

AR1028, pp. 6–7. The permittees' first annual report to the Corps did not include a statement of acres impacted. Noting that the County had not yet released the March 2003 aerial photos, which the permittees intended to use to calculate the mining and wetland impact acreage changes that occurred during the reporting period, the report stated:

[T]his 'Interim' report does not include these aerial photos and the calculated acreages and ecological balance for the permits. A 'Final' report will be submitted to the agencies within 60 days of release of the aerial photos by the County. . . . A biologist visited all of the mining operations in 2002 to assess the types of wetlands that were projected to be impacted. The wetlands that were impacted in 2002 were predominantly dense melaleuca.

SAR1321, pp. 4–5 (Interim Lake Belt 2003 Annual Report, Executive Summary, March

timates of impacts provided by the permit-tees (apparently based on aerial photos).[275]

The following table summarizes the most current information, from multiple sources, regarding the number of acres to be mined or impacted by each permittee.

| | A 2002 Mined Baseline per LB02* | B 2002 Mined Baseline per LB03* | G 8/2006 BO Current MINED (wetlands impacted) | H 8/2006 BO Current already CLEARED | I 8/2006 BO Current TO BE cleared | J 8/2006 BO Current Totals (Col. G + Col H + Col. I) | K BO* Total impacts | L April 2002 ROD* |
|---|---|---|---|---|---|---|---|---|
| White Rock | 675.9 | 1038 | 195(65) | 546 | 302 | 1043 | 1049 | 941.7 |
| Sunshine | 103.8 | 103.8 | 9(1) | 42 | 0 | 51 | 45 | 68.7 |
| Sawgrass | 52.5 | 52.5 | 12(2) | 53 | 0 | 65 | 164.2 | 137.02 |
| Tarmac | 337.3 | 722.5 | 176(133) | 315 | 653 | 1144 | 1162.3 | 989.4 |
| Continental | 276.1 | 276.1 | 17(0) | 73 | 0 | 90 | 82.7 | 146.9 |
| APAC | 144.8 | 261.3 | 36(53) | 152 | 277 | 465 | 466.6 | 410.6 |
| Florida Rock | 498.7 | 554 | 83(138) | 293 | 432 | 808 | 809.3 | 725.8 |
| Kendall | 288.5 | 288.5 | 169(245) | 264 | 81 | 514 | 514.4 | 536.7 |
| Rinker FEC | 613.5 | 613.5 | 248(293) | 235 | 576 | 1059 | 1045.1 | 1101.2 |
| Rinker SCL | 81.6 | 81.6 | 44(40) | 111 | 187 | 342 | 345.5 | 325.5 |

\* Lake Belt 2002 Annual Report, SAR1231; Interim Lake Belt 2003 Annual Report, SAR1321; BO, Docket No. 241; ROD, AR 1028

As is evident from the table above, the estimated total impacts are generally much larger in the BO than in the ROD, particularly for two of the three permittees with the largest number of acres in their individual permit; White Rock (the BO indicates more than 100 additional acres of impact), and Tarmac (the BO indicates more than 170 additional acres). Further, the baseline [276] figures, i.e., the number of acres already mined as of the issuance of these permits in early 2002—which should

11, 2004). The permits do not require that the photos be the method for determining the impacts and simply state that the permittee "may" use these photographs in preparation of their annual reports. AR1055, p. 6.

The reporting period shall be the period between the dates of each year's aerial photograph of the project area. In lieu of using the County's aerial photographs, the Permittee may use ground surveys, aerial photographs from other sources, or other methods acceptable to this office. If the County aerial photographs are not used, the reporting period shall be a 12–month period.
AR1055, p. 6.

**275.** The Court notes that an extensive amount of time was spent during the hearing on the question of whether Intervenors possessed current aerial photos of their mining operations; arguments about work product, etc., were raised. Tr. 3897–98, 3908. Upon further reflection, the Court is surprised that the disclosure of the photos required such debate; clearly the permittees disclose their mining impacts, using aerial photos, in each year's Lake Belt Annual Report (the most recent one reviewed by the Court was very well designed). Plaintiffs' Exh. 16 (Lake Belt 2005 Annual Report, published January 2006, regarding impacts through February 2005).

**276.** The Interim Lake Belt 2003 Annual Report, SAR1321, notes that a February 5, 2002, satellite photo was used to document the 2002 baseline condition that existed prior to the issuance of the permits in April 2002.

be identical because they did not change, are substantially different for four of the permittees. The state of the record in this case reveals that the Corps clearly is not in command of the extent of the wetlands impacts from the mining authorized in these permits.

The Court has only briefly reviewed the specific locations of each of the mining operations specified in these permits,[277] with the assistance of Table 2 of the Lake Belt 2005 Annual Report (Plaintiffs' Exh. 16), the most comprehensive and current source of information available in this record as to the mining activities.[278] A senior staff member at the Corps noted that "[f]or a variety of reasons, we never asked for the individual company's estimates but instead used a consolidated estimate of mining per year.... the Permit is 330 acres per year." SAR1283. At the hearing, the Corps' witness admitted that there is no limit on the amount of mining or clearing that may be done at any time by the permittees, as long as they stay within the total number.

Several of the permittees have relatively little acreage remaining to mine under these permits, and nothing remaining to be devegetated. Tarmac is "running up against the end of ... [their] ten-year permitting," and has cleared "virtually everything" they have a permit to clear, other than the restricted area in Section 10, Tr. 5064 (Townsend), "[areas that remain to be mined under the ten-year permit] are either prepared to be mined or in dense Melaleuca." Tr. 4960 (Townsend). APAC has very little mineable property left that is not in the vicinity of the production wells and, therefore, already subject to the Corps' double cross-hatched restriction (special condition 7 in the permits). Florida Rock has 294 acres to mine, and another 432 acres remaining to be cleared of vegetation. As admitted by the Corps, there are no specific limits on the number of acres per year to be mined by any particular permittee, nor as a collective total. Trans 2621 (Studt).[279] In short, the Corps' errors include exercising little or no control over this mining.

Returning to the question of alternatives, the Court finds that the record evidence indicates that the Corps violated NEPA by failing to consider the "no ac-

---

**277.** Defendants have complained about the time that would be required to "undertake separate analysis ... for short-term mining operations at the nine separate sites with ongoing mining operations subject to the existing permits," Docket. No 350, p. 9, if this Court vacates these permits and the mining companies must apply individually for permits to recommence mining until issuance of the SEIS. This complaint is meritless, as it is the Corps' duty to evaluate individual permit applications. In fact, it appears to the Court that there are far more than "nine separate sites with ongoing mining operations" which is emblematic of the problems inherent in these permits and the Corps' approach thereto. Although the challenged permits were issued to nine companies, there are mining operations in thirty different one-square mile sections of this area (and only six companies actually are mining: Tarmac, Rinker, Florida Rock, White Rock, Sunshine, Sawgrass—

White Rock mines Continental and APAC's permitted area and Rinker mines Kendall Properties' area). Plaintiffs' Exhibit 16, Table 2. In any event, examining each permitted location for its continuing vitality, as urged by the Intervenors, Docket No. 352, p. 131 ("vacatur on a permit-by-permit basis"), would require this Court to travel too far into the agency's area of alleged expertise—a decision that will remain for another day.

**278.** The BO issued by FWS provides additional information regarding impacts which, oddly, appears to be inconsistent with the information provided by the permittees in their Annual Report (see discussion above).

**279.** Nevertheless, the Defendants relied on the estimated average annual impacts in urging this Court not to disturb mining while awaiting completion of the SEIS.

tion" alternative or other less damaging approaches to mining, particularly in light of continually mounting evidence regarding the potential contamination of the Wellfield. The Corps also improperly rejected the "curtail future mining" alternative, apparently because it was determined to approve the full planned fifty years of mining.[280] The Court already has addressed its conclusion that these permits were designed to "bridge" the period between when the Corps rushed to extend the mining companies' expiring previously issued permits, and the time when the Corps could find support for the proposed "50 year" plan of mining. *Sierra Club,* 423 F.Supp.2d at 1335–36. In other words, it is evident that while these permits are labeled as "10 year" permits and limited to a specific number of acres (whatever that may be at any given time), they are intended as the foundation of a much more significant plan: to permit mining for at least another forty years (an overall mining period five times the amount of time addressed by the Corps in these permits).[281] The Corps failed to consider the benefits of denying future permits for min-

ing in the area, and failed to consider the alternative of returning to the individual permitting approach previously used in this area. The Corps suggests that these permits are similar to other mining permits which have been issued and that the only difference with these permits is their larger "scope" in terms of years and acres, Docket No. 103; but it is that larger scope of permitted activity, even as to the ten years, that is the source of many of the fatal flaws of the Corps' permitting process.

*Failure to clearly demonstrate the absence of environmentally preferable alternatives*

The Corps' collective approach to these permits apparently influenced its decision that there wasn't "sufficient" limestone available elsewhere—i.e., that there were no practicable alternatives.[282] From their initiation, these permits were designed to fail the test of practicable alternatives, 40 C.F.R. § 230.10(a) (which the Corps first claimed didn't apply), by including such a significant amount of mining that it would be impossible to find a substitute elsewhere.[283] For example, if a single company had sought a permit to mine only its

280. "The industry recognizes that Corps permits have expiration dates, and, barring a change in the Clean Water Act, *there is an expectation of continued permitting.* This is not to say the permits cannot be allowed to expire or revoked, but that the basis for the permit termination should be based on new information on environmental or other impacts that indicate mining would be contrary to the public interest or be illegal under other laws." AR1028, 36 (emphasis added).

281. It is difficult to predict accurately what will be the effect of any specific restrictions on mining in this area. Dr. David's opinions "start from the assumption of a hundred percent shutdown of Lake Belt mining," Tr. 6072 (Dr. David), which it appears may have included the entire amount of mining in the fifty year plan.

282. A practicable alternative is one that is "available and capable of being done after

taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. 230.10(a)(2).

283. Although the Corps must consider cumulative effects of permitted actions, 40 C.F.R. § 230.11(g), that directive does not require the Corps to group multiple permits together—particularly when they appear to have such very different issues regarding location and size of mining operation, and when their collective impact involves such extensive risks to the environment. DEP's amicus curiae brief, filed April 24, 2006, asserts that the review of individual permit applications gives a "myopic assessment of wetlands quality and mitigation, which if determined on a permit by permit basis over the next ten years would result in less wetland preservation." Docket No. 88, filed April 24, 2006, p. 8 (Amicus Curiae Brief filed by the State of Florida). The Court disagrees. The evidence before the Court, including the entire administrative rec-

own portion of this area, and for only a few years, it may not have been able to rebut the presumption that practicable alternatives exist,[284] but a group of companies joining together and claiming that there wasn't an alternative source with sufficient supply to replace a decade's (or five decades') worth of mining in this area presented a much more compelling need for the permits.

Intervenors admit that 13 million tons could be found over the remand period, Docket No. 352, p. 71 (citing Tr. 5957–58). It also appears that other sources of limestone may be able to be developed in the future; however, it has been suggested that developers of other mining locations may be hesitant to proceed. Dr. Jesse David, an economist who testified on behalf of Intervenors,[285] noted that "investors ... are going to have to consider the fact that at some point in the future the Lake Belt mines may be brought back onstream, either partially or fully. And if they're attempting to serve those same markets from a more distant location, they're going to be immediately out-competed when the Lake Belt mines come back. So there's a huge risk for somebody to build a new mine for the purpose of serving the customers that are now served by the Lake

Belt." Tr. 5956.[286]   The Court found Dr. David's expertise in the area of environmental economics to be impressive. His Ph.D. from Stanford University, and his fifteen years of professional experience, rendered him competent to testify as to the impacts on the mining industry from any limits on future mining. However, the Court found Dr. Weisskoff's expertise as an economist to be more pertinent, particularly in light of his substantial experience investigating the impacts of Everglades restoration projects on the local and regional economy; Dr. Weisskoff has published a book, titled The Economics of Everglades Restoration, Tr. 1605 (Dr. Weisskoff). Dr. Weisskoff has almost four decades of experience, has a Ph.D. from Harvard, has taught at Yale and is a tenured professor at the University of Miami. Tr. 1592–99 (Dr. Weisskoff).[287]

Notably, one of the permittees, White Rock, expressed concern about the "loss of customers" which implies that there are alternative sources of limestone available. "If we tell them we can't do it, then they look somewhere else for another supplier." Trans. 5792 (William Glusac). The fact that customers will go elsewhere for "another supplier" suggests that alternative sources for this rock exist. The Rinker

ord in this proceeding, suggests that the collective approach to these mining permits created an irrepressible momentum to approve further mining regardless of the adverse environmental effects.

284. It is undisputed that there are other sources of limestone—the dispute is only as to how much limestone is available elsewhere, and at what cost to the producer.

285. Dr. David, testified that Intervenors paid his firm $100,000 in connection with his testimony in this case. Tr. 6012.

286. Clearly, this Court's prior Order was not interpreted by the permittees, or the Corps, as indication that mining in the Lake Belt may be nearing the end of its days.

287. In the late 1990s Dr. Weisskoff was appointed to the Full Cost Accounting Subcommittee of the Governors' Commission for a Sustainable South Florida by its Director, Richard Pettigrew. Tr. 1597–99 (Weisskoff). Mr. Pettigrew testified before the Court on behalf of Intervenors. The Court notes that there are several interesting connections among witnesses who testified in the same area of expertise but for opposing parties at the hearing: Intervenors' witness Dr. Feenstra is a friend of Plaintiffs' witness Dr. Hennet, Tr. 6538 (Dr. Hennet); Intervenors' witness Dr. Cotruvo is a personal friend of Plaintiffs' witness Dr. Huffman, Tr. 294 (Dr. Huffman); and Intervenors' witness Mr. Ogden's research program has funded the work of Plaintiffs' witness Dr. Dale Gawlik, Tr. 3598 (Ogden).

FEC quarry was the largest producer of crushed stone in the United States in 2004 (Aggregates Study, Part II, p. 6), and the company recently was purchased by a Mexican-based company, CEMEX—suggesting that the corporation may have resources with which to balance the effect of the Court's ruling. Even prior to the purchase, Rinker's limestone reserves in Lee County in the southwestern part of Florida, were considered to be "a replacement for Lake Belt [limestone] in the short term," Aggregates Study, Part II, p. 21.[288]

Despite the extensive amount of information submitted by the Intervenors regarding the predicted disruptive effects which may result from any prohibition on their mining activities, the Court finds that the Corps did not properly apply the rebuttable presumption that practicable alternatives exist, and because the Corps agreed to consider these multiple mining operations in a single permit, despite their diverse characteristics as to size, operations, location (some are mining in areas which have fee wetlands), products pro-

duced, market, etc. This combination of multiple corporations' mining activities resulted in a larger "purpose" for the project and a significantly harder task of finding practicable alternatives. The Corps' misinterpretation of the water dependency test[289] in issuing these permits for limestone mining may have been the single most damaging of the agency's errors, for it appears to have propelled the Corps toward approval of these permits without sufficient analysis of the adverse environmental effects.[290] Even if the Corps had applied the presumption, it is not clear that the Corps would have had clear evidence to overcome it. The Court does not find record evidence to overcome the presumption that should have been applied by the Corps. The Corps made the mistake of assuming that this mining was "water-dependent"—an assumption which this Court dismissed as "circular" reasoning, *Sierra Club*, 423 F.Supp.2d at 1356, n. 240—and therefore failed to test carefully the permit applicants' claims that this Wellfield was the only location available

---

**288.** White Rock was the second largest producer of crushed stone in the United States, and Titan was the fourth largest. Aggregates Study, Part II, p. 6. The size and past profitability of these corporations suggests sufficiently strong management such that adjustments will be made to any decrease in mining.

**289.** The Court previously addressed this issue in some detail and repeats it here for emphasis. "[A]n applicant's project purpose cannot be tailored so as to render the alternatives analysis circular, i.e., using a premise (limestone mining must take place on the miners' lands which happen to be wetlands) to prove a conclusion (the project requires siting within the wetlands) that is in turn used to prove the premise." *Sierra Club*, at 1356 n. 240.

**290.** The Court notes that the Defendants have yet to demonstrate what "high quality and regionally important habitat" superior to the Lake Belt wetlands would have been damaged, as claimed in ROD, AR1028, p. 38, if alternative locations were selected for the mining under these permits. *Sierra Club*, 423

F.Supp.2d at 1357. It may be that the Corps would be unable to find sufficient limestone, i.e., a practicable alternative, if the Corps were weighing the entire fifty years of mining originally envisioned—but. The Court is not commenting on the "50 year" mining plan, as the Defendants have assured this Court that such an ambitious plan is not before the Court at this time—despite several indications in the record to the contrary. Richard Pettigrew, who speaks with an impressive breadth of experience in public policy, notes that the "50 year" plan "is entirely different in context" as to impacts on seepage and other areas of concern. Tr. 3455 (Pettigrew). The Court leaves for another day the question of whether those proposed extensive permits were ever or could ever be appropriate, but cannot resist observing that it is impossible to imagine that such action could be approved in this area, i.e., the Northwest Wellfield, where the mining leads to direct interaction with the Aquifer.

for this limestone mining. It is clear that the mining permits before this Court were the result of a decision making process which was superficial, rushed,[291] and which failed to consider all of the environmentally adverse results, including contamination of a previously pristine Aquifer, thereby making a mockery of the "Clean Water" Act.

The Court observes that the pattern of the Corps' activity in issuing these permits in April 2002 has suspicious undertones of being an attempt to issue a general permit under the CWA (as originally requested by Intervenors and intended by the Corps[292])—discussed in this Court's March 2006 Order—despite the fact that a general permit clearly could not have been approved in these circumstances. The CWA provides that the Secretary of the Army (through the Corps):

> may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environ-

mental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

33 U.S.C. § 1344(e)(1). Further,

> No general permit issued shall be for a period of more than five years after the date of its issuance and such general permit may be revoked or modified ... if ... the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

33 U.S.C. § 1344(e)(2).[293] In addition, the Corps' own regulations provide that a general permit is appropriate for those activities which are both "substantially similar in nature" and "cause only minimal individual and cumulative environmental impacts" or, in the alternative, when "[t]he general permit would result in avoiding unnecessary duplication of the regulatory control exercised by another Federal, state, or local agency provided it has been determined that the environmental consequences of the action are individually and cumulatively minimal." 33 C.F.R. § 322.2(f)(1) and (2).[294]

---

**291.** One of the suspected explanations for the Corps' urgency was the agency's attempt to preserve the $.05 per ton (of mined rock) mitigation fee in face of the permit applicants' steady refusal to pay any higher fee. Ironically, those concerns have been eclipsed, suddenly and totally, by the proposal from the permittees to increase the fee substantially, effective January 1, 2007—a proposal which the Florida Legislature adopted. The new fees increased to $.12 per ton in January 2007, and will become $.18 and $.24 per ton as of January 2008 and 2009, respectively.

**292.** As stated in this Court's March 2006 Order, the Corps "originally intended to issue a General Permit, delegating its authority to DERM. AR468." *Sierra Club*, at 1351.

**293.** *See also* 33 C.F.R. § 325.2(e) and 33 C.F.R. § 330.1.

**294.** In *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F.Supp.2d 1171 (M.D.Fl.2006), the Corps' decision to issue a regional general permit, RGP SAJ–86, for a housing developer's proposed project was approved under the CWA and NEPA by the "slimmest of margins." The Corps made a finding that the housing developments satisfied the "minimal impact" requirement in part because of the extensive mitigation planned and the numerous conditions placed on the developments regarding other environmental issues. Noting the unusual nature of a finding of "minimal impact" based upon an act, i.e., mitigation, which had not yet occurred, the Court determined that the Corps' conduct was "at, but not beyond, the outer limits of [the agency's] authority" and vacated the preliminary injunction which had been entered.

It is easy to discern Congress' intent in this language—general permits should only be issued as to those activities which are found to be only minimally adverse to the environment and, even then, should be issued only for a short duration during which the activities and permits are monitored carefully and re-evaluated frequently. According to the senior Corps staff member, Bob Barron with the "corporate knowledge of the permit," SAR1230, and the "corporate memory," SAR1233:

> This is an unusual permit ... here we have 10 companies that compete against each other working together to have the same permit conditions .... and the conditions are the same in the Corps and State permits .... sorta what I would dream about for say all homebuilders in Monroe County, etc.... which hopefully will save us immense amounts of manhours in the future renewals compared to the normal every-permit-is-unique mode .... is what GP/NWs [General Permits/Nationwide] were intended to do but they have become targets!

(SAR1230, message sent from Bob Barron to John Studt, January 9, 2003).[295] The Court understands this statement to infer that general permits are targets for either litigation or, at a minimum, enhanced scrutiny—and rightfully so as this would be consistent with the statutory and regulatory directives noted above. It would be improper for the Corps to attempt to clothe a General Permit in these Lake Belt permits' clothing. The surreptitious nature of these permits [296] and the Corps' flawed analysis of alternatives, along with other issues, render these permits fatally flawed and require that they be set aside.

*Flawed public interest review*

The Corps' governing regulations specify that the "unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). Each decision by the Corps to issue a 404(b) permit must be based on an evaluation of the "probable impacts, including cumulative impact, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1).[297] "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.* The evaluation of impacts "requires a careful weighing of all those factors which become relevant in each particular case" and the decision to issue a permit is "determined by the outcome of this general balancing process." *Id.*

As detailed above, and in the Court's prior Order, the Corps failed to give suffi-

---

**295.** As previously noted by the Court, the Corps' concern about workload also was mentioned prior to issuance of these permits. In noting that the mining industry's attempt to seek a collective permit might "collapse," a Corps staff member stated, in July 2001, that "our workload will surely increase." *Sierra Club* at 1288 n. 24.

**296.** The Corps' public documents, e.g., EIS, ROD, Public Notices, "Three Year" review report, etc., regarding these permits are notably inconsistent as to precisely how many acres of wetlands will be impacted, their location, and the timing of the impacts. *See* discussion, *infra,* regarding the confusion surrounding the specific impacts of these permits. The Court already has commented on the Corps' attempt to make more extensive permits, e.g., for fifty years of mining, have the appearance of more closely controlled and limited permits. Finding that the challenged permits were designed to lead to full mining of the Lake Belt area, despite the fact that they were presented to the public as "10 year" permits, this Court declared that such a "surreptitious approach to permitting does harm to the principles of NEPA, and the APA, as well." *Sierra Club*, 423 F.Supp.2d at 1335.

**297.** "[A] permit will be granted unless ... it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

cient weight to a number of probable impacts on the environment, and appears to have given an unjustifiably greater weight to the "benefits which reasonably may be expected to accrue" from the mining. Indeed, the Court has determined that the adverse environmental effects of this mining, particularly the risk of contamination of the Wellfield and Aquifer, are sufficiently harmful such that almost any "public and private need" for the mining would be outweighed. At a minimum, the "benefits" alleged and demonstrated to date, including the production of limestone for sale, clearly are insufficient to outweigh the "reasonably foreseeable detriments."

The Corps' governing regulations specify several criteria which must be considered when evaluating the "public interest" of the proposed activity.

> The following general criteria will be considered in the evaluation of every application [for a permit]: (i) The relative extent of the public and private need for the proposed structure or work; (ii) ... the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; (iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to

have on the public and private uses to which the area is suited.

33 C.F.R. § 320.4(a)(2). Determining the relative extent of the public and private need for this mining is somewhat difficult.

The public's need for limestone, generally, is abundantly clear from the record. Limestone products are primary construction products for roads (which use aggregates from limestone), buildings [298] (which use cement or concrete), etc. Questions have been raised, however, and remain unanswered, as to the extent of the public need for the specific limestone from the Lake Belt—including the limestone located in the Aquifer near the Wellfield's production wells, as compared to limestone from other areas. The record evidence is not convincing as to the public's alleged need for all of the limestone planned to be mined under these permits. Intervenors have argued that there is a special and extensive need for this particular limestone because it is of a certain quality which performs well when used in highway construction and and other projects. In support of their arguments, Intervenors submitted testimony by a representative of the Florida Department of Transportation ("FDOT"); the agency also filed an amicus curiae brief. Docket No. 80, filed April 17, 2006.[299] "The loss of Lake Belt aggregates

---

**298.** This extent of the need for limestone products for new construction of homes may be declining in the next several years. According to the FDOT's Aggregates Study, "the volume of building construction, measured by area, will be less in 2009 than it was in 2004 across Florida. However, 2004 was an unusually strong year—driven by the combination of strong population growth and very attractive interest rates. Levels forecast for 2009 would be back to the more sustainable, long-term trends." Aggregates Study, Part II, p. 12. "After a five-year period of rapid gains in residential construction, the growth of primary crushed stone demand in Florida is forecast to slow.... Florida is coming off of a

cyclical peak in construction activity." Aggregates Study, Part II, p. 16.

**299.** The Court notes that FDOT appears to have recently taken a very active role in framing the discussion of alternatives for the Corps and the Court. Docket No. 373–2, submitted by Plaintiffs, includes FDOT records which reveal that FDOT hired a consultant to conduct an "aggregate resources study." FDOT conducted meetings with representatives of the rock mining industry, including Intervenors Florida Rock and Rinker, regarding this study, and Plaintiffs have provided the minutes of those meetings. At the first meeting, conducted on June 5, 2006 (just one week before this Court commenced the evidentiary hearing), FDOT's Ananth Prasad

will impact the majority of [the State's transportation department] construction [projects] because the projects depend on those aggregates." Docket No. 80, p. 4. "Lake Belt mines are the primary sources of aggregates developed and used by the Department for resurfacing projects since 1994 as a durable and skid-resistant pavement surface, i.e., 'Superpave,' that reduces and prevents hyrdroplaning conditions, especially on high volume and high speed roads." *Id.*, p. 5. "The Department's best estimates indicate that the mining industry will not be able to replace aggregates from the Lake Belt mines *from any other source in Florida* in a time period of less than five (5) years." *Id.*, p. 7 (emphasis added). Five of Florida's six largest limestone mines, which also are ranked in the top twenty in the country for crushed stone materials, are located in the

Lake Belt area: Rinker (FEC Quarry), White Rock, Tarmac, Rinker (Krome Quarry/Kendall Properties site), and Florida Rock. Docket No. 367, Part I, p. 15, "Strategic Aggregates Study: Sources, Constraints, and Economic Value of Limestone and Sand in Florida", Final Report dated March 12, 2007 ("Aggregates Study").[300]

There is no question that at least some quantity of this limestone, which is sold for profit by the permittees, serves a purpose for the public by being available for public construction projects such as highways, bridges, schools, and hospitals; however, the evidence has not demonstrated a lack of alternative sources for the amounts of limestone to be produced from the remaining acres available to be mined under these permits in the short term remaining. There are other sources of limestone, e.g.,

(who also offered testimony before this Court) commenced the meeting with: "We will rely on our consultant's report to support an Act. We are neutral until the Governor decides. Must consider new Legislation. We need to sell plan more globally, including home building, etc., not just a transportation flavor." Another FDOT staff member noted a need for a "sense of urgency as other markets (Alabama, New Orleans) compete with Florida." (This statement suggests that other sources may be available as alternatives.) A person identified on the attendee list as an "industry representative" stated: "Sensitivity is huge. Local pressure is huge. Economics is huge. How we package, market is vital. Lot of potential if we stress affordable housing, schools & education, growth management." Finally, the consultant hired to prepare the report, Tom Herbert, says "we will be developing the research to support the possible legislative change but the information should be tailored to fit the needs of the industry group who will initiate legislative efforts." At a second meeting on August 15, 2006, a "consultant" reported that he had developed a computer program which will measure aggregate consumption by regional area, and will consider impacts, including "unintended consequences" identified as "affordable housing, hurricane building code changes with always

the greatest impact on poorest people, e.g., on Wal–Mart's lowest 20% of population." Another attendee stated that aggregates "are a societal need, like water or clean air and should be presented as such."

**300.** The Court is mindful of the arguments raised by the parties regarding the admissibility of items submitted after the hearing. As noted earlier, the Court has expressed a desire to have as much information as possible and has taken a broad approach to the admissibility of items; nevertheless, the Court has carefully evaluated the particular weight to ascribe to each given submission. For example, the "Strategic Aggregates Study: Sources, Constraints, and Economic Value of Limestone and Sand in Florida", Final Report dated March 12, 2007, clearly reflects the interests of the limestone mining industry, and the fact that it was "prepared for" the FDOT does not render it a neutral document. The Court notes that the study apparently was published for the purposes of this Court's review, as Part II is titled "Potential Impacts to the Economy of Florida from the Curtailment of Crushed Stone Production" the Court is not aware of any other agency or person currently considering "curtailing crushed stone production."

Georgia, Alabama, Mexico, Canada—and while they may be more costly for Florida consumers to access than locally produced Lake Belt limestone, the environmental laws are clear that even a more costly alternative may be "practicable"[301] when compared to a project that requires destruction of wetlands. Mr. Prasad states that:

> There is a significant supply of limestone available from Mexico, but it does not meet skid resistant standards and cannot replace Lake Belt aggregate.
>
> "[A]ggregates are available from Canada [which] meet the skid requirements and can be brought in by vessel . . . . at a premium price . . . and it is extremely unlikely that supplies from these sources can be increased in the near term due to logistical constraints." Affidavit, ¶ 13.

The Court notes, however, that there may be flaws in applying a presumption that all demands for development should be met. Intervenors' economist testified that he

> hadn't been in Miami for about ten years. . . . [W]hen I got here . . . my first thought was that Miami looks like *Shanghai*. I've never see [sic] anything like it in the U.S., with all the construction cranes. That is certainly not typical. Construction growth in Florida I believe is something like 16 percent an-

nually. That is multiple times the growth in the rest of the U.S. Tr. 5937 (Dr. David). "Demand for all types of construction materials has been growing rapidly, and prices have been rising as a result. In particular, cement and crushed stone are two of those products." Tr. 5938.[302]

As discussed above, the Corps failed to adequately study the existence of reasonable alternative locations to accomplish the objective of the proposed mining—in part because the Corps failed to define the project's purpose and objectives with specificity. The detrimental effects which the mining is likely to have, and which already has had, on the Lake Belt area have been discussed above. These detrimental effects, particularly the exposure of the Aquifer to increased risk of contamination, are both extensive and permanent.

Several additional factors for consideration are suggested in the regulations. 33 C.F.R. § 320.4(a)(1). The ROD only briefly analyzed any of these factors, AR1028, p. 76–83, and the parties only addressed those factors which are most relevant to these mining permits. The Court will not address each factor, nor repeat its prior analysis of issues relating to the following factors—all of which weigh against the granting of these permits: general environmental concerns,[303] wetlands,[304] wildlife values, water supply and conservation, wa-

---

**301.** Ananth Prasad, Chief Engineer of the Florida Department of Transportation, submitted an Affidavit (accompanying the Department's amicus brief) and testified at a deposition in this case (the transcript and videotape of which was submitted at the evidentiary hearing).

**302.** The job growth rate in Florida, approximately 2% annually, is four or five times faster than the U.S. as a whole, Transcript 5936 (Dr. David). This may hold some promise for those mining employees who may lose their jobs with the permittees as a result of this Court's ruling.

**303.** Consistent with the requirement that "general environmental concerns" and "wa-

ter quality" be considered as factors in the Corps' public interest review, a number of risks from the permitted mining have been identified by the parties and examined during the evidentiary hearing. In addition to those discussed by the parties throughout this process, the Court's study of this matter revealed a risk which would otherwise have appeared to be too improbable to consider. The Court discovered that a tragedy had occurred on April 26, 1997, involving the collapse of a dragline and the death of two men at one of the mining sites in the Lake Belt. The men's bodies were found in Sunshine Rock's mining lake where the men had been operating the dragline for mining. "[Two men] drowned at approximately 4:30 a.m. on April 26, 1997,

ter quality, and the needs and welfare of the people; however, a brief discussion of four factors identified in the regulations is in order: "economics," historic properties, mineral needs, property ownership,

The "economics" factor is not defined by the Corps, but it is doubtful that the "public interest" review was intended to include consideration of private profit. In *Buttrey v. United States*, 690 F.2d 1170 (5th Cir. 1982), a panel of the Fifth Circuit found that "$3 million or so in public jobs that the construction of [the applicant's proposed 40–acre residential development would create] is not the kind of 'economic' benefit the Corps' public interest review is supposed to consider." *Id.* at 1180 (*citing* 42 Fed.Reg. 37,122—37,126 (1977)).[305] The private need of the corporations to earn profits on their investments is not included in the list of relevant factors to be considered, so this Court finds that the permittees' profits should be given little or no weight in this analysis; nevertheless, the Court has briefly addressed certain significant facts regarding the consideration of "economics" as defined by the Defendants and Intervenors for the purpose of high-

when the dragline they were operating fell into 71 feet of water, carrying the victims with it." One of the bodies was not recovered by divers until 1:30 p.m. (9 hours later), and the other was discovered the following morning at 6:50 a.m. (more than 26 hours after the accident). United States Department of Labor, Mine Safety and Health Administration, Accident Investigation Report, Fatal Machinery Accident, FTL97M27 (April 26, 1997). Available at *www.msha.gov/FATALS/1997/FTL97M27.HTM* (last visited June 19, 2007). This type of evidence meets the standard for judicial notice as it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir.1997) (en banc)(quoting Fed.R.Evid. 201(b)); *Lundquist v. Continental Casualty Co.*, 394 F.Supp.2d 1230 (C.D.Cal.2005) (opinions of administrative agencies). The occurrence of this tragedy in 1997 (while the Corps was actively preparing its draft EIS) should have alerted the Corps to address this type of industrial accident as one of the potential risks of this activity.

304. The regulations direct that impacts to wetlands which perform functions "important to the public interest" should be avoided. These special wetlands include:
 (i) Wetlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species ... (iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics ... (vii) Wetlands which

serve significant water purification functions. (viii) Wetlands which are unique in nature or scarce in quantity to the region or local area.
33 C.F.R. § 320.4(b)(2). The Court finds few functions as important to the public interest as the Aquifer-protecting functions performed by the wetlands at issue herein. According to the testimony of DERM's Director, "semiconfining lawyers between surface and the production depth for these wells, 40, 60 feet, retard downward movement of pollutants from the surface." Tr. 5176 (Espinosa), Plaintiffs' Exh. 4, p. 33. Instead of focusing on the importance of these wetlands to the health of the Aquifer, the Corps directed its efforts toward approving this mining.

305. The total number of employees in Lake Belt mining jobs in 2006 was 929, according to the FDOT's Aggregate Study. Intervenors claim, however, that "[i]t is uncontroverted that a curtailment of mining during the remand period would eliminate thousands of mining jobs. Furthermore, as the effects of a shutdown of mining cascade through the economy, thousands of workers that either use the Lake Belt limestone, supply others who use such limestone, or supply the mining companies themselves, would also lose their jobs." Docket No. 352, p. 6. Again, these estimates do not distinguish between a limited prohibition on mining as compared to a permanent injunction. In light of the Court's ruling today, it appears that the Intervenors' arguments are at least mildly exaggerated and, in light of the *Buttrey* decision, employment or jobs data may be an improper factor to consider in a "public interest" review.

lighting the improper nature of weighing a private corporation's profit against significant adverse environmental effects.

Dr. Weisskoff testified that the profits of the permittees' corporations have been rising—prices are rising more than costs are rising, so profits are rising, Tr. 1846, and they will be able to use this increased margin of profits to respond to the potentially higher costs of accessing limestone from alternative sources, e.g., higher transportation costs, etc. Indeed, as noted above, two of the corporations, Florida Rock and Rinker, were bought recently—suggesting that they were an attractive investment for their respective purchasers, Vulcan and CEMEX. For example, Rinker, which has operations in Australia, China and the US, Tr. 5802, 5814 (Glusac), was recently acquired by CEMEX; it appears that this transaction has been developing since at least November 2006, i.e., before closing arguments in the evidentiary hearing, and before Intervenors' brief was filed on January 22, 2007 (Docket No. 352).[306]

The regulations note that "historic properties" may be a relevant factor. The presence of archeological sites in the Lake Belt area was known prior to issuance of the permits. The Corps included a special

condition that the "[p]ermittee shall avoid disturbance of archeological sites." Special Condition 6, AR1055, p. 18. Despite the Corps' attempt to protect these special sites, two sites already have been destroyed by the permittees, with no significant consequences.[307]

MINERAL needs

Considerations of property ownership should include a balancing of private property rights and responsibilities with other factors. In the case of these mining permits, the Corps clearly was concerned about the potential costs of not permitting mining, particularly as to the threats of inverse condemnation actions by the mining industry, as discussed in this Court's prior Order. Sierra Club, 423 F.Supp.2d at 1299–1302. It bears mention, however, that the Corps' fear may be misplaced—at least as to certain of the properties at issue.

The evidence indicates that these specific permits were granted to corporations who, for the most part, began mining in the area only twenty years ago—after passage of the Clean Water Act and with full knowledge of federal law protecting wetlands. Tarmac's representative acknowledged that when it was acquired by Titan

---

**306.** It appears that the acquisition of Rinker by CEMEX has created problems of excess for the corporation. "Rinker Takeover Deal May Cost Jobs," Palm Beach Post, June 8, 2007: Selling off 39 plants in Florida and Arizona is part of the price Monterrey, Mexico-based CEMEX ... is paying to acquire Rinker ..., the Australian materials conglomerate .... CEMEX secured 50.34 percent of Rinker shares before noon Thursday, paving the way to complete its eight-month-long, $14 billion takeover of the Aussie firm. [Antitrust concerns have resulted in the closing of twenty cement plants and six concrete block plants throughout the state.]

**307.** "[T]wo recorded sites have been inadvertently destroyed [by the mining]." " 'Three

Year' review," p. 13. Although the permits already required provisions for mining to proceed only in those areas without archaeological significance, the mining had occurred without attention to these locations. It appears that the Corps pursued no enforcement action or made any other efforts to mitigate for the loss of these two sites. The Corps simply amplified an existing condition of the permits, Special Condition 6, and now requires that all future mining proceed only in areas which have been approved in advance by state authorities. As the permits provide no consequences for failure to comply with this condition, it is unclear how this provision could be enforced. This violates the requirement in 33 CFR § 325.4(a) that permit conditions must be reasonably enforceable.

in 2000, Titan knew that it would need permits in order to mine in these wetlands. Tr. 4997–99 (Townsend). Tarmac first entered Florida and began mining in the Lake Belt when it purchased Lone Star Industries corporation in 1984. Tr. 4997 (Townsend). For clarity, the Court notes that Tarmac's representative testified that "[w]e started [mining in the Lake Belt] in the '60s," Tr. 4998, refers to his prior employment with Lone Star. Tr. 4955. The Corps' statement that "[m]ining in the Lake Belt area has been ongoing since the 1950s"[308] is an overgeneralization. Rinker is the only corporation/permittee who has such a history, and two of its quarries (FEC and SCL) did not start operations until the 1970s. Docket No. 97, p. 5. Sawgrass (mining since early 1980s, Deposition Transcript of Jose Fernandez), APAC ("mining in the Lake Belt since 1985," Docket No. 94, p. 13), White Rock (started operation in 1986, www.wrquarries.com), Continental (purchased by White Rock in Dec. 2004) (Intervenors' Exh. 132, Trans. 5563 (Hurley))

Defendants allege that the continuation of this mining provides several benefits, including the collection of mitigation fees[309] to facilitate restoration of wetlands in compensation for those destroyed by the mining, the provision of available limestone for Corps' construction projects related to Everglades restoration,[310] and the avoid-

---

308. "Companies have acquired property and mined limerock from open-pit quarries in the area now known as the Lake Belt since the 1950s under Miami–Dade County zoning and wetland permitting regulations." AR1028, p. 35. "Rinker has purchased or leased thousands of acres of property in the Lake Belt area. Most of Rinker's property has been owned for many years.... Rinker's flagship operation is the FEC Quarry. This quarry has been in continuous operation since the early 1970s and is the largest aggregate quarry (by volume) in the United States—producing approximately 13 million tons of finished aggregate annually.... The FEC quarry also has a concrete pipe plant, a concrete redi-mix plant and a concrete block manufacturing plant.... The SCL quarry was opened in 1958 by LeHigh Cement and was purchased by Rinker in 1976. Since Rinker's purchase, SCL has been in continuous operation—the Miami Cement Mill operates 24 hours a day, seven days a week.... Rinker is also the operator of the Kendall Krome quarry. This quarry excavated limestone for the production of Portland cement from the 1950s until the late 1970s. While cement is no longer produced at Krome, the aggregate portion of the operation continues ...." See Affidavit of Rinker President, Exh. 1, Docket No. 34.

309. The Court notes that the mitigation fee of $.07 cents for each ton of limestone sold resulted in a payment of only approximately $10,150 per acre. The permittees' profits are estimated to be greater than $500,000 per acre.

310. The Tamiami Trail project, part of the Modified Water Deliveries project and a key feature of the Everglades restoration program, Tr. 4853–54 (Dr. Rice), consists of two bridge structures, one two miles long and the other one mile long. The bridges will be built from concrete, the foundations are concrete and the bridge deck is concrete—"all of the quotes that we have for concrete and for the lime rock base material are [based] on material coming from nearby quarries from the Lake Belt." Trans. 2945 (Scott Burch). The project also includes raising the remainder of the roadway anywhere from two to five feet in order to have more water flowing south. "Those base materials to raise the roadway are all going to be limestone aggregate, and all of those would come from the Lake Belt." Trans. 2946 (Scott Burch). In any event, despite Dr. Rice's predictions that Congress is "coming to the end of the rope" regarding any increases in funding, there is insufficient evidence in this record to find that the Corps will be unable to locate other resources for construction of any of its projects, or that the increased costs which are predicted from any limits this Court places on mining pursuant to these permits will not be able to be absorbed. Recall that the Corps' representative testified that the costs might rise by as much as 25%, despite his inability to produce studies or data to support that estimate. The Court's calculation reveals that a 25% increase for the materials, which are estimated to cost $55 million for the Tamiami Trail project, would be $13,750,000.

ance of costly expenses of acquiring these wetlands.[311] Intervenors' witness, Mr. Pettigrew, testified that CERP also includes the proposed use of some of the quarry pits in the north and central part of the Lake Belt as storage reservoirs, but that the first pilot project to test this type of reservoir apparently is taking place around Lake Okeechobee, Tr. 3415–16.[312]

The question of further infrastructure development for our growing population is at the heart of several of Intervenors' expressed concerns. One of the Intervenors' witnesses, Richard Pettigrew, testified about the larger community's desire to limit further development to the west in Miami–Dade County and that his support for the creation of a vast network of mining pits was consistent with that desire. Ironically, he testified that the Governor's Commission for a Sustainable South Florida[313] had concerns about the potential suburban development of the Lake Belt area if limestone mining was not approved.

Well, we thought if there had been no mining that inevitably suburbia would extend, as it had in Broward, right out toward the levee. And that, of course, is much more harmful than the choice of mining. Because people use pesticides, they use gasoline, they use all kinds of household products, and all of them tend to get into the environment and to add to the burden of the environment.

Tr. 3386–87.[314] The mining, however, apparently also uses, or used, gasoline or other fuels to conduct its blasting events, which may have resulted in the present contamination of the Aquifer with benzene.

Unfortunately, ... the history of South Florida ... [is that we need these 80–foot–deep pits there in the Lake Belt, because absent that no one's going to have the will to make a hard decision to protect wetlands] .... I think the risk is very substantial that if we were to stop all rock mining and let them sell off their land, and then we left it up to

311. It is peculiar, to say the least, that the Corps is grasping for as extensive an impact as possible with respect to the accessibility of mined rock when they have been consistently myopic throughout these proceedings regarding the environmental risks of this mining—telling the Court, for example, that this mining is proceeding in only a small, environmentally insignificant area of wetlands.

312. Further, the water storage aquifers which are the "Lakebelt-related components of the Comprehensive Everglades Restoration Plan ... are only conceptual at this point and require further environmental analysis." Declaration of Terrence "Rock" Salt, dated April 25, 2006, Exhibit 3, Docket No. 103.

313. A report issued by the Governor's Commission, of which Mr. Pettigrew was chair, evaluated the Corps' proposed C & SF Project Restudy. (See Sierra Club, 423 F.Supp.2d at 1292.) "In the design of the Lake Belt reservoir pilot project and detailed design of the components in the vicinity of the Northwest Wellfield, the Restudy shall consider the directive of the Florida Legislature that the Northwest Wellfield retain its designation as a

groundwater source of water supply. The change of designation could cost in excess of $260 million to the local government to modify the current treatment processes at the [water treatment plants]." Plaintiffs' Exh. 163 (Governor's Commission for a Sustainable South Florida, Restudy Plan Report, January 20, 1999).

314. Mr. Pettigrew admitted that the Governor's Commission never looked at the issue of benzene, nor at whether petroleum hydrocarbons were released as part of the blasting process associated with rock mining. Trans. 3405. Pettigrew acknowledges that "if there's some use of benzene or other volatiles of that nature [by the mining operations,] I think the Court should appropriately say no more." Trans. 3438–39. He later modified his statement as follows: "if there's benzene that's been detected in the production wells, if it's not being taken care of at the water treatment plant by the current aeration system, then that could be a problem and should be addressed." Trans. 3450.

locally elected public officials, we would have land use changes. Tr. 3414–15.[315] "I would rather have lakes with some improvements to make them more lake-like and the flexibility of storm-water treatment areas in related area[s] ... and to have the flexibility of future reservoirs as needed if [aquifer storage recovery] doesn't work." Tr. 3416.[316]

The Court also notes the expressed concern with the "public perception" and the fact that allowing the mining to continue under these permits will be a "benefit" to the public's perception of a cooperative effort to restore the Everglades. Mr. Pettigrew testified that he is:

concerned that a major dislocation [of the mining companies' activities] would undermine that support that was fundamental to getting the support of hte[the] business community, which was very important in dealing particularly with the State legislature and with the Congress, and I don't want to jeopardize that by seeming to depart from the support that had been developed by saying that, you know, the public/private partnership that was developed was wonderful in getting it passed, but now we're going to take it away.

Trans. 3398. He admitted, however, that the public "might not necessarily [be] unhappy with [a decision to stop the mining of the Lake Belt], except as to the consequences. They would be very upset about the increased prices and costs and the implications for the economy of the region." Tr. 3411 (Pettigrew). Mr. Pettigrew did not address the question of increased costs which already have been paid by the public for investigation of the benzene contamination incident, arguably caused by the mining activities, or the future costs related to necessary upgrades to the water treatment plants.[317]

Earlier this year a district court in West Virginia, where coal mining "has long been part of the fabric of Appalachian life, providing jobs to support workers and their families and energy to fuel the nation," issued an injunction against mining activities because the Corps had issued § 404

---

315. This Court is not willing to take such a dismal view of locally elected public officials.

316. Mr. Pettigrew was questioned about prior objections to these permits submitted by Everglades National Park regarding the potential effects of Lake Belt-related seepage and other risks to the resource (the Park). He testified that there is a distinction between the Superintendent (or "policy-level people") and "certain hydrologists ... who are often at variance in their views from those of the policy people." Trans. 3418. It appears that Mr. Pettigrew was unaware that the objection to these permits was raised not by a "certain hydrologist" but rather by the Park's Superintendent at the time, Maureen Finnerty. AR825, see also Plaintiffs' Exh. 71 Superintendent Finnerty's statement on behalf of the national resource, ENP, leaves no room for misinterpretation by the Corps:

We believe that mining closer than 2,000 feet to this conveyance [L–31N] canal will directly impact the hydrologic conditions in the adjacent marshes of Everglades National Park, and indirectly impact our ability to provide water to downstream agricultural areas, the eastern watersheds of the park, and existing and future wellfields that support the communities of south Miami–Dade. To our knowledge mining has never been permitted this close to a primary water supply conveyance canal, such as L–31N.... Mining within lands in the area between 1,000 and 2,000 feet of the L–31N canal should not be included within any permit.

AR825/Plaintiffs' Exh. 71.

317. Indeed, the shortfall between what the mitigation fee will collect from the mining industry, i.e., a total of $37.5 million if all of the mining was completed under these permits, and the anticipated costs of the upgrades, $97.9 million, at a minimum, appears to represent a much greater cost to the public than the costs which are anticipated to increase for the construction of the Tamiami Trail project, $13.75 million.

permits without first preparing an EIS. *Ohio Valley Envtl. Coalition v. United States Army Corps of Eng'rs*, 479 F.Supp.2d 607 (S.D.W.Va.2007) (note that an appeal has been filed). Judge Chambers elected to impose an injunction, and to rescind the permits, instead of only remanding, apparently because he found "fundamental deficiencies in the Corps' approach" and apparently also because he previously had remanded the permits (in response to the Corps' request for voluntary remand) but the Corps reissued the permits shortly thereafter with a supplemented administrative record. *Id.* at 617. "Congress mandated the Corps 'maintain the chemical, physical, and biological integrity of the Nation's waters,' which may require the Corps ultimately to deny the permits if the adverse impacts to the waters are significant." *Id.* The method of coal mining at issue involved the removal of rock on top of a mountain under which horizontal seams of coal are found. The removed rock is placed in adjacent valleys while the coal is extracted, then some of the rock is placed back on top of the mountain to achieve the "original contour" of the mountaintop, and the rest of the rock remains in the valleys, burying intermittent and perennial streams. *Id.* at 615. (citations omitted). The parallels between the two mining cases (the West Virginia case, and this case) are striking: the Corps had attempted to justify approval of the mining because of prior mining activities in the area, *id.* at 630–31,[318] the mining

activity leaves indelible imprints (whether as artificial lakes on top of a contaminated Aquifer or as reshaped mountain tops with blocked streams below), the natural resource at issue is important to the economy (coal, limestone), a group of companies were issued permits at one time (five coal mining companies, 615), the administrative records were extensive *id.* at 615, 626) ("it is not the amount of the Corps' efforts that is at issue here; rather, what matters is whether the results meet the proper standards." 626), projects were revised "at least in part to reduce the environmental concerns," *id.* at 626, and the Corps' mitigation plans were found to be flawed, *Id.* at 652. "The Corps argues that the context of this project, being in previously mined areas, weighs heavily in support if [sic] its conclusion. Clearly, mining activities already have disturbed a sizeable area of the watershed and caused unfortunate degradation of the streams. However, this fact does not provide a license to destroy more streams without assessing the cumulative impact of this additional destruction." *Id.* at 659.[319]

For many of the same reasons that Judge Chambers entered his ruling in West Virginia, this Court now enters its ruling here. The Court finds that the record in this case requires that these permits be set aside before any further destruction of the environment. In summary, the Corps' weighing of the "public interest" in continued mining resulted in a

318. "The Corps' staff clearly devoted substantial time and effort reviewing and considering the applications.... The staff obviously took the Corps' responsibilities seriously and endeavored to produce decisions that tracked the standards set in the statutes and regulations which the Corps is duty-bound to apply.... The Court's criticisms arise more from the practices and fundamental assumptions used by the Corps than from the expertise or diligence of the staff." p. 10 of that opinion

319. "While this is a laudable effect [an improvement in some of the water quality will result from the flooding of the valleys which will neutralize the acid from past mine drainage], the purpose of the valley fill is not to remedy harm caused by unregulated or poorly controlled past mining." P. 35, Fn 85. "Therefore, the Court, although sympathetic to the substantial economic benefits stressed by Intervenors, must ensure the Corps complied with the requirements of the CWA." p. 23 n. 50.

decision which is contrary to the statutory and regulatory guidance and, therefore by definition is contrary to the "public interest." Because the Corps' analysis of the "public interest" was so significantly flawed, this Court has determined that these permits must be set aside.

*Balancing the relationship between short-term uses of environment and maintenance and enhancement of long-term productivity*

For the same reasons detailed above, in the public interest review, the Corps' balancing of the short-term uses of the environment against the maintenance and enhancement of long-term productivity was flawed.

'NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula.' Nevertheless, 'an agency [must] search out, develop and follow procedures reasonably calculated to bring environmental factors to peer status with dollars and technology in their decisionmaking.'... However, every attempt to assign a dollar value to future effects of present actions necessarily involves prediction. Such opinion estimates can be most precise when the systems involved are simple. As they become more complex and interactive, the ability to forecast becomes more a guess and less a prediction.

*Sierra Club v. Morton,* 510 F.2d 813, 827 (5th Cir.1975) (citations and footnotes omitted).

## CONCLUSION

To summarize, the Court has determined that these permits must be set aside because the adverse environmental effects from these mining activities are not outweighed by the beneficial effects. In other words, keeping limestone products available for purchase from local producers and the collection of funds from mining companies to be used to acquire wetlands for restoration do not outweigh the risk of Wellfield contamination,[320] the destruction of wetlands including foraging habitat for the endangered wood stork (and the "take" of wood storks), and the potentially damaging seepage impacts which have yet to be fully studied. The Court's March 2006 decision on summary judgment was compelled by the record before it at that time, and the decision to set aside these permits is compelled by the record at present. The Corps simply has failed to abide by its governing regulations, and its failure to disclose the benzene contamination to the public, and to this Court, and to consider it fully is the most egregious example of these failures. The Corps' approval of this mining is contrary to the directives of NEPA, the CWA, and the ESA.

As previously noted, if the Corps had pursued the plan for the full fifty-years of mining, "the Court would have invalidated the permits and directed the Corps to deny the permits (rather than simply remanding the case for further study). Such a conclusion would have been required under NEPA (and the CWA) because of the significant adverse effects and the Corps' insufficient mitigation and other analyses." March 22, 2006 Order p. 106.[321]

---

320. Future mining activities also will generate funds to pay for a portion of the costly upgrades to water treatment facilities which would not be necessary but for the mining activities.

321. To some readers this decision may appear to raise issues of violations of principles of agency deference, judicial restraint, or, perhaps, even the doctrine of separation of powers. Those readers would be woefully mistaken. Any of these potential accusations against this Court would be a small price to pay for a clear conscience that I had faithfully executed my oath as a judicial officer by analyzing whether major federal agencies had done their very important jobs.

Nothing in the evidence presented to the Court subsequent to my earlier finding has changed my conclusion that these "bridging permits" are intended to survive much longer than ten years, and that—even as to the shorter term of ten years—the permits suffer from serious shortcomings.

To borrow a phrase from the Honorable Patricia Wald, formerly of the United States Court of Appeals for the District of Columbia Circuit, this Court has "taken a long while to come to a short conclusion:" these permits should not have issued.[322] And, the activities pursuant to these permits should not continue. These activities should not have been permitted in the first instance if the Corps had been conducting the level of analysis mandated by the CWA, ESA, NEPA, and APA, and the relevant regulatory guidance. The Corps has been blind to the lasting effects of the mining activities approved in these permits. At the hearings before this Court, the Corps took the narrow view of examining only those impacts from mining that will occur in the next few months, i.e., until the Corps publishes the SEIS. The evidence suggests that the Corps has already concluded that mining must proceed, no matter the cost to the environment—this predetermination of the issues is unacceptable, and ignores the harm already suffered in the past five years of activity which should never have been permitted in the first instance; some of those harms may very well be irreparable. The Corps' role as builder conflicted with its role as protector of the wetlands in this case.

322. Judge Wald was writing for the majority in *Sierra Club v. Costle,* 657 F.2d 298 (D.C.Cir.1981) (which included then-Judge, now Justice Ruth Bader Ginsburg), in a case which required the appellate court to determine whether the EPA had properly promulgated standards for the emission of sulfur dioxide by coal-burning power plants. Allegations by the plaintiffs included that the agency had engaged in improper ex parte contacts with representatives of the industry being regulated (including meetings with White House staff and the President, which had not been docketed in the EPA's rulemaking record) as well as a lack of authority under the Clean Air Act to issue the type of standards that it did. The appellate court ultimately rejected, in a comprehensive opinion, all of the plaintiffs' challenges to the rulemaking proceedings. The court held that if due process concerns are not implicated, and the docketing of such communication is not specifically required by statute, and if the communications do not contain information or data, they need not be docketed in the rulemaking record. The court's description of its burden in that case fits my impression of my own role in the present challenge to these permits which allow extensive blasting and destruction of wetlands in the name of accessing the limestone below.

We reach our decision after interminable record searching (and considerable soul searching). We have read the record with as hard a look as mortal judges can probably give its thousands of pages. We have adopted a simple and straight-forward standard of review, probed the agency's rationale, studied its references (and those of appellants), endeavored to understand them where they were intelligible (parts were simply impenetrable), and on close questions given the agency the benefit of the doubt out of deference for the terrible complexity of its job. We are not engineers, computer modelers, economists or statisticians, although many of the documents in this record require such expertise and more.

Cases like this highlight the critical responsibilities Congress has entrusted to the courts in proceedings of such length, complexity and disorder. Conflicting interests play fiercely for enormous stakes, advocates are prolific and agile, obfuscation runs high, common sense correspondingly low, the public interest is often obscured.

So in the end we can only make our best effort to understand, to see if the result makes sense, and to assure that nothing unlawful or irrational has taken place. In this case, we have taken a long while to come to a short conclusion: the rule is reasonable.

*Sierra Club v. Costle,* 657 F.2d 298, 312–314 (D.C.Cir.1981) (footnotes omitted).

This region's (and, indeed, this State's) ecosystems can sustain our growing population only if the federal government fulfills its responsibility for wise stewardship of non-renewable resources. Intervenors have cited this Court's own earlier ruling on the extension of Interstate–75 from Broward County to Miami–Dade County, *Florida Wildlife Fed'n v. Goldschmidt*, 506 F.Supp. 350, 353 (S.D.Fla.1981), in support of their claim that this Court should decline to impose any remedy for the Defendants' serious violations. It is ironic that Intervenors have selected this case for citation, particularly because it contains striking parallels to the present case—none of which support Intervenors' position. The citations selected by Intervenors are taken out of context and their import is exaggerated.[323] It is particularly surprising that Intervenors would direct this Court to that holding, as it contains the following clear statement: "Bearing in mind that these are not the dollars of a private ... corporation but those of the taxpayers and citizens which would be forever lost." *Id.* at 371. In the present case, the costs are again to be born by the taxpayers, not for the reasons urged by Defendants, but rather because the consumers of municipal drinking water in Miami–Dade County will be left with a substantial bill for upgrades to the water treatment plants which will *not* be fully paid for by the mitigation funds to be paid by the Intervenors.[324]

Indeed, this Court's decision in the *Goldschmidt* case, rendered less than four years after this Court began judicial service, provides an important counterpoint to the present case.[325] As stated earlier, this case presents the first time in three decades of judicial service that this Court is left with the impression that a federal agency has exhibited a disregard for its duty. Unlike in *Goldschmidt*, where this Court noted that it had "more than a little difficulty ascribing to Defendants [including the Corps at that time] such bad faith and utter disregard of duty," 506 F.Supp. at 370, as was alleged by those plaintiffs, in the present case the Court has found numerous examples of the Corps' failure to follow its own regulations, and perhaps an overall lack of appropriate interest in protecting the environment. To be clear, this is not a conclusion which sits comfortably with the Court; indeed, at this stage of my judicial career it is deeply disappointing to be faced with a situation where an agency has been subjected to overwhelming pressures to approve a questionably supported action.

The extraordinary assertions by the Defendants regarding a Hurricane Katrina-

---

**323.** The Court's decision in that case was not "because [a preliminary injunction] would both inflict harm on companies that had made substantial investments and reliance on permits and deprive 'residents and taxpayers not only their tax dollars but also of their access to safe, efficient means of both routine local travel and emergency evacuation,'" Docket No. 352, pp. 103–104, but rather was based on the plaintiffs' lack of success in establishing "the substantial threat of irreparable injury necessary to justify a preliminary injunction," *Goldschmidt*, 506 F.Supp. at 370; in light of such a failure of proof, the balancing of harms clearly weighed in favor of the federal defendants—direct spenders of the taxpayers' funds. *Id.* at 372–373.

**324.** Indeed, it is possible that the upgrades will not even have commenced before mining ceases in this area and, presumably, the corporations may refuse to pay any further fees, even though the upgrades are required because of these corporations' private, profitable, activities which already have occurred. And this is just one example of the lasting impacts from these improperly permitted mining activities.

**325.** One witness, William Pitt, whom the Court found credible then as well as today, and multiple similar issues such as water quality/Aquifer contamination, secondary development effects, sufficiency of the EIS, etc.

type impact and the Intervenors' predictions of a severe recession if this Court does anything to affect the future of mining—when added to the Defendants' and Intervenors' claims that this Court's actions will place restoration of the Everglades in jeopardy—effectively have masked the underlying facts of this case. The "economic" issues in this case are extremely important, but these are private companies who have operated since 2002 under these permits, and who should have taken account of the risk that some day their mining into the Aquifer and near the main Wellfield of Miami–Dade County might be prohibited.

Simply put, the decision to issue the severe remedy of vacating these permits while permitting the corporations to complete a brief period of mining[326] is one which the record compels. The Court finds that Defendants' record of making important decisions without mandatory public disclosure and participation, the Corps' stubborn determination to approve this mining regardless of the proven detrimental impacts of these activities so near a major municipal water source, and the inherent conflict in the two roles the Corps attempted to play throughout this process lead to a lack of confidence in this agency at this time. The Court has followed the environmental statutes, regulations, reported decisions in this area, and other relevant authorities in making this decision. As a nation, we must ever regard our natural resources as a trust to be used for the welfare of all humankind. As noted by Defendants' counsel,

> "Congress has entrusted [the Corps] with overseeing the costly restoration of the Everglades .... Congress has entrusted [FWS] with avoiding jeopardy to endangered species by consulting with federal agencies, such as the Corps of Engineers, and with taking other actions to try to recover endangered species, such as the wood stork. Congress has charged [the Corps and FWS] with acting in the public interest."

Tr. 7189–90. This Court's role is to examine the record and determine if the Defendants' have met their obligations to protect the environment for future generations.[327]

In summary, these permits must be set aside; however, the vacatur will be stayed until the SEIS is completed—except as to those locations which are in closest proximity to the production wells, as identified at pages 1246–47, above.

---

**326.** As noted above, the delay in effect of this Order is only to allow for some transition for the Intervenors' employees—beyond the fifteen months that already have passed since entry of this Court's Order in March 2006 and during which appropriate planning may have occurred.

**327.** In light of the extensive review which this Court has completed—a veritable "immersion" in the evidence—no motions for reconsideration or stay will be entertained, unless specific new factual information is presented. To be clear, the Court's decision is final and any motions to stay the effect of this Order beyond the stay incorporated herein as to certain mining activities at a distance from the Wellfield, will be denied.

# Appendix A

Note: Adapted from document "Exhibit 1-1 Aerial
View of the Northwest Wellfield's Watershed and
Protection Zones" provided by NRDC.

**Figure 3b** Travel-Time Distances Corresponding to the Current Demand of 150 MGD
Low Porosity-Thickness Case